1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK
     ---------------------------------------X
4    EARLINE SKATES,

5                        Plaintiff,

6            - against -

7    INCORPORATED VILLAGE OF FREEPORT,

8
                         Defendant.
9    ---------------------------------------X

10                   DEPOSITION OF VICTORIA DINIELLI, taken by

11   Plaintiff, pursuant to Notice, at the offices of

12   Henry Law Group, P.C. 1597 Grand Avenue, Baldwin,

13   New York, on Wednesday, January 4, 2017, commencing

14   at 1:15 p.m., before Chandra D. Brown, a Registered

15   Professional Reporter and Notary Public within and

16   for the State of New York.

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4              HENRY LAW GROUP, P.C.
                Attorneys for the Plaintiff
 5              1597 Grand Avenue
                Baldwin, NY 11510
 6              By: CHAUNCEY D. HENRY, ESQ.

 7

 8
                BEE READY FISHBEIN HATTER
 9              & DONOVAN, LLP
                Attorneys for the Defendant
10              170 Old Country Road
                Mineola, NY 11501
11              By: DEANNA D. PANICO, ESQ.

12    ALSO PRESENT:

13         Earline Skates

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2              IT IS HEREBY STIPULATED AND AGREED

3    by and between the attorneys for the respective

4    parties herein, that filing and sealing be and

5    the same are hereby waived.

6              IT IS FURTHER STIPULATED AND AGREED

7    that all objections, except as to the form of

8    the question, shall be reserved to the time of

9    the trial.

10             IT IS FURTHER STIPULATED AND AGREED

11   that the within deposition may be sworn to and

12   signed before any officer authorized to

13   administer an oath, with the same force and

14   effect as if signed and sworn to before the

15   Court.

16

17

18

19

20

21

22

23

24

25

1                          Proceedings

2              MR. HENRY:  The record reflects that we

3      are seated here in the middle of the

4      deposition.  Counsel showed up 30 minutes

5      late -- instructed --

6              MS. PANICO:  That's incorrect.

7              MR. HENRY:  -- 40 minutes late.  She

8      instructed her client, her witness to get up

9      from the deposition on the grounds that she

10     believes that the deposition cannot be

11     videotaped, which I've never heard of in --

12     I've never heard of this.  I've done dozens of

13     depositions and they are all videotaped.

14             Counsel now has, in my opinion, frustrated

15     this process and has prevented us from moving

16     forward.  We've been here on notice.  She's had

17     this deposition notice.  We provided her an

18     accommodation for her to get here and instead

19     she shows up 40 minutes late and instructs the

20     witness to leave the deposition.  At this

21     point, we're going to seek judicial

22     intervention and we will begin the record again

23     based upon the outcome of that.

24             (Whereupon, a short recess was taken.)

25             THE COURT:  On the record.

1                        Proceedings

2              So I understand from what I heard that

3         there is an issue as to whether or not there is

4         going to be a videographer at this deposition.

5              Is that right?

6              MR. HENRY:  Well, in part, Your Honor.

7         There's two parts.

8              THE COURT:  Did you notice the deposition

9         as being taken by a videographer?

10             MR. HENRY:  There is no videographer here,

11        Your Honor.  That's what I wanted to explain to

12        the Court initially.

13             The issue here, Judge, this video -- and

14        I'm looking for the precedent now, which I have

15        but my server is acting up -- this is a video

16        that's produced by our office for my purposes.

17        This is a work product.  And the precedence in

18        this area, based off of what I've done, and

19        I've dozens of depositions this way, I'm able

20        to keep this for my own usage, which doesn't

21        require any notice because it's not a part --

22        I'm not using it in terms of this litigation.

23        In the event that I do, however, I would,

24        obviously, have to go through the motions and

25        produce that.  But this is entirely for my own

1                          Proceedings

2           purposes.  It's no different than me placing a

3           tape recorder here and recording it.

4                As an attorney, I need to be able to

5           understand and evaluate and analyze this

6           witness' responses to my question.  This

7           deposition is being recorded by stenographic

8           means but I need it.  This is what I need.

9           This is a tool of my trade that I've used in

10          trials that I've done in the Eastern District,

11          and also that I've used in other depositions

12          that I've had.

13               We don't have a videographer here that's

14          videotaping this, that's going to produce this

15          as a certified representation of this.  This is

16          me -- our office activating a video for my

17          usage so that I can prepare and get ready for

18          trial in this case, Your Honor.

19               Again, I'm bringing up the case that I

20          have.  I'm just having some issues.  But this

21          is a case that I've looked into before.  That's

22          how I even learned that I was able to do it,

23          because of the case.  So that's our position.

24               And to have counsel get up before we even

25          make a record of our respective positions and

1                          Proceedings

2          instruct the witness not to even be sworn in,

3          and then to storm out of my office and then

4          tell the witness that she doesn't have to be

5          here, right, to then also having us wait while

6          we call the Court, you know, that to me is no

7          justification whatsoever for this.  If there's

8          a dispute, she has a legitimate concern that

9          the video was there, then we raise it like

10         professionals and we make or record and we call

11         the Court as I did.  To me, I've never seen

12         that before.  I've never seen that.

13              MS. PANICO:  Good afternoon, Your Honor.

14              If I may just address what Mr. Henry said.

15         The reason that I needed to leave the office

16         was because I needed to make a phone call to my

17         office to find out whether or not the Notice of

18         Deposition that Mr. Henry sent to my office,

19         whether or not it indicated whether or not the

20         deposition was going to be recorded by

21         stenographic means or audio visual.

22              Mr. Henry made the misrepresentation to me

23         while we were sitting here that his notice

24         indicated that --

25              MR. HENRY:  I did not say that.  That's

1                         Proceedings

2          why we have the video recording.  I'll play it

3          back.  I did not tell you that.

4               MS. PANICO:  Mr. Henry had indicated that

5          the Notice of Deposition indicated that it was

6          supposed to be recorded by stenographic and

7          audio visual means.  I asked him to produce a

8          copy of the Notice of Deposition to me, which

9          he refused to do.

10              MR. HENRY:  That's not true.  I did not

11         give -- if you're going to tell the truth, tell

12         the truth.  I did not give you a copy.

13              MS. PANICO:  I didn't interrupt you,

14         Mr. Henry.

15              THE COURT:  Counsel, stop.

16              One question.  The Notice of Deposition,

17         did it mention videographer at all?

18              MR. HENRY:  No, Your Honor, it did not.

19              THE COURT:  Okay.

20              In that case, the ruling is this:  The

21         deposition will go forward by stenographic

22         means.  There will be no videotaping of the

23         deposition.

24              Get on with it.

25              MR. HENRY:  Your Honor, may I respond?

1                         Proceedings

2          THE COURT:  You've already responded.

3     Thank you.

4          MR. HENRY:  Well, I mean, at this point,

5     I'm going to have to make an application,

6     Judge.

7          THE COURT:  Do what you want to do.

8          MR. HENRY:  I'm asking you.  I mean, in

9     light of the Court's ruling, I'm going to have

10     to make an application pursuant to Rule 60.

11     And also with respect to the motion for the

12     deposition.  I mean, we'll -- there's no way

13     for me to move forward without the judge ruling

14     on that application because, again, I have the

15     case law that I'm looking up now that would

16     provide the Court with clarity as to the

17     purpose of this.  And for the Court to issue a

18     decision without that, I think is tough.

19          THE COURT:  You're saying you have a case

20     law, but you don't have it.  I don't know what

21     you're talking about.

22          Here's what I'll do.  Why don't we take 15

23     minutes and see if you could find a case for me

24     and I'll hear back from you in 15 minutes.

25          MR. HENRY:  Thank you, Judge.

1                         Proceedings

2              MS. PANICO:  Your Honor, if I may, I

3    didn't have the opportunity to brief this

4    matter and to look up cases prior to today

5    because Mr. Henry didn't provide me with prior

6    notice.

7              THE COURT:  I understand that.

8              MS. PANICO:  I'm also at Mr. Henry's

9    office.  So I --

10             THE COURT:  I get it.  I understand all of

11   that, but I'll hear from you in 15 minutes.

12             MR. HENRY:  Thank you, Judge.

13             (Whereupon, a short recess was taken.)

14             MR. HENRY:  On the record.

15             Let the record reflect that we just had a

16   substantive discussion with the Court.  I

17   agreed that I would not be recording this

18   deposition.  I agreed that our office will not

19   record this deposition at this point in time.

20             Furthermore, during the discussion that we

21   had with the Court, I made it clear that the

22   parties agreed to stipulate to the continuation

23   of depositions that were noticed months ago

24   outside of the discovery period, and if there's

25   any issue with respect to any -- the recording

1                         Proceedings

2            of those depositions at a later date, then we

3            can cross that bridge and raise our objections

4            when we get there.

5                 As of today, the Court gave me my options,

6            either to proceed without recording or set a

7            briefing schedule.  I am proceeding without

8            recording.

9                 Counsel wants me to turn off our

10           conference room computers.  I am not doing

11           that.  I'm making a representation to her that

12           the recording -- that it's not recording.  I

13           mean, I don't know what else she wants me to

14           say.  When she stormed up and went out of

15           conference room, there's a button here that was

16           pressed to stop it because she left.  Now when

17           she came back, it was not reactivated.

18                Counsel may refer to certain conversations

19           that we had in the beginning, yes, those

20           conversations were picked up because we were

21           getting ready to swear this witness in before

22           the attorney asked the witness to leave and

23           before she herself left.

24                So we don't see any issues here.  The

25           recording is off.  We're not recording it and

1                         Proceedings

2          we'll move forward.

3               And the time now is 2:45.

4               MS. PANICO:  If I may, the audio recording

5          device is still on.

6               MR. HENRY:  It's not on.  This is a

7          conference room camera.  This is a conference

8          room.

9               MS. PANICO:  Mr. Henry, I didn't interrupt

10         you.

11              MR. HENRY:  It's a power -- I'm telling

12         you what it is.  This is my office and this

13         light is the power light on this particular

14         device that's connected to this.

15              MS. PANICO:  It may be your office but I

16         have a right to make a record.

17              MR. HENRY:  Make a record but we got to

18         go.  It's not recording.  I made that

19         representation to you.

20              MS. PANICO:  You continue to interrupt me

21         while I'm trying to make my own record --

22              MR. HENRY:  Go ahead.

23              MS. PANICO:  -- which is that the audio

24         recording device which Mr. Henry has agreed not

25         to use is still on.  There's a blue light on

1                          Proceedings

2          and it's directly pointing at the witness.

3          I've asked Mr. Henry to turn it off.

4               MR. HENRY:  It is off.

5               MS. PANICO:  He has refused to do so.

6               MR. HENRY:  The recording is off.  I'm

7          making a representation to you it is off.  You

8          want me to it shut down my computer.  I'm not.

9               MS. PANICO:  I want you to answer whether

10         or not there's a power button on the --

11              MR. HENRY:  It is not being recorded.  My

12         representation to you is that it is not being

13         recorded.  You cannot direct me how my IT works

14         and what to shut down.  It's not recording.

15              MS. PANICO:  If it has a power button --

16              MR. HENRY:  There is no power button.

17              MS. PANICO:  I've asked you several times

18         and you haven't told me that.

19              MR. HENRY:  Can we please bring the

20         witness in.

21              There is no power button on it.  What are

22         you doing?  There's no power button on it.  Why

23         would I tell you -- there's no power button on

24         it.

25              MS. PANICO:  There's no way this could

1                          Proceedings

2        just be unplugged?

3              MR. HENRY:  No.  It's not recording.

4              MS. PANICO:  So why don't we point it at

5        you then?

6              MR. HENRY:  No.  We leave it alone.  It's

7        not recording.

8              MS. PANICO:  Then don't point it at my

9        witness.

10             MR. HENRY:  Anyway, can you please bring

11       the witness in.  It's not recording.

12             MS. PANICO:  If you don't agree --

13             MR. HENRY:  I'm going to call the Court.

14             Are you not bringing her in?

15             I represented to you now six times on the

16       record --

17             MS. PANICO:  It's clearly on.

18             MR. HENRY:  But it's not recording.

19             MS. PANICO:  Why don't you just point it

20       at yourself then.

21             MR. HENRY:  It's not recording.

22             MS. PANICO:  You want to call the Court,

23       then call the Court again.

24             MR. HENRY:  I'm not.  It's not recording.

25             MS. PANICO:  I don't care.  Call the Court

1                    V. Dinielli - 1/4/17

2           again.  It's clearly still on.  You're not

3           agreeing to turn it the other way.

4                    MR. HENRY:  Okay.  Whatever you say.

5                    (Whereupon, a short recess was taken.)

6   V I C T O R I A   D I N I E L L I, called as a

7           witness, having been first duly sworn by a

8           Notary Public of the State of New York, was

9           examined and testified as follows:

10  EXAMINATION BY

11  MR. HENRY:

12          Q    Ms. Dinielli, please state your full name.

13          A    Victoria Dinielli.

14          Q    And your current address, please.

15          A    50 Dartmouth Street, Rockville Centre.

16          Q    And what is your educational background?

17          A    Four years college.

18          Q    All right.

19               Can you provide me a little bit of details

20          about that, please?

21          A    I just have four years.  I don't have a

22          diploma.

23          Q    Four years.  Do you have an actual degree

24          from that college?

25          A    No, I don't.

1                     V. Dinielli - 1/4/17

2      Q      And what college did you attend?  What

3      were the years?

4      A      St. John's University, '77 to '81.

5      Q      Okay.

6             And what was the degree program that you

7      were pursuing?

8             MS. PANICO:  Objection to form.

9      Q      You may answer.

10            MS. PANICO:  You can answer, if you

11     understand.

12     A      Could you repeat the question, please?

13            MR. HENRY:  May I have a readback, please.

14            (Whereupon, the requested record was read

15     back by the Court Reporter.)

16     A      I believe it was a bachelor's of science.

17     Q      Okay.

18            And what year was that, what year of

19     attendance?

20     A      '77 to '81.

21     Q      Okay.

22            And I know I jumped right into it, but I

23     wanted to just lay a little bit of ground

24     rules.

25            Have you ever been in a deposition before?

1                    V. Dinielli - 1/4/17

2        A     I don't believe so.

3        Q     Have you ever been in a room where you

4        were asked questions where there was a Court

5        Reporter?

6        A     I have been in a deposition before, yes.

7              MS. PANICO:  Just let him finish the

8        question before you answer.

9              THE WITNESS:  I'm sorry.

10   BY MR. HENRY:

11       Q     So your testimony is that you were in a

12       deposition before?

13       A     Yes, I believe so.

14       Q     You testified a few moments ago that you

15       didn't believe that you were in a deposition

16       before.

17       A     I was -- you know, it's a lot of years.

18       Q     Do you usually give inaccurate testimony

19       under oath?

20             MS. PANICO:  Objection to form.

21       Q     You can answer my question.

22       A     Yes.

23       Q     You usually give inaccurate information?

24       A     I thought you said "an accurate."

25             No.

1                   V. Dinielli - 1/4/17

2        Q    Is there a particular reason why you said

3    you hadn't been at a deposition before although

4    you had?

5             MS. PANICO:  Objection to form.

6             MR. HENRY:  Counsel, speaking

7    objections -- your objections are noted, but

8    speaking objections, there's no need for it.

9        Q    During the course of this deposition, you

10   may hear your attorney say -- note objections.

11   At no point in time should you not answer my

12   question unless your attorney instructs you

13   specifically not to answer my question.

14            Do you understand?

15       A    Yes.

16       Q    Okay.

17            So with respect to the question that I

18   asked you as to whether or not you've been in

19   depositions before, the first response you gave

20   was an inaccurate one; isn't that right?

21            MS. PANICO:  Objection to form.

22       Q    Isn't that right?

23       A    The first a response was inaccurate.

24       Q    So do you usually give inaccurate

25   responses after taking an oath?

1                    V. Dinielli - 1/4/17

2         MS. PANICO:  Objection to form.

3    A    I corrected myself and after thinking

4    about it.  I believe I was in a deposition

5    before.

6    Q    Okay.

7         MS. PANICO:  Let me just take a break with

8    my client.

9         MR. HENRY:  I'm sorry.  One moment.  No.

10   There's open questions, number one.

11        MS. PANICO:  There is no pending question.

12        MR. HENRY:  There's no break.  How could

13   you take a break with your client?  We're in

14   the middle of a deposition.

15        MS. PANICO:  Doesn't matter.

16        MR. HENRY:  Let record reflect that

17   counsel now is standing up and instructing her

18   client to, I guess, leave the conference room

19   while I'm in the middle of my questioning.  I'm

20   going to have no choice at this point but to

21   call the Court.

22        MS. PANICO:  We're taking a break.

23        MR. HENRY:  We're not taking a break.

24   We're on the record now.  We just started.

25   We've only been on the record not even four

1                    V. Dinielli - 1/4/17

2          minutes.  I'm going to call the Court.

3               MS. PANICO:  Fine.  I'm trying to clarify

4          your record to make it clear for you.

5               MR. HENRY:  You can't coach her.

6               MS. PANICO:  Go ahead then.  I'm not going

7          to bother the Court again.

8               MR. HENRY:  Let the record reflect that

9          within the first four minutes of this

10         deposition counsel wanted to take a break, I

11         guess to go out and give her client some

12         instruction on how to answer my questions.

13              MS. PANICO:  I object to Mr. Henry's

14         misrepresentation as to whether or not I was

15         going to coach my client or not coach my

16         client.  I ask that he keep his opinions and

17         personal beliefs to himself rather than

18         disrupting and destroying the record with what

19         he believes and what he doesn't believe.

20              MR. HENRY:  May we move forward now,

21         please.

22    BY MR. HENRY:

23         Q    So with respect to this deposition, the

24         deposition that you were in before, can you

25         describe the nature of that deposition?

V. Dinielli - 1/4/17

1

2     A     I don't recall.  I don't recall.

3     Q     How many times were you in a deposition?

4     A     I'm not sure.

5     Q     Well, when was the last time you were in a

6     deposition?

7     A     I don't even know if it was a deposition.

8     I'm not --

9     Q     Let the record reflect that you've now

10    within a matter of five minutes given three

11    different versions.

12          MS. PANICO:  Objection to Mr. Henry's

13    misrepresentation.

14    Q     You said that you weren't in one, then you

15    said that you were in one, and now you're

16    saying --

17          MS. PANICO:  Objection to Mr. Henry's

18    misrepresentation of Ms. Dinielli's testimony.

19    A     I'm not sure I was --

20    Q     Did you testify earlier that you didn't --

21    you don't know if -- you were not in a

22    deposition before?

23    A     I may or may not have been.  I'm not quite

24    sure.

25    Q     I see.

1                    V. Dinielli - 1/4/17

2              Then you testified again that you were in

3     a deposition, right?

4     A     I'm not sure if I was.

5     Q     And then you testified just a few moments

6     ago that you are now not sure if you even were

7     in a deposition, right?

8              MS. PANICO:   Objection to Mr. Henry's

9     representations of what my client testified to.

10    Q     What's your current occupation?

11    A     I'm the manager of the Freeport Recreation

12    Center.

13    Q     How long have you been in that position?

14    A     Seven years.

15    Q     And what was your title before that?

16    A     I was a manager of a private company.

17    Q     So is the course of your employment with

18    Freeport limited to those seven years that you

19    served as a manager?

20    A     Yes.

21    Q     What was the private company that you were

22    with prior to --

23    A     Sportime in Lynbrook.

24    Q     Okay.

25              Is that the only position that you

1                    V. Dinielli - 1/4/17

2          maintained while employed at Freeport?

3          A     Yes.

4          Q     And what are some of your responsibilities

5          in that position?

6          A     I manage the facility.  I manage the

7          people.  I run the programs; rent the space;

8          make sure the facility is clean and maintained;

9          and I bring new programs and activate new -- I

10         activate new programs.

11         Q     Has your responsibilities been the same

12         over the course of this -- of that time in

13         Freeport or have they changed?

14         A     The same.

15         Q     Are you under the influence of any

16         medication or any other substance at this point

17         that may affect your ability to tell the truth

18         here?

19         A     No.

20         Q     Do you have any problems recalling or

21         remembering events?

22               How would you say your memory is?

23         A     Average.

24         Q     What would you define as "average"?

25         A     I could forget things.  That's possible.

1                    V. Dinielli - 1/4/17

2        Q      How often do you forget things?

3        A      Not very often.

4        Q      So for the most part, you recall and

5    remember everything?

6               MS. PANICO:  Objection to form.

7        Q      That's right?

8        A      I remember today.  I remember yesterday.

9    I may or may not remember time past.

10       Q      Do you know why you're here today?

11       A      Yes, I do.

12       Q      And why is that?

13       A      Ms. Skates has a lawsuit with the Village.

14       Q      What do you understand about that lawsuit

15   with the Village?

16       A      I understand that Ms. Skates was -- she

17   was in my employment.  She was terminated and

18   she is fighting that.

19       Q      Why are you here?

20       A      I was her manager.

21       Q      How did you learn of today?

22       A      I was contacted by our legal counsel.

23       Q      And had there ever been any requests made

24   upon you to appear for a deposition any time?

25       A      I don't understand the question.

V. Dinielli - 1/4/17

2    Q    Were you ever advised, prior to today,

3    that you would be required to be here to be

4    deposed?

5    A    Prior to today?

6    Q    Yes.

7    A    No.

8    Q    When was the first time you learned that

9    you needed to be here to be deposed today?

10   A    We had a schedule of about -- maybe about

11   a month ago and then it was -- the date was

12   changed to today.

13   Q    And prior to that date change from a month

14   ago, were you ever provided with any dates with

15   any other earlier dates?

16   A    Yes.

17   Q    Okay.

18        Were there any reasons why you didn't

19   appear for those dates?

20        MS. PANICO:  Can you specify the dates?

21   Q    You may answer.

22   A    I don't know what the reasons are.

23   Q    Was there ever any reason that you

24   provided why you were unavailable for any of

25   the previous dates?

1                    V. Dinielli - 1/4/17

2      A    No.  No.

3      Q    So how did you learn that those previous

4      dates were cancelled?

5           MS. PANICO:  Objection to form.

6      Q    You may answer.

7      A    I got a phone call last week asking if I

8      could come today.  I said, yes.

9      Q    Prior to today for the deposition that

10     were -- the dates that you were given, that you

11     testified that you had earlier, did you ever --

12     A    No.

13     Q    -- cancel?

14          MS. PANICO:  Objection to form.

15     A    No.  No.

16     Q    The decision to cancel or not appear for

17     those depositions, was that your decision?

18     A    No.

19          MS. PANICO:  Objection to form.

20          MR. HENRY:  Your objection is noted,

21     Counsel.

22          Let the record reflect that, again, just

23     reminding you that frequent objections are

24     perceived and can be perceived as oppressive.

25     I would kindly ask that you limit your

1                    V. Dinielli - 1/4/17

2      objections to those that are meaningful.

3           MS. PANICO:  I'm going to continue to

4      object until you specify what dates you're

5      referring to because it's confusing to my

6      client.

7           MR. HENRY:  The speaking objections --

8           MS. PANICO:  I'm allowed to make a record,

9      Mr. Henry.

10          MR. HENRY:  I'm going to call the Court.

11     I'm calling the Court.  I'm not going to have

12     the speaking objections.  This is not your

13     deposition.

14          (Whereupon, a short recess was taken.)

15          MR. HENRY:  Back on the record.

16          We had a discussion with the Court.  Each

17     side raised their respective concerns.  From

18     what I drew from the Court or the clerk from

19     the Court's instruction was that Counsel does

20     have the right to make objections and that

21     those objections should be based on reasonable

22     grounds, from my interpretation of it.

23          With that said, we are going to be moving

24     forward with the deposition.

25          MS. PANICO:  Just for the record, that is

1                    V. Dinielli - 1/4/17

2          Mr. Henry's interpretation of the court

3          conference.  I don't think it's necessary to

4          put my beliefs on the record.

5                  Let's just move forward.

6                  MR. HENRY:  Okay.

7     BY MR. HENRY:

8          Q    So with respect to -- with respect to the

9          reason why you're here today, were you provided

10         with any documents to review?

11         A    No.

12         Q    Did you review any documents before coming

13         here?

14         A    I reviewed my own notes.

15         Q    When you say your own notes, what do you

16         mean you reviewed your own notes?

17         A    I had a file at the time.

18         Q    Were those notes provided to your

19         attorney?

20         A    Yes, they were back when.

21         Q    Can you recall when?

22         A    No.

23         Q    When you say -- I'm sorry?

24         A    No.  Go ahead.

25         Q    You can finish.

1                    V. Dinielli - 1/4/17

2       A     No.  Go ahead.

3       Q     When you say your file, were these

4       handwritten notes?

5       A     Memos that were written.

6       Q     When you say "memos," were they

7       handwritten memos or were they typed up memos?

8       A     Typed memos.

9       Q     Okay.

10            Were all of those -- are those maintained

11      in your private file or are those maintained

12      elsewhere?

13            MS. PANICO:  Objection to form.

14      A     They were in my private file and I submit

15      then I gave copies to our Village legal

16      counsel.

17      Q     And your Village legal counsel, who was

18      that?

19      A     Howard Colton.

20      Q     And when you say you gave copies to your

21      counsel, how many pages were they, if you can

22      recall?

23      A     Give or take 20.

24      Q     You said you looked at those today?

25      A     Yes.  I did look at them this morning

V. Dinielli - 1/4/17

2      before I left the house.

3           MR. HENRY:  At this time, I would like to

4      call for the production of those documents and

5      those records that the witness has testified

6      that she looked at today.

7           In light of the limited discovery

8      schedule, Counsel, and the ease of accessing

9      those records in that the witness testified she

10     reviewed them today, would you have any

11     objection in getting those to me sooner than

12     later?

13          MS. PANICO:  Those records have already

14     been produced.

15          MR. HENRY:  Well, I'm not sure if they

16     have and I'm not sure if they are the same ones

17     because, as this witness just testified, those

18     records that she reviewed were records that

19     were, in part, in her own file that she

20     maintained and elsewhere, as she testified.

21     And she also testified that she provided those

22     records to someone other than you.

23          So again, just to avoid any confusion, I

24     know there were some initial productions made

25     that contained the contents of Ms. Skates'

1          V. Dinielli - 1/4/17

2          file.  I believe that our demand is limited to

3          those records that this witness testified she

4          looked at today, which may include records that

5          are in her own file, as she just testified to.

6               So my question again is:  Would you have

7          any objection with getting those to us in a

8          relatively expedient matter?

9               MS. PANICO:  I am not the individual who

10         is being deposed here today; however, I will

11         answer you the same way that I did previously,

12         which is that those records have already been

13         produced.

14              MR. HENRY:  Okay.

15              So my question is:  Will you, as you

16         represent this witness here, and we're making

17         that demand upon you as her counsel, how soon

18         do you think you can get the documents that

19         this witness claims she reviewed today?

20              MS. PANICO:  Clearly you're not

21         understanding my prior response.  Those records

22         have already been produced.

23              MR. HENRY:  Well, how would you know that

24         if she said she looked at them today and gave

25         them to someone other than you?

                          V. Dinielli - 1/4/17

 2          MS. PANICO:  Because I already spoke --

 3     again, I'm not the witness here.  If you want

 4     to ask Ms. Dinielli --

 5          MR. HENRY:  We're making a document --

 6          (Counsel speaking simultaneously.)

 7          MS. PANICO:  I'm telling you that I've

 8     already produced the records.  Period.

 9          MR. HENRY:  Let the record reflect Counsel

10     is raising her voice and grasping our table,

11     conference room table.  But we're going to move

12     forward, nevertheless.

13          MS. PANICO:  Let the record reflect that I

14     am not raising my voice and I am not -- what

15     was the word that you used?  Rasping.  Rasping

16     on the conference room table.

17          MR. HENRY:  Grasping.

18          MS. PANICO:  Grasping.

19     BY MR. HENRY:

20     Q    Can you describe your first interaction

21     with Ms. Skates?

22     A    Human Resources sent her over to our

23     department and I was told that she would be

24     working in our department.

25     Q    When you say "Human Resources sent her

1              V. Dinielli - 1/4/17

2        over," do you have a particular person within

3        Human Resources that sent her over?

4        A      Conor Kiran.  He's the executive

5        director.

6        Q      When was she sent over to your department?

7        A      I believe it was April 2013.

8        Q      And was she sent from a prior from -- a

9        previous department, from another department?

10       A      I believe so.

11       Q      What department was that?

12       A      I believe it was the assessor's office.

13       Q      So why was she transferred to your

14       department?

15       A      That wasn't my -- I don't know.

16       Q      What was her prior position?

17       A      I don't know.

18       Q      But you knew that it was within the

19       assessor's office; isn't that right?

20       A      That's what I heard.

21       Q      Now, was her transfer to you considered a

22       promotion?

23       A      No.

24       Q      What was it considered?

25       A      I don't know.  I don't work in Human

1                    V. Dinielli - 1/4/17

2        Resources.

3        Q     Would you consider it a demotion?

4        A     I don't know what her duties were in the

5        other department.  I wasn't involved in that

6        conversation.

7        Q     So who was -- well, withdrawn.

8              What year was that?

9        A     2013.

10       Q     And you said that Conor --

11       A     Conor Kiran.

12       Q     Can you spell his name, please?

13       A     C-O-N-O-R.  K-I-R-A-N.

14       Q     What's his title?

15       A     He's the director of Human Resources.

16       Q     So would you consider the transfer to

17       the -- the transfer from the assessor's office

18       to the -- you said you were in the

19       recreation --

20       A     Department of Recreation.

21       Q     Would you consider that to be a promotion?

22             MS. PANICO:  Objection.  Asked and

23       answered.

24       Q     You may answer.

25       A     Not my --

1                    V. Dinielli - 1/4/17

2              MR. HENRY:  I would request that, if

3         counsel could -- if you want to note your

4         objection, that's fine.  But as far as the

5         adding my appendage to it, I would,

6         respectfully, request that you not do so.

7              MS. PANICO:  I'm actually required to

8         state the reason for my objection.

9              MR. HENRY:  Although I understand you're

10        preserving your rights, I would just ask that

11        you limit the speaking components of the

12        objection because it makes it difficult for me

13        to continue my line of questioning.

14             MS. PANICO:  That's exactly why I just

15        asked the Court to make clear for you because

16        clearly you had that misunderstanding, that me

17        saying "objection, asked and answered" or me

18        saying "objection to form," that's not a

19        speaking objection.  I'm actually required to

20        do that under the Federal Rules to preserve the

21        objection.  So I will continue to do that.

22             MR. HENRY:  And I will continue to make my

23        record.

24   BY MR. HENRY:

25        Q    So what year was it that you began with

1                    V. Dinielli - 1/4/17

2        Ms. Skates?

3        A    2013.

4        Q    Do you recall the month?

5             MS. PANICO:  Objection.  Asked and

6        answered.

7        Q    Have I asked you what month?

8        A    Yes.

9        Q    What month was that?

10       A    April.

11       Q    My apologies if I did.  Counsel's

12       objections are throwing me off my outline.

13            Do you recall what Ms. Skates' position

14       was when she began in the recreation

15       department?

16       A    He was a rec attendant.  That's a civil

17       service title.

18       Q    You were her direct manager; is that

19       right?

20       A    I'm the manager of the facility.

21       Q    As part of her position as a rec

22       attendant, what were some of her

23       responsibilities?

24       A    Rec attendant is a very broad title.  It

25       encompasses the whole facility.  Maintenance,

1                    V. Dinielli - 1/4/17

2       activities, housekeeping, setup, breakdown.

3       All of our daily activities.

4       Q     And that would be a demoted position for

5       someone who was previously in the assessor's

6       office?

7            MS. PANICO:  Objection.  Asked and

8       answered.

9       A     I don't know what her title or I don't

10      know what she was doing in the assessor's

11      office.

12      Q     Do people generally request transfers from

13      the assessor's office to the recreational

14      department?

15           MS. PANICO:  Objection.  Calls for

16      speculation.

17      A     I never -- not while I was there.  I don't

18      know of any.

19      Q     Would you yourself have requested --

20      withdrawn.

21           Did there ever come a time that -- what

22      type of training did you receive prior to

23      becoming the supervisor of this department, of

24      the recreational department?

25      A     I was a manager of a similar facility for

1                    V. Dinielli - 1/4/17

2          20 years.

3          Q      What facility was that?

4          A      Sportime in Lynbrook.

5          Q      Why did your employment there end?

6          A      I was offered this position.

7          Q      So your testimony here today is that you

8          only left Sportime in Lynbrook because of the

9          opportunity in Freeport?

10         A      Yes.

11         Q      Okay.

12                Did you have to submit a resume or a job

13         application as part of this --

14         A      Yes.

15         Q      -- part of the application process in

16         Freeport?

17         A      Yes.

18                MR. HENRY:  At this time, I would like to

19         call for the production of this witness' job

20         application with Freeport.

21    BY MR. HENRY:

22         Q      You said you've been with them about seven

23         years?

24         A      Yes.

25         Q      So would that have been in 2010 or '09?

1                   V. Dinielli - 1/4/17


2        A    Yes.

3             MR. HENRY:  Counsel, in light of the

4        limited discovery schedule and our forthcoming

5        stipulation to depose the remaining witnesses,

6        would you be able to provide me, I guess, a

7        timeline or an approximation or agree to

8        provide me with a copy of this witness' job

9        application?

10            MS. PANICO:  I'm going to ask that you

11       follow up in writing and I'll respond to you

12       then.

13            MR. HENRY:  Well, the rules -- I'll cite

14       the rules for you that we are able to make

15       document requests during the course of the

16       deposition.  And those document requests, I

17       believe, will be treated or should be treated

18       as rules -- I'm sorry -- as demands that are

19       made during the course of a deposition.  I'll

20       give you the rule now.  I'll put it on the

21       record.  And I'll also ask that the Court

22       Reporter annex in the rear of this deposition

23       transcript document requests and label this one

24       Number 2.  And as far as the first document

25       request, we can have that a Number 1.

1              V. Dinielli - 1/4/17

2              Counsel, will you like me to read that

3       rule into the record for you?

4              MS. PANICO:  I don't need you to read the

5       rule into the record.  No.  Thank you.

6              MR. HENRY:  So my question again is:  Do

7       you think that, in light of the limited

8       discovery period, that you may be able to get

9       that to me?  Or when do you reasonably think

10      that you would be able to get it to me?

11             MS. PANICO:  Again, I'm asking that you

12      follow up in writing and I'll respond to you

13      appropriately then.

14             MR. HENRY:  I just want to go ahead and

15      just note this for the record, then, just so

16      that the record is clear.

17             So there's two parts to it, but in sum and

18      substance, rule -- Federal Rule Civil Procedure

19      30 provides that requests may be made for

20      documents.  And then there's another rule here

21      which is Rule 34, which also provides that we

22      are able to make these requests for the

23      production of documents; also provides that

24      Counsel should respond within the time provided

25      under that rule, which, I believe, is 30 days.

1                    V. Dinielli - 1/4/17

2              So my question to Counsel was:  In light

3         of the limited discovery period in the

4         forthcoming stipulation, would counsel agree to

5         produce those documents in a shortened period

6         than the 30 days that the rules permit?

7              MS. PANICO:  Are you asking me again for

8         the third time?

9              MR. HENRY:  Yeah.  I'm asking if you would

10        be willing to -- the rules allow that you're

11        able to provide a response to that request

12        within 30 days.

13             My question to you is:  In light of

14        forthcoming close of discovery and our

15        stipulation, would you be willing to -- would

16        you be amenable to getting me the -- any

17        documents requested during this deposition in a

18        shortened period than the rules provides?

19             MS. PANICO:  No.  Not at this time.

20             MR. HENRY:  So you'll get it to me within

21        the time frame that the rule provides?

22             MS. PANICO:  I will respond to your

23        request within the time period, yes.  That

24        doesn't necessarily mean that I'm producing it.

25             MR. HENRY:  Okay.  We would just ask that

1                    V. Dinielli - 1/4/17

2          a privilege log accompany any objection that

3          you feel that you're grounded in.

4     BY MR. HENRY:

5          Q    As part of your position as the supervisor

6          of the rec department in Freeport, did you ever

7          receive any training from Freeport in -- with

8          regards to the Family Medical Leave Act?

9          A    No.

10         Q    Were you ever provided with any training

11         as it relates to the Americans with

12         Disabilities Act?

13         A    No.

14         Q    Were you ever provided with any training

15         whatsoever?

16         A    No.

17              MR. HENRY:  At this time, though we've had

18         a number of discussions pertaining to

19         defendant's deficiencies, we had requested from

20         defendant its policies including FMLA policies,

21         all policies in Document Request No. 15,

22         Document Request No. 20, and as of date, those

23         have not been produced.  So we will be making

24         the necessary application as it relates to

25         those documents unless Counsel -- unless

1                    V. Dinielli - 1/4/17

2          Counsel can advise as to when she may get us

3          those documents.

4                MS. PANICO:  Mr. Henry's misrepresentation

5          or Mr. Henry's representation regarding whether

6          or not those records have or have not been

7          produced is inaccurate.  The Village's FMLA

8          policy has, in fact, been produced.

9                What was the other policy that you're

10         seeking?

11               MR. HENRY:  And what was the Bates numbers

12         on that?

13               MS. PANICO:  I don't have that in front of

14         me, but it was produced.

15               MR. HENRY:  Well, we don't have any record

16         of the FMLA policy.  And if I'm incorrect, I

17         would just request that you let me know the

18         Bates numbers of that production by later

19         today.

20               MS. PANICO:  I'm going to request that you

21         look back at what we produced and --

22               MR. HENRY:  I don't have it.

23               MS. PANICO:  It has been produced.

24               MR. HENRY:  So if you can point me to

25         where it's been produced, that would be greatly

1                  V. Dinielli - 1/4/17

2          appreciated.  Because based upon my records, I

3          don't have that.  So if you can give me the

4          Bates numbers by tomorrow, that would be

5          greatly appreciated.

6               We will reserve our right to seek --

7          continue this deposition, as needed, to discuss

8          issues within that policy.

9               MS. PANICO:  We will not be re-conducting

10         or holding this deposition open with respect to

11         the FMLA policy since that has already been

12         produced.

13              MR. HENRY:  Well, we don't have it and you

14         don't have any record of producing it to me.

15              MS. PANICO:  That's not correct.

16              Mr. Henry, if you don't have it, then it's

17         only because your office lost it.

18              MR. HENRY:  Well, what's the Bates numbers

19         for it?

20              MS. PANICO:  You want me to call my

21         office?  We'll take a break right now.

22              MR. HENRY:  No.  Just get it to me by

23         tomorrow.  If you're willing to call your

24         office now, then I'm sure you'll be willing to

25         call them later.

1                    V. Dinielli - 1/4/17

2          MS. PANICO:  I just want to make it clear

3     that we are not re-producing Ms. Dinielli with

4     respect to the FMLA policy because it has

5     already --

6          MR. HENRY:  I have seven hours.  I have

7     one day.

8          MS. PANICO:  Okay.

9          MR. HENRY:  I have a full seven hours with

10    her, so...

11         MS. PANICO:  Okay.  But we're not going to

12    be producing her with respect to that --

13         MR. HENRY:  I'm not going to argue with

14    you.  With the same enthusiasm that you were

15    going to be calling your office now, I hope you

16    have that same enthusiasm tomorrow to ensure

17    that I get the Bates numbers to that policy.

18   BY MR. HENRY:

19    Q    Ms. Dinielli, were you ever provided with

20    any policies and procedures --

21         MS. PANICO:  Objection.

22         MR. HENRY:  Let the record reflect, again,

23    that I'm not even able to get my question out.

24    Counsel's objections have been frequent and

25    fruitful.  Again, bordering oppressive.  And

V. Dinielli - 1/4/17

1

2      although I don't want to call the Court, I may

3      have to call the Court again.

4            Please allow me to finish my question.

5            May I have a readback, please, of the

6      question that I attempted to -- nevermind.

7      I'll try to --

8            MS. PANICO:  That's because you did

9      complete the question.

10           MR. HENRY:  No, I didn't.

11  BY MR. HENRY:

12     Q    Were you trained on how to deal with -- or

13     rather did your employer ever provide you with

14     policies and procedures about discrimination in

15     the workplace?

16     A    I believe so, yes.

17           MS. PANICO:  Same objection.

18           MR. HENRY:  Again, what is the -- what is

19     your grounds for your objection?

20           (Court Reporter interruption.)

21           MS. PANICO:  There's not discrimination

22     component to this lawsuit anymore.  I'm

23     preserving my objection for the record.

24           MR. HENRY:  I'm not asking about

25     discrimination.  I'm asking if she was provided

1                    V. Dinielli - 1/4/17

2        with policies and procedures about

3        discrimination in the workplace.  It does not

4        only mean discrimination in terms of what you

5        believe to be a part of the lawsuit or not.  It

6        also deals with disability discrimination;

7        discrimination on the basis of retaliation;

8        discrimination on a number of basis.

9            If you would allow me to finish my

10       question without noting these frivolous

11       objections, then we can get through this.

12           MS. PANICO:  I did not direct my client

13       not to answer.  That's number one.  Number two,

14       a ADA discrimination is no longer a component

15       of this case.

16           Retaliation under --

17           MR. HENRY:  Your speaking objections are

18       ridiculous.

19           (Counsel speaking simultaneously.)

20           MR. HENRY:  This is an FMLA claim where we

21       are alleging that she was discriminated against

22       because of her disability.

23           MS. PANICO:  There's no ADA claim.

24           MR. HENRY:  There's a FMLA claim.

25           MS. PANICO:  That's not disability

1                   V. Dinielli - 1/4/17

2          discrimination.

3              MR. HENRY:  FMLA requires that there be a

4          qualified disability.  I'm asking this witness

5          if she was provided with any policies and

6          procedures pertaining to discrimination in the

7          workplace.

8              I only ask that you please refrain from

9          the meritless objections.

10             MS. PANICO:  I'm permitted to make an

11         objection on the record.  I'm allowing my

12         client to answer.

13             You're the one that continues to --

14             MR. HENRY:  I'm really not.

15     BY MR. HENRY:

16         Q    Were you ever provided with any policies

17         and procedures about discrimination in the

18         workplace at Freeport?

19         A    Upon employment, yes.

20         Q    And do you know the title of those

21         policies?

22         A    No.

23         Q    Do you know how many pages they were?

24         A    I don't remember.

25         Q    How long ago was that?

1                    V. Dinielli - 1/4/17

2        A       Seven years ago.

3        Q       Are there any ongoing training

4        requirements with respect to discrimination and

5        with respect to being familiar with the laws?

6        Does Freeport have any ongoing training?

7        A       Yes, they do.

8        Q       Do you participate in those trainings?

9        A       Yes, I do.

10       Q       What is the name of those trainings, if

11       you recall?

12       A       I don't recall.

13       Q       Is it an online training?

14       A       No.

15       Q       What type of training is it?

16       A       A training with a lector.

17       Q       How often is this training given?

18       A       Periodically.  I can't really say.

19       Q       When was the last time you had such

20       training?

21       A       There was a training a couple of months

22       ago.

23       Q       How frequently do they give it?

24       A       Maybe once a year, twice a year.

25       Q       Are you graded on your performance during

1                V. Dinielli - 1/4/17

2        these trainings?

3        A     No.

4        Q     What are some of the subjects covered?

5        A     The last one was violence in the

6        workplace.

7        Q     Do you recall ever having any training

8        with respect to disabilities, employees with

9        disabilities?

10       A     Training, no.

11       Q     What were you provided with respect to

12       employees with disabilities?

13       A     I wasn't provided with anyone.

14       Q     Did you bring any experience with or

15       knowledge in the area of employees with

16       disabilities to this position at Freeport?

17       A     Well, 20 years of working in another

18       facility, I had my -- I believe I come across

19       it.

20       Q     Were you provided any direct training for

21       dealing with employees with disabilities at

22       Sportime in Lynbrook?

23       A     Direct training, no.

24       Q     How about informal training?

25       A     Informal training, yes.

1                    V. Dinielli - 1/4/17

2      Q    Okay.

3           Now, did you have any -- were you provided

4      with a copy of the Family Medical Leave Act

5      during your time at Sportime in Lynbrook?

6      A    Was I provided with it, no.

7      Q    Were you provided with a copy in Freeport?

8      A    Was I provided with it, no.

9      Q    So how would you know that you received

10     training informally if you never were provided?

11          MS. PANICO:  Objection to form.

12     A    Topic was discussed and I read up on it

13     myself over the years.

14     Q    So your testimony here today is the scope

15     of your training, as it relates to the FMLA, is

16     limited to topics discussed and self-directed

17     study?

18          MS. PANICO:  Objection to form.

19     Q    You may answer.

20     A    Well, it's related to as need.

21     Q    So the scope of your -- the scope of your

22     training, as you testified here today as it

23     relates to the FMLA, is topics discussed, as

24     needed and -- what was the other?

25     A    And my own.

1                     V. Dinielli - 1/4/17

2      Q      And your own-self study.

3             MS. PANICO:   Objection to form.

4      Q      Is that right?

5      A      Basically, yes.

6      Q      Did there ever come a time that you

7      learned of a complaint that Ms. Skates filed

8      against you with the New York State Division of

9      Human Rights.   Withdrawn.

10            Did there ever come a time that you became

11     aware of a complaint that Ms. Skates filed with

12     the New York State Division of Human Rights

13     against the Incorporated Village of Freeport?

14     A      Yes.

15     Q      How many complaints did you hear that she

16     filed?

17     A      I don't know.   I was given -- I don't

18     know.

19     Q      Now, this complaint that you learned of,

20     when did you learn of it?

21     A      Within the last couple of years.

22     Q      Were you named in that complaint?

23     A      I don't recall.

24     Q      Did there ever come a time that you

25     learned of a complaint that was filed against

1          V. Dinielli - 1/4/17

2          you by Ms. Skates while she was still an

3          employee with Freeport?

4          A     No.

5          Q     So your testimony here today is at no

6          point in time Ms. Skates filed a complaint

7          against you while she was working at Freeport?

8                MS. PANICO:   Objection.   Asked and

9          answered.

10         Q     You may answer.

11         A     Not that I'm aware of.

12         Q     Did there come a time that you became

13         aware that Ms. Skates had a disability?

14         A     No.

15         Q     So your testimony here today is that

16         there's no point in time during the time that

17         Ms. Skates worked in your department that you

18         learned that she had a disability?

19         A     No.

20         Q     Did there come a time that you learned

21         that Ms. Skates required a leave because she

22         had a disability?

23         A     No.

24         Q     Did there ever come a time that Ms. Skates

25         made a request for you for sick leave or

                    V. Dinielli - 1/4/17

 1

 2    medical leave because of her disability?

 3            MS. PANICO:  A request?

 4            MR. HENRY:  Yes.

 5            MS. PANICO:  Objection to form.

 6    Q     You may answer.

 7    A     Because of -- can you restate?

 8            MR. HENRY:  May I have a repeat of that

 9    last question, please.

10            (Whereupon, the requested record was read

11    back by the Court Reporter.)

12    A     No.

13    Q     Did there ever come a time that Ms. Skates

14    presented to you a request for medical leave or

15    sick leave?

16    A     A request, no.

17    Q     Can you describe the recreational center's

18    parking lot during the time -- during the

19    period of 2013, beginning January 2013, ending

20    December 2013?

21    A     Parking lot is in the front of the

22    building.  It is very large.  I don't want to

23    estimate how many spots, but it's a very, very

24    large parking spot in the front of the

25    building.

1                    V. Dinielli - 1/4/17

2    Q    Is that parking spot used for employees

3    and the general public?

4    A    Yes.

5    Q    Are there any portions of that parking

6    lot, as you remember in 2013, that was just

7    limited to employees' usage?

8    A    No.

9    Q    Can anyone just pull in and park?

10   A    Yes.

11   Q    Are there any sections of that parking lot

12   designated for staff and employees?

13   A    No.

14   Q    Are there any key access or access cards

15   or anything of that nature required to access

16   that parking lot?

17   A    No.

18   Q    Can you describe some of the duties that

19   Ms. Skates' title had?

20        MS. PANICO:  Objection to form.

21   A    Her duties were to maintain -- to do

22   general housekeeping in all of the areas of the

23   recreation center.

24   Q    Now, with respect to the position that

25   Ms. Skates was transferred from in the

1                    V. Dinielli - 1/4/17

2         assessor's office, did that position in the

3         assessor's office include sweeping?

4         A     I have no idea.

5         Q     Dusting?

6         A     No idea.

7         Q     Was it janitorial in nature?

8         A     Never worked in the assessor's office.  No

9         idea.

10        Q     The position that Ms. Skates had in the

11        recreational center, was that a janitorial

12        position?

13        A     It was a housekeeping position.

14        Q     Did it have janitorial components?

15              MS. PANICO:  Objection to form.

16        A     We all maintained the building.

17        Q     Did her position include sweeping?

18        A     Yes.

19        Q     Dusting?

20        A     Yes.

21        Q     Painting?

22        A     Maybe.

23        Q     Cleaning recreational center equipment?

24        A     Yes.

25        Q     Mopping floors?

```
 1                    V. Dinielli - 1/4/17

 2       A     Yes.

 3       Q     Cleaning paint off walls and tables?

 4       A     Yes.

 5       Q     Cleaning bathrooms?

 6       A     Yes.

 7       Q     Cleaning the recreational center's parking

 8   lot?

 9       A     Yes.

10       Q     What was Ms. Skates' title?

11       A     Recreation attendant.

12       Q     How many recreation attendants did you

13   have at that time in 2013?

14       A     Possibly five.

15       Q     Did all of their responsibilities include

16   all of the items that I just listed?

17       A     Yes.

18       Q     So your testimony here today is that every

19   rec attendant serving, as far as you could

20   recall, in 2013 maintained the responsibilities

21   listed including cleaning the recreational

22   parking lot?

23       A     Some.  Not everyone might do that.  But,

24   yes, we all would do that.  I've done it

25   myself.
```

1                    V. Dinielli - 1/4/17

2        Q     Did you maintain the discretion to

3    determine what job duties Ms. Skates would have

4    had during that time?

5        A     I and my rec leaders.

6        Q     So you could have came and said, perhaps,

7    Ms. Skates you're going to clean the parking

8    lot today, right?

9        A     I wouldn't have done that.

10       Q     But you could have?

11       A     I could have, but I had other managers

12   below me or supervisors below me that would

13   have done that.  I really wasn't involved with

14   her to tell her what to do.

15       Q     Well, why don't you give me an

16   organizational chart, with you in the middle,

17   of downward organizational chart during the

18   period of 2013.

19       A     I am the manager.  I have two rec leaders.

20       Q     And who were they?

21       A     John Henry and James Beauford.  Those are

22   senior rec leaders.  One rec leader, which is

23   Carol Murphy.

24       Q     And so you're the manager.  Two rec

25   leaders.

1                    V. Dinielli - 1/4/17

2        A     Two senior rec leaders.

3        Q     Two senior rec leaders.

4        A     Yes.

5        Q     And then beneath them?

6        A     One rec leader.

7        Q     So beneath them, between the two senior

8    rec leaders would be one rec leader?

9        A     Yes.

10       Q     And who was that?

11       A     Carol Murphy.

12       Q     And then?

13       A     Then underneath that are -- well, there's

14   a building maintenance supervisor.  Just

15   another person.  He would probably be the same

16   level as the rec leaders.  And then I have

17   recreation attendants, laborers.

18       Q     Where did Ms. Skates fit in this?

19       A     She was a rec attendant.

20       Q     So she would have received her command or

21   her chain of command would have been the

22   building maintenance?

23       A     No.  It would be from the senior rec

24   leaders.

25       Q     So Ms. Skates would have received, as a

1                    V. Dinielli - 1/4/17

2       rec attendant, instruction from John Henry or

3       James Beauford?

4       A     Yes.

5       Q     Would you also have given her instruction?

6       A     We all work together.

7       Q     My question is:  Would you have also given

8       her instruction?

9       A     If need be.

10      Q     So when she made requests, who would she

11      make those requests to?

12      A     Depends on the request.

13      Q     If she made a request pertaining to sick

14      leave, who would that be?

15      A     It would be me.

16      Q     If she made a request for a change of

17      assignment, who would that be?

18      A     A change of duty?

19      Q     Change of duty.  Who would that be?

20      A     Senior rec leader.

21      Q     Would she also make those requests to you

22      too?

23      A     If she chose to, she could.

24      Q     Had she ever made any such requests to

25      you?

1                    V. Dinielli - 1/4/17

2      A    Not that I recall.

3      Q    So she complained or had a complaint about

4      something, who would she raise that complaint

5      with?

6           MS. PANICO:   Objection.  Calls for

7      speculation.

8      Q    In the organizational chart that you just

9      provided me, who would Ms. Skates, as a rec

10     attendant, go to with her complaints?

11          MS. PANICO:  Same objection.

12     A    She would go to one of the senior rec

13     leaders if they were on hand.  If they weren't

14     she certainly could come to me.  Door was

15     always open.

16     Q    Was there a policy that provided the chain

17     of command when an employee has a complaint?

18     A    Policy, no.

19     Q    Or a guideline?

20     A    When she came into our department, she was

21     introduced to all of the people.  And so she

22     knew who the people -- the acting managers and

23     the supervisors were.

24     Q    So it's your testimony here today that

25     Ms. Skates only was able to rely on her own

1                      V. Dinielli - 1/4/17

2          knowledge in terms of how she would raise a

3          complaint or a concern?

4                  MS. PANICO:  Objection to form.

5      Q     Is that your testimony?

6      A     She worked for the Village.  So she knew

7      we had a Human Resource department and she knew

8      who the people in our building were.

9      Q     James Beauford, what's his race?

10     A     What is his race?

11     Q     Yes.

12     A     He's half white, half black.

13     Q     And how do you know this?

14     A     Because I've seen his mother and father.

15     Q     John Henry, what's his race?

16     A     White.

17     Q     And how do you know this?

18     A     Because he's white.

19     Q     Have you seen his mother and father?

20     A     No, I haven't.

21     Q     Did there ever come a time that you

22     learned that Ms. Skates complained about being

23     verbally insulted or abused by her co-workers

24     during the period of 2013?

25     A     That she was -- no.

V. Dinielli - 1/4/17

2    Q    Did there ever come a time that Ms. Skates

3    complained about you mistreating her during the

4    course of -- beginning in 2013, ending in 2013?

5    A    Complained to me?

6    Q    Complaining about you, have you ever

7    learned that --

8    A    No.

9    Q    How about mistreatment?

10       MS. PANICO:  Objection to form.

11   A    I didn't mistreat her.  I wasn't directly

12   working with her.

13   Q    What's your understanding of the term

14   "comp time"?

15   A    Comp time?

16   Q    Yes.

17   A    It's anything past your regular hours that

18   you're not being paid for and that you're

19   taking in time to use in the future.

20   Q    How about vacation days?

21   A    Time that is designated by the Village to

22   its employees.

23   Q    Is there any particular policy or manual

24   or writing anywhere that contains information

25   about vacation days and comp time that you're

1                    V. Dinielli - 1/4/17

2        aware of?

3        A    Every employee has an attendance card.

4        Q    Some of your -- as part of your duties,

5        were you able to approve or deny vacation days

6        or comp time requests?

7        A    Yes.

8        Q    Did you look at a policy when you made

9        such decisions?

10       A    The union book, the union manual.

11       Q    Are you familiar with the individual by

12       the name of Victoria Grotton?

13       A    Yes.

14       Q    Who is that?

15       A    She's another rec attendant, full-time rec

16       attendant that works for us.

17       Q    Does she still work there?

18       A    Yes, she does.

19       Q    Is there any particular reason why you

20       would have discussed Ms. Skates' vacation days

21       and comp time in the presence of Victoria

22       Grotton?

23            MS. PANICO:  Objection to form.

24       A    I didn't.

25       Q    So is it your testimony here today that

1                      V. Dinielli - 1/4/17

2          you never speak to Victoria Grotton about

3          Ms. Skates' comp time or vacation time?

4          A     She was at the far end of a room, of a

5          large room, of a skate lounge, when I was

6          walking in the back door and I approached

7          Mrs. Skates.

8          Q     When you say you approached Mrs. Skates,

9          can you elaborate?

10         A     I was walking in.  She was at the front of

11         the room and I had the opportunity to speak to

12         her.

13         Q     Well, it must have been a loud

14         conversation for Victoria Grotton to hear it,

15         right?

16              MS. PANICO:  Objection to form.

17         A     I don't know that she heard it.

18         Q     Well, you don't know that she didn't hear

19         it, right?

20         A     I don't know.

21         Q     Why -- do you consider a discussion about

22         vacation days and comp time a private one with

23         an employee?  Do you consider that to be a

24         conversation that's private in nature?

25         A     Not really, no.

1                    V. Dinielli - 1/4/17

2      Q    So your testimony here today is that

3      discussions that deal with an employee's

4      vacation days and comp time days that you, as

5      the supervisor, would have with that employee

6      is not one that's private in nature?

7      A    Broadly, no.

8      Q    Did you have an office during that time?

9      A    I did.

10     Q    Did your office have a door?

11     A    Yes, it did.

12     Q    Why didn't you have that discussion in the

13     office where you could have closed the door?

14     A    Because I very rarely saw Ms. Skates.

15     Q    So instead of having a conversation in

16     your office where you could have closed the

17     door, you decided to have it in a big room?

18     A    It wasn't a discussion.

19     Q    You decided to have a discussion or

20     approach Ms. Skates in a big room where there

21     was someone else present, right?

22          MS. PANICO:  Objection to form.

23     A    It was a statement.

24     Q    Well, couldn't you had made the statement:

25     "Ms. Skates, I would like to talk to you in my

1                  V. Dinielli - 1/4/17

2        office"?  Couldn't you have made that

3        statement?

4                MS. PANICO:  Objection.  Calls for

5        speculation.

6        Q    You may answer.

7        A    I could have.

8        Q    But instead you chose to have such a loud

9        statement -- to make such a loud statement that

10       someone on the far end of the room, Victoria

11       Grotton, could have or could not have heard it,

12       right?

13               MS. PANICO:  Objection to form.

14       Q    Isn't that right?

15               MS. PANICO:  You're misrepresenting --

16       A    It wasn't loud.

17       Q    You may answer the question.

18       A    It wasn't loud.

19       Q    Well, wouldn't you agree that something

20       that's loud to me may not be loud to you?

21       A    Yes.

22       Q    So instead of having a private discussion

23       with an employee in your office with a door you

24       could have closed, you decided to make a loud

25       statement, loud enough for someone on the far

1                    V. Dinielli - 1/4/17

2          end of the room to hear it, right?

3                MS. PANICO:  Objection to form.

4          A    I don't believe it was loud and I don't

5          believe she heard it.

6          Q    Well, as you're sitting here today, you

7          have no idea whether she heard it or not,

8          right?

9          A    I don't believe she heard it.

10         Q    Did there ever come a time that you

11         threatened that you would strip Ms. Skates of

12         her accumulated time?

13         A    I passed on information that was given to

14         me from Human Resources.

15         Q    Who gave you this information?

16         A    Conor Kiran.

17         Q    What information was provided to you and

18         when?

19         A    Her attendance card was not to be found

20         and I was told by Human Resources to let her

21         know that we would -- we were starting at no

22         time.

23         Q    And did you let her know that?  When did

24         that conversation happen, what year or --

25         A    I don't recall.

1                    V. Dinielli - 1/4/17

2      Q    Was it in or around the year of 2013?

3      A    Yes.

4      Q    Okay.

5           Did you have that conversation with

6      Ms. Skates in a private -- in your private

7      office with a door?  Was that another statement

8      you made in a loud room?

9           MS. PANICO:  Objection to form.

10     A    I believe was in my office.

11     Q    I'm sorry?

12     A    I believe it was in my office.

13     Q    Did you consider that conversation a

14     private one, private in nature?

15     A    I don't know.  I really don't know.

16     Q    This we know.

17          So is there any particular reason why you

18     threatened to strip her time away when you

19     really don't know?

20          MS. PANICO:  Objection to form.

21          Please stop mischaracterizing my client's

22     testimony.

23     Q    You may answer.

24     A    I didn't threaten anything.  I was passing

25     on information from Human Resources.

1                    V. Dinielli - 1/4/17

2     Q     So you were the middleman or middle-woman.

3           MS. PANICO:  Objection to form.

4     A     One could say.

5           MS. PANICO:  Same objection.

6     Q     Isn't that right?

7     A     Yes.

8     Q     You were just passing information along.

9     A     I'm not Human Resources.

10    Q     Did you ever question what information

11    Human Resources gives you to pass on or do you

12    just pass it on?

13    A     I pass on Village policy from Human

14    Resources.

15    Q     So the decision to threaten Ms. Skates

16    with stripping her of her accumulated time was

17    one that came from higher up?

18          MS. PANICO:  Objection to form.

19          That's not what my client testified to.

20    Please stop mischaracterizing her testimony.

21    Q     You may answer the question.

22    A     Human Resources advised me of how we were

23    going to move forward.

24    Q     Human Resources, are they in a higher

25    position than you are?

1                    V. Dinielli - 1/4/17

2       A    I wouldn't say higher but they handle

3       different -- they have different, you know --

4       Q    Human Resources, they could fire you,

5       right?

6       A    Yes.

7       Q    So wouldn't they have more power than you?

8       You can't fire yourself.

9       A    I don't believe they could fire me on

10      their own.  That would have to come from our

11      mayor.

12      Q    But they would handle it, right?

13      A    They would handle it, yeah.

14      Q    So in essence Human Resources is its

15      own --

16      A    I guess so.  I never thought about it.

17      Yes.

18      Q    So you received marching orders from Human

19      Resources to threaten Ms. Skates with stripping

20      heard of her accumulated time, right?

21          MS. PANICO:  Objection.  Please stop

22      mischaracterizing testimony.

23      Q    Didn't Human Resources give you the

24      instruction to threaten to strip her time?

25      A    They didn't tell me to threaten anybody.

V. Dinielli - 1/4/17

1

2      Q    You threatened her on your own?

3      A    I passed on information.

4      Q    That information was if you don't give me

5      your attendance card, we're taking away your

6      accumulated time, right?

7      A    That's not how it was said.

8      Q    How was it said?

9      A    It was said we need your attendance card.

10     Do you have any idea where it was.

11     Q    Or?

12     A    Or is.

13     Q    What would be the consequence if she

14     didn't?

15     A    I never -- that wasn't the conversation.

16     The conversation is we need your attendance

17     card.  Attendance card could not be found.  I

18     said if the attendance card -- if we don't find

19     the attendance card, this is what Human

20     Resources has said.

21     Q    And what did Human Resources say?

22     A    That we're going to -- we're going to have

23     to start at zero.

24     Q    So isn't that a threat?

25     A    I don't believe so.  It's a statement.

1                     V. Dinielli - 1/4/17

2      Q    So if I tell you that if you don't do

3      this, then I'm going to do that, isn't that a

4      threat that that is going to happen?

5           MS. PANICO:  Objection to form.

6           Please -- again, stop mischaracterizing

7      the testimony.

8      A    I didn't say "if you don't do this."  I

9      said "if we don't come up with the attendance

10     card" --

11     Q    Then?

12     A    -- "then this is what Human Resources has

13     instructed me to tell you."

14     Q    This is the threat that Human Resources

15     told me to tell you?

16          MS. PANICO:  Objection to form.

17     Q    Isn't that right?

18     A    I don't call it a threat.

19     Q    What would you call it?

20     A    I don't call it a threat.

21     Q    What do you recall it?

22     A    A directive.

23     Q    An ultimatum?

24     A    A directive.

25     Q    You received a directive from a higher

1

2      source, right?

3      A    Uhm-uhm.

4      Q    Did there ever come a time that you later

5      learned that that directive was incorrect?

6           MS. PANICO:  Objection to form.

7      A    Incorrect, no.

8      Q    Did there ever come a time that you

9      learned that Ms. Skates deserved the credit for

10     her hours that she accumulated?

11     A    I might have been given new information.

12     I don't recall what the new information was.

13     Q    But that -- did that new information

14     include a finding that Ms. Skates' attendance

15     card was accurate?

16          MS. PANICO:  Objection to form.

17     A    I don't know.

18     Q    Well, did she lose her time?

19     A    I don't know.  I don't recall.

20     Q    So your testimony here today is that you

21     don't recall if Ms. Skates lost her accumulated

22     time?

23     A    I don't -- I don't recall exactly what

24     time she claimed to have or she said she had

25     and what time she actually received, no.  She

1                   V. Dinielli - 1/4/17

2       did receive time.

3       Q     Who is Peter Renki?

4       A     At the time he was the union president.

5       Q     Would there ever come a time during that

6       period in 2013 that you would have possibly met

7       with Mr. Renki?

8       A     He might have been with Ms. Skates.  He

9       doesn't meet with me, no.

10      Q     Did there ever come a time that had you a

11      meeting with Mr. Renki, Mr. Beauford and

12      yourself?

13      A     Yes.  Well, not -- and Ms. Skates.

14      Q     And Ms. Skates?

15      A     Yes.

16            He represents Ms. Skates.  He doesn't work

17      with us.

18      Q     During that meeting, was there an

19      acknowledgment that Ms. Skates deserved the

20      credits for the hours that you directed or gave

21      her a directive that she would have lost?

22            MS. PANICO:  Objection to form.

23      Q     Isn't that right?

24      A     Human Resources was there.  I was just

25      present at the meeting.

1                    V. Dinielli - 1/4/17

2       Q    But wasn't that right?

3       A    Was what right?

4       Q    That during that meeting you or there was

5       an acknowledgment that Ms. Skates deserved the

6       hours that she accumulated.

7            MS. PANICO:  Objection to form.

8       Q    Right?

9       A    It was discussed, yes.

10      Q    And that acknowledgment was made during

11      that meeting; isn't that right?

12      A    Determination was made as a result of that

13      meeting, yes.

14      Q    So, in fact, the directive that you gave

15      the threat was based on incorrect information,

16      right?

17           MS. PANICO:  Objection to form.

18      A    No.  It was changed.

19      Q    It was based on incomplete information,

20      right?

21           MS. PANICO:  Objection to form.

22      A    It was updated.

23      Q    So it was based on outdated information,

24      right?

25      A    No.

1                V. Dinielli - 1/4/17

2        Q    Well, how could you update something that

3    wasn't outdated?

4        A    It was a meeting to discuss it and this is

5    what was determined from that meeting.

6        Q    So it was a reversal from the position

7    they took when you gave the directive, right?

8             MS. PANICO:  Objection to form.

9        Q    You may answer.

10       A    I don't know that "reversal" is the

11   correct word.

12       Q    Well, you threatened that she would lose

13   the time?

14       A    I didn't threaten.

15       Q    You directed?

16       A    I passed on information.  The information

17   was changed.  Agreement was made.  An agreement

18   was made as a result of that meeting.

19       Q    That agreement was different than the

20   directive that you were ordered to give; isn't

21   that right?

22       A    Yes.

23       Q    Do you usually give directives that you

24   later change when new information comes?

25       A    I've given directives that have changed,

1                    V. Dinielli - 1/4/17

2          yes.

3          Q    How does that make you feel when your

4     directives have changed?  Does that make you

5     angry?

6          A    No.

7          Q    Does it make you happy?

8          A    That's the business.

9          Q    What do you mean that's the business?

10         A    That's the business.  As far as that is

11    how -- that is how Human Resources is worked.

12    That is how the union works.

13         Q    Are you in the business of giving out

14    directives that are changed?

15         A    I'm in the business of giving out

16    directives as I am told -- instructed to do so.

17         Q    And when you give those directives, you're

18    confident that those directives are correct?

19         A    I'm hopeful.

20         Q    So you hope that your directives are

21    correct?

22         A    I hope that the directives that I'm giving

23    stay, yes.

24         Q    How would you -- how would you describe

25    hope?  Is that a feeling of joy?

1                        V. Dinielli - 1/4/17

2              MS. PANICO:  Objection to form.

3         Q    You may answer.

4         A    Maybe I should say confident.  I'm

5    confident that the directives that are given to

6    me are the directives that will continue.

7         Q    So confident, is that joy?  Confident.

8    Enthusiastic.

9         A    It's business.

10        Q    Positive?  Is it a positive feeling?

11        A    Not always positive.  It's just a feeling

12   of assurance.

13        Q    That makes you feel good when you're

14   confident, right?

15        A    When I'm confident, when I have -- give a

16   directive, it's not a matter of feeling good or

17   bad.  It's just --

18        Q    Confidently assured, right?

19        A    Yes.

20        Q    So then how do you feel when those

21   directives that you're confidently assured

22   about you later learn that those directives are

23   reversed?

24        A    Sometimes I agree.

25        Q    Well, why would you give a directive that

1                    V. Dinielli - 1/4/17

2          you disagreed with to begin with?

3          A     Because I was instructed.

4          Q     So your testimony here today is that you

5          do what you're told without any second

6          guessing?

7          A     Sometimes I have to.

8          Q     When you say you have to, describe that a

9          little bit more.

10         A     There are people above me, higher-ups, I

11         am part of the big picture and sometimes I am

12         instructed to do things or to say things or to

13         pass on information that I might not always

14         agree with but I follow -- I'm told to follow

15         orders.

16         Q     So with respect to the directive that you

17         got with respect to Ms. Skates, right, was that

18         one of the higher-ups that you received a

19         directive from?

20         A     I told you Human Resources gave me the

21         directive.

22         Q     Did you agree with that directive?  As you

23         just testified, sometimes you agree, sometimes

24         you don't.

25         A     No, I didn't agree with the directive.

1                    V. Dinielli - 1/4/17

2        Q    So do you usually give directives that you

3        disagree with because it came from a higher

4        source?

5        A    If -- yes.

6        Q    What's the fear?  Why are you afraid to

7        not disagree with the higher source?

8        A    Because I am just a manager of the

9        recreation center.  The Village runs the

10       whole -- the mayor and -- the mayor and Human

11       Resources are in charge of the whole Village.

12       I'm just one department in a Village.

13       Q    So if you disagree with a decision that

14       the mayor or Human Resources makes pertaining

15       to one of your subordinate employees, you don't

16       feel it's your position to have a voice?

17            MS. PANICO:  Objection.  Calls for

18       speculation.

19       Q    You may answer.

20       A    When Ms. Skates' card was not found, I did

21       agree with her that that wasn't her

22       responsibility; however, I do not make the

23       rules.

24       Q    So now that we know that you disagree

25       sometimes and one of those times that you

1                    V. Dinielli - 1/4/17

2          disagreed was with respect to that card, are

3          there any other things about the Village

4          business that you disagree with as it pertains

5          to Ms. Skates?

6          A     Not that I could recall or not that I

7          could say at this point.

8          Q     As it relates to the employee parking lot,

9          is there a card key that requires -- that an

10         employee or anyone requires to access the

11         employee parking lot?

12         A     There's an -- there's a back lot in the

13         back of the building not different from the

14         front of the building that we spoke about

15         before that has a key pass, an electronic gate

16         that is opened with a pass or by sirens on a

17         police car or a emergency vehicle.

18         Q     Who has access to those key cards?

19         A     Well, the people that had access to

20         them -- well, that still do -- is the people

21         that open the building, close the building, the

22         girl that makes the monetary deposit with the

23         Village Hall every day, facility mechanic and

24         myself.

25         Q     Did there ever come a time where

1                    V. Dinielli - 1/4/17

2       plaintiff -- I'm sorry -- where Ms. Skates

3       closed the building?

4       A    No.

5       Q    How about open the building?

6       A    No.

7       Q    Is there any reason why she wasn't

8       provided with a key card?

9       A    Because she didn't open the building.  She

10      wasn't the first one there.  She wasn't the

11      last one to leave.  She didn't make the money

12      drop during the day.  And she's not the

13      manager.

14      Q    Well, did she have a key card at any point

15      in time?

16      A    No.

17      Q    So it's your testimony here today that

18      Ms. Skates never had a key card, never parked

19      in the employee parking lot?

20      A    Not to my knowledge.

21      Q    Is there anything that would refresh your

22      recollection as to whether or not Ms. Skates

23      had a key card?

24           MS. PANICO:  Objection to form.

25      A    Key cards -- the only way key cards were

1                      V. Dinielli - 1/4/17

2        obtained was through a request through a

3        company that made the key cards and request

4        would come to me and go to Human Resources.

5        That company -- that -- is not even in business

6        anymore.  We can't even get new key cards.

7        Only key cards accessible are key cards that

8        were existing.

9              If somebody gave her a key card, I'm not

10       aware of that.  I never gave her a key card.

11       Q    Did there ever come a time that you --

12       withdrawn.

13             Did you ever write Ms. Skates up?

14       A    Yes.

15       Q    And what was that for?

16       A    That was when I believe she came and asked

17       for a key card.  She got angry in my office.  I

18       called her back.  She was pointing her finger

19       at me and waving at me and she left the office

20       angry.

21       Q    What did she ask you for?

22       A    A key card.

23       Q    What was your response?

24       A    I cannot -- I'm not giving you a key card.

25       I cannot give you a key card.  I'm not giving

1          V. Dinielli - 1/4/17

2     you a key card.

3     Q     Did you give her any instruction during

4     that conversation?

5     A     I don't understand.

6     Q     You testified she walked away and you

7     called her back.

8     A     I called her back, yes.

9     Q     Why did you call her back?

10    A     Because she was angry and I wanted to

11    discuss it.

12    Q     When she walked away, was the conversation

13    over?

14    A     She was waving her hand at me and I didn't

15    feel like I deserved to be treated like that.

16    Q     So when you called her back what -- she

17    had already left and her hands had already been

18    waved?

19    A     She turned her back to me and she was

20    walking away from me out of the door into the

21    main office.

22    Q     Did you ask her to do anything?

23    A     I said please come back here.

24    Q     What did you write her up for?

25    A     Insubordination.

V. Dinielli - 1/4/17

2   Q    It's your testimony here today that

3   Ms. Skates walking away when she was upset --

4   walking away when he was upset that that's

5   insubordination?

6   A    And waving her hand at me.

7   Q    So your testimony here today is that

8   someone --

9   A    Raising her voice at me.  Waving her hand

10  at me.  Walking away.

11  Q    You testified previously that she raised

12  her voice.  You just said that she waved her

13  hand.

14       MS. PANICO:  Objection to form.

15  Mischaracterization of her prior testimony.

16  Q    So your testimony here today that

17  Ms. Skates by walking away from you and waving

18  her hand while she walks away --

19  A    And raising your voice.

20  Q    Was she walking away with her back to the

21  door like this (indicating)?

22  A    She was like that and then she turned

23  around.  She had both hands in the air and she

24  was walking out of the door.

25  Q    I find it quite odd that your description

1                          V. Dinielli - 1/4/17

2          of the events have evolved.

3                  MS. PANICO:  Objection to the

4          mischaracterization of my client's testimony.

5                  The record will reflect what she testified

6          to.  We don't need you to characterize it.

7     BY MR. HENRY:

8          Q     Well, how can one walk away and wave their

9          finger at you at the same time?

10         A     She did.  That's the way I recall.

11         Q     You consider that insubordination?

12         A     Yes.

13         Q     Is there anything in the policy that you

14         can point to that says when an employee walks

15         away, waves their finger and raises their voice

16         that that's considered insubordination?

17         A     It's disrespect.  Disrespect is

18         insubordination.

19         Q     You would agree that in some cultures

20         people wave as a from of a term of endearment,

21         right?

22                 MS. PANICO:  Objection.

23         Q     Isn't that right?

24         A     I would know the difference.

25         Q     Because you know all cultural terms of

V. Dinielli - 1/4/17

2      endearment.  Is that your testimony here today?

3      A     Because I heard the tone of her voice.  I

4      heard the context that she was speaking.  And I

5      could see her body language.

6      Q     So you're a certified body language

7      reader?

8      A     No.

9      Q     You know the difference between cultural

10     terms of endearment, right?

11     A     I'm not saying I do, no.

12     Q     So you rely on your own opinion as to what

13     you believe is disrespect or not, right?

14     A     Yes.

15     Q     As you testified earlier, sometimes your

16     opinion could be influenced, right?

17           MS. PANICO:  Objection to form.

18           Again, please refrain from

19     mischaracterizing Ms. Dinielli's testimony.

20     Q     In fact, you wrote Ms. Skates up for

21     insubordination because you were upset that the

22     way she handled your denial of her key pass,

23     right?  You felt disrespected; isn't that

24     right?

25     A     I wrote her up because of the way she

V. Dinielli - 1/4/17

1

2      reacted to what I was telling her.

3      Q    Well, if she gave you a hug, would you

4      have written her up?

5      A    No.

6      Q    But because she expressed --

7      A    -- anger.

8      Q    -- frustration with your denial of the key

9      card, you found that to be disrespectful,

10     right?

11          MS. PANICO:  Objection to form.

12     A    Yes.

13     Q    Had she blown you a kiss, would you have

14     written her up?

15     A    She wouldn't have been angry and it

16     wouldn't be considered insubordination.

17     Q    As a result of that writeup, what

18     consequence did Ms. Skates receive?

19     A    I sent the writeup to Human Resources and

20     Human Resources determined that she would go to

21     EAP.  I don't recall what that stands for, an

22     anger management program.

23     Q    So how did it make you feel now knowing

24     that a directive you gave Ms. Skates was later

25     acknowledged and reversed and Ms. Skates

1                    V. Dinielli - 1/4/17

2          expressed frustration with you in response to

3          her request for a key card?  How did that make

4          you feel about Ms. Skates?

5     A    I didn't connect it.

6          MS. PANICO:  Objection to form.

7     Q    You may answer.

8     A    I didn't connect it to -- they were not

9          related.

10         MS. PANICO:  Just give me a second after

11         you answer because I don't want to speak over

12         him while he is asking the question.

13    BY MR. HENRY:

14    Q    What month was that writeup, if you

15         recall?

16    A    Possibly May.

17    Q    Does April 17, 2013 sound right?

18    A    Possibly, yes.

19    Q    So did there ever come a time --

20         withdrawn.

21         So the EAP program counseling that you

22         described, do you know when that ended?

23    A    No, I don't recall.

24    Q    How long does that usually last?

25    A    It was a number of days.  I'm not sure how

1                    V. Dinielli - 1/4/17

2      many days.

3      Q    Does April 19, 2013 through May 10, 2013

4      sound about right?

5      A    It wasn't every day.  It was probably once

6      a week.  Yes.  That might be right.

7      Q    Were you aware that Ms. Skates was in that

8      EAP program?

9      A    Yes.

10     Q    How did that make you feel?

11     A    Not good because I lost an employee.

12     Q    So is there any reason why while

13     Ms. Skates was at EAP that you changed her job

14     duties to cleaning the exercise room?

15     A    It has nothing to do with the EAP.

16     Q    Did it have to do with the disrespect?

17     A    No.  It had nothing to do with that.

18     Q    Why would you stick her in the exercise

19     room when you had never stuck anyone else in

20     the exercise room?

21          MS. PANICO:  Objection to form.

22     Q    Why did she deserve the exercise room and

23     no one else did?

24     A    The exercise room was actually -- can I

25     tell you -- can I say the story of how that

1                    V. Dinielli - 1/4/17

2          came about?

3          Q     No.  I just want to know why was

4          Ms. Skates singled out for the exercise room.

5          A     For protection for herself.

6          Q     So your testimony here today is that

7          she -- Ms. Skates was singled out and put in

8          this exercise room for protection for herself?

9                MS. PANICO:  Objection to form.

10         Q     Is it for herself or from herself?

11         A     For herself.

12         Q     Protection from who?

13         A     The seniors in the senior lounge.

14         Q     Who were the seniors, John and --

15         A     The senior patrons.

16         Q     Your testimony here today is that you

17         stuck Ms. Skates in the exercise room, a less

18         desirable position, for protection for herself

19         from the senior patrons?

20               MS. PANICO:  Objection to form.

21               Please don't mischaracterize.  She never

22         testified that it was a less desirable

23         position.

24         A     It was not less desirable and there were

25         other people that cleaned the senior room.

1                  V. Dinielli - 1/4/17

2          Obviously -- I mean, that cleaned the fitness

3     center because it's a very well-kept area.

4          Q     But Ms. Skates was the only one that was

5     assigned to that particular duty?

6          A     No.

7          Q     You just testified a few moments ago that

8     you did it for protection from herself.  So

9     which one is it?

10         A     She was not the only one that cleaned the

11    fitness center.

12         Q     Not cleaned but assigned exclusively to

13    the fitness center.

14         A     Only one out of who?

15         Q     The others that you listed.

16               Was there anyone else that was in there on

17    a full-time basis?

18         A     She wasn't there on a full-time basis.

19         Q     The record reflects exactly what you said

20    so we'll move forward.

21               How about Naomi?  How about Gwen?

22         A     Who?

23         Q     Naomi and Gwen.

24         A     Who is Gwen?

25         Q     Are you familiar with the name Naomi?

1                        V. Dinielli - 1/4/17

2            A     Yes.

3            Q     How about Naomi?

4                  MS. PANICO:  How about Naomi what?

5                  MR. HENRY:  Let the record reflect again

6       counsel's continuous objection.  I'm in the

7       middle of asking my question.

8                  MS. PANICO:  That was a complete question.

9       You said:  "How about Naomi?"

10                 MR. HENRY:  It was not.

11                 MS. PANICO:  I will just object to form.

12                 MR. HENRY:  Counsel is exceptionally

13      trigger happy with these objections.

14      BY MR. HENRY:

15           Q     Naomi, who was that?

16           A     Naomi is another employee at the Village.

17           Q     Was Naomi relegated to the rec room?  I'm

18      sorry.  Was she relegated to the exercise room

19      as in the same manner Ms. Skates was?

20                 MS. PANICO:  Objection to form.

21           Q     You may answer.

22           A     Naomi spends her whole day cleaning the

23      locker room.

24           Q     My question was:  Was she stuck in the

25      exercise room like Ms. Skates for her

```
 1                    V. Dinielli - 1/4/17

 2      protection?

 3              MS. PANICO:  Objection to form.

 4      A    I think -- no.

 5      Q    So Ms. Skates was the only one that was

 6      stuck in the exercise room for her protection,

 7      right?

 8              MS. PANICO:  Objection to form.

 9      Q    Right?

10      A    From a situation, yes.

11      Q    And when you stuck her in the --

12      A    I didn't stick her anywhere.

13      Q    When you --

14      A    -- relocated her.

15      Q    -- relocated her to the exercise room, you

16      did so while she was still at EAP receiving EAP

17      counseling, right?

18      A    I don't recall.

19              MR. HENRY:  Can we take a break?

20              (Whereupon, a short recess was taken.)

21              MR. HENRY:  Back on the record.

22  BY MR. HENRY:

23      Q    Did there ever come a time that Ms. Skates

24      complained to you about your decision to stick

25      her in the exercise room?
```

1                    V. Dinielli - 1/4/17

2              MS. PANICO:  Objection to form.

3    Q    Or her reassignment.

4              Did there come a time that Ms. Skates

5    complained to you about her reassignment?

6    A    No.

7    Q    So your testimony here today that

8    Ms. Skates did not complain to you about her

9    reassignment?

10   A    No.

11   Q    So your testimony here today is that you

12   never had a discussion with Ms. Skates about

13   her dissatisfaction with being reassigned to

14   the exercise room?

15             MS. PANICO:  Objection.  Asked and

16   answered.

17   A    No.

18   Q    Did there ever come a time that Ms. Skates

19   during that period that the reassignment that

20   she requested that she leave work to seek

21   medical attention because she had chest pains?

22   A    Yes.

23   Q    Why did she have chest pains?

24   A    I don't remember.

25   Q    Could it possibly be because you raised

1                      V. Dinielli - 1/4/17

2          your voice, screamed at her in a hostile

3          manner?

4          A     No.

5          Q     Did she ask you to leave work?

6          A     Did she ask me to leave?

7          Q     Did she make the request to you directly

8          that she leave work to seek medical attention

9          for her chest pains?

10         A     Yes.  She was leaving.  She was leaving.

11         Q     When you say she was leaving, what do you

12         mean?

13         A     She didn't ask me.  Another employee came

14         into my office and said Mrs. Earline Skates is

15         having chest pains, she's leaving.  With that,

16         I walked out in the lobby and saw her heading

17         towards the door.

18         Q     Why was she leaving?

19         A     Because she had chest pains.

20         Q     Did anyone or any other employee ever come

21         to your office and say that Ms. Skates is upset

22         because she is in -- she was reassigned to the

23         exercise room?

24         A     No.

25         Q     Was there ever any connection between the

1                    V. Dinielli - 1/4/17

2       chest pains and her leaving work to seek

3       medical attention to the fact that she was

4       reassigned to the rec room?

5       A     At that time I was not aware of any

6       connection.

7       Q     But later on you became aware?

8       A     Just through statements that I'm hearing.

9       Q     Did there ever come a time thereafter that

10      you learned that Ms. Skates was instructed by

11      her doctor not to return to work for one week?

12      A     No.

13      Q     Earlier I asked you a question pertaining

14      to whether or not there was ever a request made

15      or whether you learned of a request where

16      Ms. Skates requested sick leave or to leave or

17      had some form of disability.  You testified no.

18      A     Yes.

19      Q     Well, you just testified a few moments ago

20      that you learned that Ms. Skates requested

21      medical attention, to leave work for medical

22      attention because she was experiencing chest

23      pains and that you actually met her in the

24      lobby, right?

25      A     She didn't request.  She was leaving

1                    V. Dinielli - 1/4/17

2       because she was having chest pains which was

3       understood.

4           Q    Leaving for medical attention, right?

5           A    She was leaving to go home because she

6       was -- she had -- she was having chest pains.

7           Q    How would you know if she was leaving to

8       go home if you didn't know what she was leaving

9       for?

10          A    I know.  She was leaving because she

11      had -- she wasn't feeling well and she was

12      having chest pain.

13          Q    It's your testimony here today that

14      leaving because of chest pains or not feeling

15      well is not the same as leaving to seek medical

16      attention?

17          A    I don't know why she was -- she was

18      leaving to go home.  She wasn't feeling well.

19          Q    Well, when you testified --

20          A    It wasn't a request.  She was leaving

21      which was understood.

22          Q    When you testified earlier that you never

23      had any occasion to know of Ms. Skates leaving

24      due to a disability or being sick or because of

25      a medical condition, that was inaccurate

1                    V. Dinielli - 1/4/17

2        testimony, right?

3            MS. PANICO:  Objection to form.

4        A    No.  Because I didn't know it was a

5        condition.  I didn't know she was seeking

6        medical attention.  She was leaving to go home.

7        Q    Well, you just testified a few moments ago

8        that you learned that Ms. Skates' treating

9        doctor told her not to return to work for a

10       week, right?

11       A    What?

12       Q    You just testified a few moments ago that

13       you later learned that Ms. Skates' treating

14       doctor told her not to return to work for a

15       week.

16       A    I said -- no, I didn't say --

17           MS. PANICO:  Object to form.

18       A    I said I was not aware.  I was not

19       advised.

20       Q    Did there ever come a time that you

21       changed Ms. Skates' work schedule to include

22       Sundays?

23       A    Yes.

24       Q    Did that change occur on or around May 22,

25       2013?

1                    V. Dinielli - 1/4/17

2        A    Yes.

3        Q    So after Ms. Skates disrespected you and

4    you wrote her up for insubordination on

5    April 17, 2013 while she was in EAP program

6    from April 19th through May 10th, you stuck her

7    in the exercise room and then put her on

8    Sundays --

9             MS. PANICO:  Objection to form.

10       Q    -- put her on Sundays when she never

11   worked Sundays before?

12       A    I didn't stick her anywhere.

13       Q    You reassigned her?

14       A    I reassigned her which people were

15   reassigned quite often as need be.  And I, as

16   far as Sundays, everybody -- every employee in

17   the recreation center, aside from myself and

18   one other employee, works a day on the

19   weekends, Sunday through Thursday or Tuesday

20   through Sunday.

21       Q    Is every employee also reassigned to the

22   rec room for their -- to the exercise room --

23       A    As needed, yes.

24       Q    -- for their own protection?  Does that

25   happen to every employee?

1                    V. Dinielli - 1/4/17

2        A    If an employee was being harassed in a

3        certain area, I would reassign them so that

4        they would not go -- they would not be

5        subjected to treatment like that, yes.

6        Q    But Ms. Skates was the only one that you

7        reassigned to the exercise room for her

8        protection during that period, right?

9        A    It was only her and another individual.

10       Q    Well, she was the only one, right?

11       A    Yes.  Because the other individual had

12       been in that room for a number of years.

13       Q    She was the only one that you changed her

14       schedule to include Sundays?

15       A    No.

16            MS. PANICO:  Objection to form.

17       A    No.  Everybody.  Everybody worked a

18       weekend.  We are recreation.  We are nights and

19       weekends.

20       Q    Well, didn't you know prior to making that

21       change Ms. Skates couldn't work on Sunday due

22       to religious commitment?

23       A    No.

24       Q    So it's your testimony here today that you

25       were not aware that Ms. Skates could not work

1                    V. Dinielli - 1/4/17

2       on Sundays due to her religious convictions?

3       A     Yes.

4       Q     Well, why is it that you told her that

5       this is the schedule and I'm not going to

6       change it?  Why did you say that to her then?

7       A     Because after the schedule was changed,

8       she said, I go to church on Sundays.  So I

9       said, well, other people go to church on

10      Saturdays.  Maybe you could switch your -- if

11      your church is -- has services on Saturdays.

12      We are a recreation and we're open seven days a

13      week.

14      Q     Well, I just asked you whether or not you

15      knew that Ms. Skates said that she couldn't

16      work on Sundays due to her religious

17      convictions.  You said no.

18      A     Before I made the ruling, before I sent

19      her the assignment.

20      Q     But there came a point in time that you

21      learned that she couldn't work on Sundays due

22      to her religion.

23      A     That was afterwards.

24      Q     And then in response you said, I'm not

25      going to change it.  In fact, you elaborated

V. Dinielli - 1/4/17

2    and said that she needed to tell her pastor to

3    change service to Saturday.

4    A    I didn't tell her to tell her pastor to

5    change service to Saturday.

6    Q    Well, you told her to go to a Saturday

7    service.

8    A    I just said maybe your church offers

9    services on Saturdays.  It was a suggestion.

10   Q    You suggested that her pastor come in on

11   Saturday for her because you put her on a day

12   to work less than 20 days after she

13   disrespected you?

14        MS. PANICO:  Object to form.

15   A    My church has -- I didn't ask anything

16   extra.  My church has services on Saturday.

17   Q    You usually do that to people who

18   disrespect, Ms. Dinielli, you change their

19   schedule and stick them in the exercise room?

20   A    That was her schedule to be.  She was

21   trained on Monday through Friday and she had to

22   adhere to the same schedule that everybody else

23   was working.

24   Q    Did you ever receive a policy from

25   Freeport with respect to retaliation?  Do you

1                    V. Dinielli - 1/4/17

2        know what retaliation means, Ms. Dinielli?

3        A    Yes, I do know what it means.

4        Q    What does it mean?

5        A    Means getting back at somebody, getting

6        even.

7        Q    You felt disrespected when Ms. Skates

8        complained that she didn't have a key card,

9        right?

10       A    At that moment, she was disrespecting me

11       and I wrote her up and it was over.

12       Q    Was it really over when you stuck her in

13       the exercise room while she was getting --

14       A    Yes it was.

15       Q    -- while she was still in EAP counseling?

16            MS. PANICO:  Object to form.

17       A    Yes.

18       Q    Was it really over when you told her that

19       she needed to go to her pastor and have him --

20       suggest that he change his program from Sunday

21       to Saturday?

22            MS. PANICO:  Objection to form.

23       Q    Was it really over then?

24       A    It was just a suggestion that maybe she'd

25       look into it.  I didn't tell her to go to her

1                    V. Dinielli - 1/4/17

2        pastor.

3        Q    Well, you concede and appreciate why we

4        believe that that's retaliation, right?

5             MS. PANICO:  Object to form.

6        A    No.  To work the same schedule as every

7        other employee in that building, no.

8        Q    Do you tell every other employee or

9        suggest to their pastor that they change their

10       service from the day that the service is?

11            MS. PANICO:  Objection to form.

12       Q    You may answer.

13       A    I've had other employees that have also

14       stated religious preferences, yes.

15       Q    Did there ever come a time that you

16       learned thereafter -- well, withdrawn.

17            So after you suggested that she tell her

18       pastor --

19       A    I didn't suggest she tell her pastor

20       anything.

21       Q    Suggest a new service, right?

22       A    I suggest she seek.  I didn't suggest she

23       told anybody anything.

24       Q    When you later learned that her request

25       for a religious accommodation to be off on

1                    V. Dinielli - 1/4/17

2        Sundays, did you go back and adjust the

3        schedule so she was off on Sunday?

4        A    Yes, I did.

5        Q    So you made a decision to strip her of a

6        day that she was entitled to without having the

7        full information or knowledge as to what you

8        could have or couldn't do.

9             MS. PANICO:  Objection to form.

10       Q    Right?

11       A    I don't understand what you mean.

12       Q    Well, why would you give her a day that

13       you took away if you knew that you couldn't

14       take it away to begin with?

15            MS. PANICO:  Objection to form.

16       A    I don't understand what you're saying.

17       Q    Why would you give Ms. Skates her Sundays

18       back if you knew that you didn't have the right

19       to take it away to begin with?

20            MS. PANICO:  Objection to form.

21       A    I had the right to take it away.  I gave

22       it back to her because she agreed -- my

23       lightest days are Fridays and Mondays because

24       of the Saturday/Sunday schedule.  She agreed to

25       keep the Monday and split her days off.  So we

1                    V. Dinielli - 1/4/17

2          sort of made an agreement.  It was a

3          negotiation on both of our parts.

4          Q    Do you usually negotiate with people who

5          disrespect you?

6          A    I negotiate with my employees, yes.

7          Q    Do your employees disrespect you?

8          A    On a whole, no.

9          Q    Do you usually negotiate with employees

10         that disrespect you?

11         A    I negotiate with anybody if it's something

12         that can be talked about, yes.

13         Q    How is it negotiation when you took the

14         day away?

15              MS. PANICO:  Objection to form.

16         A    Because I assign schedules to all my

17         employees.

18         Q    So generally employees are given two

19         consecutive days off, right?

20         A    Yes.

21         Q    Is that a long-standing practice and

22         policy?

23         A    We like to do that.

24         Q    So is there any reason why after

25         Ms. Skates complained about her schedule that

1                    V. Dinielli - 1/4/17

2        she was the only employee during that time that

3        wasn't given two consecutive days off?

4        A     She agreed to it.

5        Q     Do you have that agreement in writing?

6        A     She did it.

7        Q     I'm asking you.  Do you have it in

8        writing?  Is that part of the notes you

9        reviewed before you came here today?

10       A     No.  I don't recall seeing it.  I'm not

11       really quite sure.

12       Q     Why would she agree to something and then

13       later complain about it?

14       A     I don't know.  You would have to ask her.

15       Q     Is it possible that she didn't agree to

16       it?

17       A     Well, she didn't come -- she worked the

18       day -- she worked on the Monday and she didn't

19       work on the Sunday.  So I would assume she

20       agreed.

21       Q     Did there ever come a time that you

22       learned that Ms. Skates required

23       hospitalization in or about June of 2013

24       through July 2nd of 2013?

25       A     I did learn that at some point, yes.

1                    V. Dinielli - 1/4/17

2     Q    And what was the reason why you learned

3     that Ms. Skates required hospitalization?

4          MS. PANICO:  Objection to form.

5     A    She -- when she called -- when she -- I

6     had sent her -- when she hadn't come to work, I

7     sent her a letter and she replied.  She called

8     me up and told me that he had been in the

9     hospital.

10    Q    Do you know why she was in the hospital?

11    A    No.

12    Q    Does stress-induced stomach pains sound

13    about right?

14    A    I was not informed what her ailment was.

15    Q    How about back pains; does that sound

16    right?

17    A    No.

18    Q    How about possible suicidal ideation; does

19    that sound right?

20    A    No.  I was not privy to her medical

21    history.

22    Q    Well, you testified earlier that you were

23    privy that she needed to go home early because

24    she had chest pains, right?

25    A    She told me.

1                     V. Dinielli - 1/4/17

2       Q     Is that not a medical history?

3       A     Well, she told me.

4       Q     Did you send her a letter in June 5th of

5       2013 telling her that she needed to give you

6       medical documents?

7       A     Yes.

8       Q     Did she ever respond to that letter?

9       A     She sent me a doctor's note stating that

10      when she could return to work.

11      Q     You just testified a few moments ago that

12      you didn't have any documentation pertaining to

13      her medical history.

14      A     It doesn't say on it what her problem was.

15      Q     Would you consider a letter from a doctor

16      medical documentation?

17      A     I said I was aware that she had seen a

18      doctor and was hospitalized.  Said I did not

19      know why she was hospitalized.

20      Q     Do you usually testify with incomplete and

21      inaccurate responses?

22            MS. PANICO:  Objection to form.

23      Q     Do you usually give inaccurate testimony

24      while under oath?

25      A     I try my best.

1                   V. Dinielli - 1/4/17

2          Q     Do you correct instances where you give

3     inaccurate testimony while under oath?

4                MS. PANICO:   Object to form.

5          A     I have not been under oath in quite awhile

6     so...

7          Q     What was the contents of that letter?

8          A     I believe -- I'm just -- she had not come

9     to -- she had called in sick.  She had not come

10    back to work and the letter stated that she

11    needed to -- the doctor's note that she had

12    sent us said that she was going to return on a

13    certain date.  She did not return to work on

14    that date.

15               About a week, give or take, had passed and

16    I said if you do not return to work on I think

17    it was July 8th, we will assume that you're --

18    that you're abandoning your job.

19         Q     Earlier I asked you whether or not

20    Ms. Skates had made a request for sick leave.

21    You testified no.

22         A     Yes.

23         Q     But you just testified a few moments ago

24    that she called in sick and made a request for

25    sick leave.

1              V. Dinielli - 1/4/17

2    A    No.  She called in sick day by day.

3    Q    When I asked you earlier if she made a

4    request for sick leave, you told me no.

5    A    Well, leave to me -- I understand leave to

6    be --

7    Q    Or she called in sick.  You said no.

8    A    I understand leave to be more than a day.

9    Leave to be -- like when you say leave, that's

10   what I'm -- that's what I am --

11   Q    But when I asked you earlier --

12   A    I understand it to be.

13   Q    When I asked you earlier whether or not

14   Ms. Skates had called in sick you said no.

15        MS. PANICO:  Objection to form.

16   A    I never said no.

17        MS. PANICO:  That's a mischaracterization

18   of testimony again.

19   Q    When I asked you earlier whether or not

20   Ms. Skates -- were you aware of any

21   disabilities she may have had, you said no.

22        MS. PANICO:  Again, objection to form.

23   A    I'm not aware of any disabilities.

24   Q    When I asked you earlier whether or not

25   Ms. Skates had any medical conditions, you said

1                   V. Dinielli - 1/4/17

2       no.

3            MS. PANICO:  Objection to form.

4       A    I'm not aware of any medical condition.

5       Q    And when I asked you if she requested sick

6       time, you said no.

7            MS. PANICO:  Objection to form.

8       A    A span of sick time.  She never asked to

9       be off for a length of time.

10      Q    So it's your testimony here today that the

11      testimony you gave earlier was inaccurate?

12           MS. PANICO:  Again, objection to form.

13           Please stop mischaracterizing her

14      testimony.

15      A    No.

16      Q    You just testified a few moments ago that

17      you learned directly that Ms. Skates made a

18      request for sick -- to call in sick on a

19      certain day.

20      A    She called in days and she said she wasn't

21      coming to work.  Some days she said her

22      daughter was ill.  Some days she said she had a

23      personal problem.  She never called -- I never

24      knew -- first of all, she never called in to

25      me.  So I never spoke to her until that one --

1                    V. Dinielli - 1/4/17

2          until after I sent her the letter.

3          Q    So when she called in sick and you

4          testified earlier that she never called in

5          sick, that was inaccurate, right?

6                    MS. PANICO:  Objection to form.

7                    Mr. Henry, we have a stenographer here for

8          a reason.

9                    MR. HENRY:  Your objection is noted.

10                   (Counsel speaking simultaneously.)

11                   MS. PANICO:  We have a stenographer here

12         for reason.  She's recording the record --

13                   MR. HENRY:  Again, your objection is

14         noted.

15                   MS. PANICO:  Please allow me to make a

16         record.

17                   MR. HENRY:  No.  Because speaking

18         objections is not needed.

19                   May I please move forward?

20                   MS. PANICO:  No.  I'm allowed to make a

21         record.

22                   MR. HENRY:  I accommodated you by allowing

23         this deposition to happen after 1 o'clock.

24         And, please, your objection is noted.  But if

25         you want to have a speaking objection, we can

1                  V. Dinielli - 1/4/17

2        leave a part in the transcript at the end so

3        you can note it.

4              MS. PANICO:  You're taking longer to go

5        through this right now than it would for me to

6        make my objection.

7              My objection is that there is a record --

8              (Counsel speaking simultaneously.)

9              MR. HENRY:  Your objection is noted.

10             MS. PANICO:  There is a record of

11       Ms. Dinielli's --

12             MR. HENRY:  Your objection is noted.  You

13       cannot tell me --

14             MS. PANICO:  Mr. Henry, please allow me to

15       make my objection.

16             MR. HENRY:  I'm going to call the Court at

17       this time.

18             MS. PANICO:  To allow me to make --

19             MR. HENRY:  I'm calling the Court because

20       this counsel is engaging in what I believe to

21       be obstruction misconduct.  We have a number of

22       objections that have been made, but in the

23       spirit of moving this along, I haven't taken

24       much issue with it.

25             Now I'm asking this witness pointed

2        questions that tests her credibility and

3        knowledge.  I note Counsel's objection.  And at

4        the end of the day, if Counsel does not allow

5        me to move forward, I'm going to call the Court

6        because I believe this is completely harassing

7        and oppressive.

8            So can I ask my next question or am I

9        going to have to call the Court.

10           MS. PANICO:  No.  I'm making a record.

11           MR. HENRY:  Your objection is noted.

12       Please --

13           MS. PANICO:  No.  It's going to take

14       longer for you to call the Court than it will

15       for me to just make the objection.

16           (Counsel speaking simultaneously.)

17           MR. HENRY:  Let the record reflect I'm

18       calling the Court.

19           MS. PANICO:  Okay.  Call the Court again.

20           MR. HENRY:  I'm not going to deal with

21       speaking objections.  The Court just admonished

22       you on it, that you're able to give your

23       objection and move on.  But you want to give a

24       speaking dialogue.

25           (Whereupon, a short recess was taken.)

1                    V. Dinielli - 1/4/17

2              MR. HENRY:  Back on the record.

3              Can we agree that the Court said to move

4         on -- it's objection to form and move on.

5              MS. PANICO:  No, we can't agree.

6              Let's just move on with the deposition,

7         Mr. Henry.

8              MR. HENRY:  All right.  One second.

9              Could I have a readback of my last

10        question, please, before the Court was called.

11             (Whereupon, the requested record was read

12        back by the Court Reporter.)

13             MS. PANICO:  Objection to form.

14        Q    You may answer.

15        A    I never said she never called in.  There

16        were times she called in for a day.  She never

17        called in for a leave.  She never requested a

18        leave.  And there were times she didn't call

19        in.

20        Q    So did there come a time that you learned

21        that Ms. Skates would be required to stay in

22        the hospital and not return to work until

23        July 8, 2013?

24        A    No.  There was a different date.

25        July 8th was the day she was supposed to return

1                    V. Dinielli - 1/4/17

2       to work.

3       Q    What date was it that you learned she

4       would be staying in the hospital?

5       A    I believe the doctor said June 16th.

6       Q    Did there ever come a time that you

7       informed Ms. Skates that she would be suspended

8       for two days without pay for failing to call in

9       sick due to hospitalization?

10      A    Yes.  She was -- yes.  She was suspended.

11      I don't know that it was for a hospitalization

12      that she was suspended.

13      Q    Well, was she suspended because of the

14      fact that she was out sick?

15      A    She was suspended because she hadn't

16      called in some of the days, all of days.

17      Q    Well, did any part of those days have to

18      do with receiving medical treatment or being

19      hospitalized?

20      A    I don't know.

21      Q    Well, you just testified a few moments ago

22      that you learned and received medical documents

23      from her doctor pertaining to the period in

24      time that she was out of work.

25      A    That was after the fact.

1                      V. Dinielli - 1/4/17

2         Q    So the suspension for two days -- it's

3    your testimony that that suspension happened

4    before?

5         A    I don't recall.  I would have to look at

6    the timeline of what the dates were.  I don't

7    remember.

8         Q    Did there ever come a time that you

9    learned that Ms. Skates filed a complaint

10   against you or against Freeport on a basis of

11   her race, religion and disability and

12   retaliation?

13             MS. PANICO:  Objection to form.

14        Q    You may answer.

15             MS. PANICO:  Asked and answered.

16        A    During her employment, no.  After her

17   employment, yes.

18        Q    So at the time that you suspended

19   Ms. Skates, did you learn shortly thereafter

20   that you were named in a complaint by her?

21             MS. PANICO:  Object to form.

22        A    After her termination, I was advised.  Not

23   during her employment.

24        Q    How did you receive that notice?

25        A    I don't recall.

1                        V. Dinielli - 1/4/17

2       Q    Did there also come a point in time that

3       you learned that -- you later learned that

4       Ms. Skates complained about you in that

5       complaint to the -- that administrative filing

6       with the EEOC New York State Division of Human

7       Rights?

8            MS. PANICO:   Objection.   Asked and

9       answered.

10      A    If I was given a copy of it, I'm sure I

11      read it.

12      Q    Did there ever come a time that you later

13      learned that Ms. Skates suffered a work-related

14      injury on her right wrist?

15      A    I learned it the day -- the day she was --

16      she went -- after she went to the emergency

17      room, she called me and she told me that she

18      had hurt her wrist.

19      Q    Do you recall what date that was?

20      A    October 22nd possibly.

21      Q    And what did you understand about that

22      injury that she suffered?

23      A    I don't understand anything.   I mean she

24      told me she hurt her wrist and she was in the

25      emergency room.

                        V. Dinielli - 1/4/17

 2    Q    When you say she told you, how did she

 3    tell you that?

 4    A    She called up.

 5    Q    Did she submit to you any requests in

 6    writing or any notice in writing?

 7    A    No.

 8    Q    And how did you -- what was your

 9    understanding of that work-related injury to

10    her right wrist?

11    A    After she left the emergency room, she

12    came to the recreation center to fill out an

13    incident report and she told me that she had

14    hurt her wrist the prior day when she was

15    cleaning the parking lot, picking up garbage.

16    Q    Did you look at the FMLA -- I'm sorry.

17    Did you look at the -- withdrawn.

18         Do you have any knowledge or experience

19    with Village of Freeport's work-related injury

20    policies?

21    A    No.  That's why I called Human Resources.

22    Q    Who in Human Resources did you call?

23    A    I called Conor Kiran who quickly came over

24    to see Ms. Skates.

25    Q    Was this the same Conor Kiran that gave

1                    V. Dinielli - 1/4/17

2       you the directive to threaten Ms. Skates with

3       something that you didn't agree with as it

4       pertained to her attendance record?  Was that

5       the same Conor Kiran or a different one?

6       A    Conor is the director -- Mr. Kiran is the

7       director of Human Resources.  We only have one

8       director of Human Resources.  He did not tell

9       me to threaten her.

10      Q    Well, he told you to give her a directive

11      you didn't agree with.

12      A    He told me to give her a directive --

13      Q    That you disagreed with, right?

14      A    I did disagree with it, but I'm not Human

15      Resources.

16      Q    Was that the same Conor that you called

17      when Ms. Skates said --

18      A    Yes.

19      Q    Well, do you think that he would have been

20      fair in evaluating that October 22nd or so 2013

21      medical leave request from Ms. Skates?  Do you

22      think he would have been fair?

23           MS. PANICO:  Objection to form.

24      A    That's his job.

25      Q    Was it his job also to give directives

V. Dinielli - 1/4/17

1

2       that you disagreed with?

3       A    Yes.

4       Q    Did there ever come a time that you

5       learned that Ms. Skates was advised that she

6       needed to be out of work for several months in

7       order for the damaged ligaments to heal?

8       A    No.

9       Q    So it's your testimony here today that you

10      never learned that Ms. Skates needed to be out

11      of work for months due to damaged ligaments?

12      A    No.

13           MS. PANICO:  Objection.  Asked and

14      answered.

15      Q    Is that no that that's not your testimony

16      or is that -- is your testimony that you

17      weren't aware that she needed months?

18      A    I was not aware.

19      Q    Did there ever come a time that you

20      learned that Ms. Skates applied for workers'

21      compensation?

22      A    No.

23      Q    Did there ever come a time that Ms. Skates

24      provided you with a doctor's note as it

25      pertained to that October 22, 2013?

1                          V. Dinielli - 1/4/17

2       A     No.  Because she was terminated on that

3       day.  So I had no -- I had no conversation with

4       her after that day.

5       Q     Well, how would you know that she was

6       terminated?

7       A     How do I know?  Because when Conor Kiran

8       came over, he came over with legal counsel the

9       day that she came in with her arm and they

10      terminated her.

11      Q     They terminated Ms. Skates on the day that

12      she had a work-related injury.

13            Is that your testimony?

14      A     The day she claimed she had a work-related

15      injury.

16      Q     So the day that Ms. Skates had a

17      work-related injury, she was terminated, right?

18      A     Yes.  They were not aware of the

19      work-related injury prior to making plans to

20      terminate her.

21      Q     But you were aware that she --

22      A     I was aware that morning.

23      Q     So the decision --

24      A     It was a decision to terminate her the

25      prior day when we had no idea she had a

V. Dinielli - 1/4/17

2      work-related injury.  The next morning she

3      called out.  So I said we cannot terminate her

4      today.  She called and said she was coming to

5      fill out a report.  I called over to Human

6      Resources.  They came over and they terminated

7      her.

8      Q    So you stood up for Ms. Skates and said we

9      can't terminate her on that day, right?

10     A    No.

11     Q    Well, didn't you just testify that you

12     said that they couldn't terminate her on that

13     day?

14     A    They couldn't terminate her because she

15     wasn't coming to work.  She was not here to

16     terminate her.

17     Q    So the decision to terminate her, was that

18     a decision that came from you?

19     A    It was a collective decision to terminate

20     her.

21     Q    Was that collective decision -- were you

22     at the helm of that collective decision?

23     A    I wouldn't say I was at the helm, no.  I

24     don't have that authority.

25     Q    Was that another decision or another

1              V. Dinielli - 1/4/17

2         directive that you just received orders?

3    A    No.  I agreed with it.

4    Q    So you agreed that Ms. Skates should be

5    terminated on the day that she learned that --

6    the day that you learned of a work-related

7    injury?

8         MS. PANICO:  Objection to form.

9    A    I wasn't aware of the work-related injury

10   when the decision was made to terminate her.

11   When she left work on the day of the injury,

12   she told nobody.  In fact, I saw her leave and

13   she didn't tell me she hurt herself during the

14   day.

15   Q    Are you familiar with the Village of

16   Freeport's work-related injury policy and as it

17   relates to protection afforded to people who

18   suffer injuries?

19   A    No.

20   Q    Did you care to look at it?

21   A    Whenever I have a question or something

22   I'm not aware of that comes up, I call Human

23   Resources for them to educate me and inform me.

24   Q    But in this instance you didn't call Human

25   Resources, did you?

1                    V. Dinielli - 1/4/17

2      A    Yes, I did.

3      Q    Did you call Human Resources before or

4      after you agreed with the decision to

5      terminate?

6      A    I called -- I called Human Resources on

7      the morning of the 22nd stating Ms. Skates was

8      not coming to work so we could not terminate

9      her.  She then came in.  I did not know she was

10     coming in.  She then came in with her arm in a

11     sling.  At that point, I didn't even know it

12     was a work-related injury.

13          I called Human Resources.  I said,

14     Ms. Skates' arm is in a sling.  She was in

15     Nassau Hospital.  They said try to keep her

16     there.  We're coming over.  They came over and

17     she was terminated.

18     Q    Did you find -- did you think that that

19     was fair to terminate someone who had a

20     work-related injury that you stuck in an

21     exercise room and that had disrespected you?

22          MS. PANICO:  Objection to form.

23     A    I didn't stick her anywhere.

24     Q    You reassigned her, right?

25     A    That's my job to reassign.  I reassign all

1          V. Dinielli - 1/4/17

2          my -- I move around all my employees.

3          Q    Did you think that that was fair?

4          A    Did I think it was fair, I thought it was

5          necessary.

6          Q    Why did you think it was necessary?

7          A    Because she wasn't -- she was not -- she

8          did not -- her work was not satisfactory.  Far

9          from satisfactory.

10         Q    Had she been written up at all?

11         A    Yes.

12         Q    During the period after she disrespected

13         you to the point in time that she was

14         hospitalized, was she written up for

15         performances issues?

16         A    She sent -- she was spoken to.  She was

17         written up when she went to the EAP.

18         Q    That was right after she disrespected you,

19         right?

20         A    Yeah.

21         Q    Were there any other writeups during that

22         time?

23         A    I don't recall.

24         Q    So in fact you can't point to one

25         performance-related writeup after she

1                    V. Dinielli - 1/4/17

2        disrespected you, right, aside from the EAP,

3        aside from the insubordination where she

4        disrespected you?

5   A     She had disrespect.  She had --

6   Q     That was it, right?

7   A     No.  She didn't show up for work.  She

8        didn't call in for work.  She thought her

9        daughter was calling in for work.  Then I had a

10       lot of complaints from employees about her,

11       about her behavior and how they couldn't get

12       along with her.

13  Q     But you didn't write her up for those,

14       right?  From the time that she was written up

15       for disrespecting you to the time in

16       October 2013, you hadn't written her up for any

17       of those other things, right?

18            MS. PANICO:  Objection to form.

19  A     I don't know if I wrote her up.  I kept

20       administration in the loop of everything that

21       was happening.

22  Q     Aside from the request that she made for

23       sick leave and aside from the time that she

24       needed off, that she was entitled to, you can't

25       identify any other instance where you wrote her

V. Dinielli - 1/4/17

2     up.

3          MS. PANICO:  Objection to form.

4     Q    Right?

5          MS. PANICO:  Aside from what she testified

6     to already?

7     A    I don't know to be a fact.  I would have

8     to go back at the time.  I don't know if she

9     was written up or not.

10    Q    But as we're seeing here, we know that she

11    was only written up at least one time from the

12    time she disrespected you and that was the time

13    she disrespected you, right?

14         MS. PANICO:  Objection to form.

15    A    I sent her a letter that she had to come

16    back work.

17    Q    And that was the letter that you sent in

18    or around July of 2013 and that was after or

19    before you found out that she was in the

20    hospital, right?

21         MS. PANICO:  Objection to form.

22    A    The doctor said she would return to work

23    on June 16th.

24    Q    How would you know what the doctor said if

25    you testified earlier you didn't receive any

1              V. Dinielli - 1/4/17

2       medical documentation?

3       A     I said that I received it after I asked

4       for it.

5       Q     Did there ever come a time that Ms. Skates

6       complained to you or rather have there ever

7       been a time that Ms. Skates had complained or

8       filed a grievance against you?

9             MS. PANICO:  Objection.  Asked and

10      answered several times.

11      A     I don't believe.

12      Q     Did there ever come a time --

13      A     Not during her employment, yes.

14      Q     Did there ever come a time that you denied

15      Ms. Skates' complaint or grievance filed with

16      respect to how you handled her request?

17            MS. PANICO:  Objection to form.

18      A     Well, when she made a call to the union or

19      when she requested the help of the union, I

20      guess that would be a complaint, but not

21      necessarily about me.  Well, I guess maybe

22      about me, my department.

23      Q     When you say you guess about you, in fact,

24      it was about you?

25      A     It was about the policies or the decisions

1                    V. Dinielli - 1/4/17

2         that were made.

3         Q    The decisions that were made by you,

4         right?

5         A    That were handed down to her by me, yes.

6         Q    Were you ever the subject of a grievance

7         filed by Ms. Skates?

8              MS. PANICO:  Objection.  Asked and

9         answered.

10        A    I don't recall.

11        Q    Did you ever deny any of Ms. Skates'

12        grievance requests?

13        A    I don't recall what the grievances were,

14        so I can't say yes or no.

15        Q    Did there ever come a time that Ms. Skates

16        made a grievance to you pertaining to time that

17        she needed to heal that you denied?

18        A    No.

19        Q    Did there ever come a time that Ms. Skates

20        made a grievance to you for time that she

21        needed to address a medical condition that you

22        denied?

23        A    No.

24        Q    Did there ever come a time that Ms. Skates

25        made a grievance to you during the period of

1                     V. Dinielli - 1/4/17

2          June 2013 that you denied?

3     A     No.  She used every day she had available

4     to her.

5     Q     So your testimony here today is that in

6     June, around June 2013, Ms. Skates didn't make

7     a grievance to you that you denied?

8          MS. PANICO:  Objection to form.

9     A     I never denied anything that she was --

10    that she was entitled to, no.

11         MR. HENRY:  At this time, I would like to

12    mark for identification 1, previously marked as

13    1.

14         MS. PANICO:  Do you have a copy for me?

15         MR. HENRY:  Sorry.  I don't.

16         MS. PANICO:  Could you make me a copy?

17         MR. HENRY:  Sorry.  We don't have that

18    much time.

19         (Whereupon, the aforementioned document,

20    was marked as Plaintiff's Exhibit 1 for

21    identification as of this date by the

22    reporter.)

23  BY MR. HENRY:

24    Q     Do you recognize that document in front of

25    you?

1                    V. Dinielli - 1/4/17

2          MS. PANICO:  Give me an opportunity to

3     review it.

4          MR. HENRY:  How can you review?  You can't

5     review it.  This is not the trial.

6          I'm calling the Court.

7          MS. PANICO:  Allowed to see --

8          MR. HENRY:  No.  Let the --

9          MS. PANICO:  I'm allowed to see what

10    you're showing my client.

11          (Counsel speaking simultaneously.)

12          MR. HENRY:  You can see it right there.

13          MS. PANICO:  Then call the Court again.

14          MR. HENRY:  I will.  I absolutely will.

15          The witness needs to see the document

16    that's there in front her.  You're not even

17    allowing her to look it.

18          MS. PANICO:  I will allow her once I get

19    to see what you're giving her.

20          MR. HENRY:  Let her see it.  I don't

21    understand.  You're not going to go through

22    this with all my exhibits.  I'm not doing this.

23    I'm calling the Court.

24          MS. PANICO:  Just give me a copy of

25    whatever you're giving my client.

                    1          V. Dinielli - 1/4/17

 2          MR. HENRY:  I have one copy.  We already

 3     had these previously marked.

 4          MS. PANICO:  Just give me a copy.  How can

 5     you show my client something when you're not

 6     even giving me an opportunity to --

 7          MR. HENRY:  These are documents that you

 8     produced.

 9          (Whereupon, an off-the-record discussion

10     was held.)

11          MR. HENRY:  On the record.

12          Counsel had this one-page document that

13     has maybe five lines, total word count of 40 in

14     her hand now for at least two minutes, the time

15     it took for me to call the Court.  She's

16     looking, gesturing in a way as if to say she's

17     holding it, inspecting every corner of it.  We

18     need to move on.

19          MS. PANICO:  You're unbelievable.

20          Mr. Henry, for the record I would like to

21     state that during those two minutes that I had

22     this document --

23          MR. HENRY:  Three minutes, actually.

24          MS. PANICO:  -- we were on the telephone

25     with the Court.

1                    V. Dinielli - 1/4/17

2           I guess Mr. Henry expected me while I was

3      giving my argument to the Court to be reading

4      the document.  I'm sorry if I'm incapable of

5      speaking to the Court while I'm also reading a

6      document.  But I don't have that capability,

7      Mr. Henry.  I am very proud of you if you do

8      have that ability, but that's not my

9      capabilities.

10          I'm now asking for the opportunity to

11     review the document as the Court said that I'm

12     entitled to do.

13          MR. HENRY:  She said briefly.  See the

14     exhibit tab and then that's it.  That's where

15     we're at.

16          Counsel has had this exhibit now for five

17     minutes, plus the time we were on the phone

18     with the Court.

19          MS. PANICO:  Mr. Henry, I'm not going to

20     read the document while you're speaking into

21     the record.  If you will give me an opportunity

22     to review the document, it will take me all of

23     30 seconds to do.

24          (Counsel speaking simultaneously.)

25          MR. HENRY:  We have 50 exhibits left to

1                      V. Dinielli - 1/4/17

2          go.  I can't afford for you to take five

3          minutes an exhibit --

4                    MS. PANICO:  If you would just stop

5          talking, then I can review the exhibit.

6                    MR. HENRY:  The document speaks for

7          itself.  You provided it to us.  It shouldn't

8          be difficult for you to recall a document you

9          gave us.

10                   MS. PANICO:  Are you done speaking?

11     BY MR. HENRY:

12         Q    Do you recognize that document there

13         before you?

14         A    Yes.

15         Q    What do you recognize that document to be?

16         A    As I stated before, I believe this has got

17         to do with the parking pass which I did state

18         before that I did deny her.

19         Q    Drawing your attention to where it says

20         "To," do you see that?

21         A    To?

22         Q    Yes.  To.  Who is it addressed to?

23         A    To.  Earline Skates.

24         Q    Who is it from?

25         A    It's from me.  Okay.

1          V. Dinielli - 1/4/17

2     Q     And who is cc'd in there?

3     A     Conor Kiran, Human Resources.  And I sent

4     it to Earline's e-mail.

5     Q     What --

6     A     I don't really remember anything about

7     this to be totally honest.

8     Q     Can you go ahead and read what it says

9     there?

10    A     Reviewed your June 6th grievance, I don't

11    remember what the grievance is, and the current

12    Collective Bargaining Agreement.  After my

13    review, I'm denying your request.

14          I don't really recall what the background

15    of this is.  I have to be honest.

16    Q     When you testified earlier that you had

17    not given Ms. Skates or denied Ms. Skates'

18    grievance in June of 2013, that was inaccurate,

19    right?

20    A     It was accurate according to my

21    recollection.  I do not recall this.

22    Q     Do you usually give inaccurate testimony

23    or inaccurate responses when you don't have a

24    complete picture of the facts?

25          MS. PANICO:  Objection to form.

1                    V. Dinielli - 1/4/17

2      A    I thought I had a picture of the facts.

3      Q    So do you usually give inaccurate or

4      incorrect testimony when you think or you

5      thought you had a clear picture?

6            MS. PANICO:  Objection to form.

7      A    I answer at the time to what I believe is

8      true.

9      Q    Well, now that you see this document here

10     in front of you, that testimony that you gave

11     earlier that you did not deny her grievance in

12     2013, that was inaccurate, right?

13           MS. PANICO:  Objection to form.

14     A    I don't even know what this was about.  I

15     would have to see the June 6 grievance.  I

16     don't even recall that.

17     Q    But that testimony was inaccurate, right?

18     A    I don't know that.  I have not seen -- I

19     don't know what that -- I don't know what this

20     is.  I don't recall this.

21     Q    But that's your name, right?

22     A    It is my name, yes.

23           So then if I did deny a request, then it's

24     right here that I did.  Although my signature

25     is not on here, but usually I sign my things.

1                    V. Dinielli - 1/4/17

2        But I guess, you know, if I sent it, I sent it.

3        I'm not saying I didn't.  I don't recall.

4        Q    So the testimony that you gave earlier was

5        incorrect, right?

6        A    If this is correct, then it's incorrect.

7        Then I was mistaken.

8        Q    Do you usually give mistaken and incorrect

9        testimony while you're under oath?

10       A    I'm human.  I'm doing the best I can.

11       Q    So is it your testimony here today that

12       because you're human it excuses you from your

13       obligation to give truthful testimony while

14       under oath?

15            MS. PANICO:  Objection to form.

16       A    It doesn't excuse me but allows me.

17       Q    You believe here and based upon your

18       testimony you're allowed to give inaccurate

19       testimony?

20       A    I'm allowed to make a mistake.

21       Q    So that's what you call giving inaccurate

22       testimony, making a mistake, right?

23       A    I don't recall this.  I don't recall this

24       conversation or this issue.

25       Q    There ever come a time that you learned

1                        V. Dinielli - 1/4/17

2           that Ms. Skates grieved the fact that she did

3           not have two consecutive days off from work?

4           A     She agreed to it.  I don't believe she

5           grieved it because that was the agreement that

6           we made.

7           Q     So your testimony here today is that --

8           A     She wanted the Sunday off.  This was the

9           agreement that we made.

10          Q     Earlier when I asked you whether or not

11          Ms. Skates had complained or grieved or

12          challenged your decision to have her not have

13          two consecutive days off, you said no, right?

14          A     I said she agreed to it.  That was the

15          agreement that we together came upon.

16          Q     Then my question to you was:  Why would

17          she agree to something and then complain about

18          it?  Do you remember that question?

19          A     Yes.  I said to you she didn't come to

20          work on Sunday, but she did come to work on

21          Monday.

22          Q     Then I also asked you whether or not

23          Ms. Skates grieved or complained about that

24          having two consecutive days off and you said

25          no, right?

1                    V. Dinielli - 1/4/17

2        A    I believe that after we made that

3        agreement, she went with the schedule.

4              MR. HENRY:  At this time I would like to

5        mark for identification Plaintiff's 2.

6              (Whereupon, the aforementioned document,

7        was marked as Plaintiff's Exhibit 2 for

8        identification as of this date by the

9        reporter.)

10   BY MR. HENRY:

11       Q    Do you see that document there?

12       A    Yes, I do.

13       Q    What do you recognize that document to be?

14       A    It's a document about her grieving the two

15       days off.

16       Q    When you testified earlier that Ms. Skates

17       did not grieve or complain about not having two

18       days off, that was inaccurate, right?

19       A    You asked me if I remembered, if I recall,

20       and I said, no, I didn't and I still do not

21       remember.

22       Q    Well, the testimony you gave earlier

23       pertaining to this particular grieving and

24       complaint about not having two days off, that

25       was incorrect, right?

1          V. Dinielli - 1/4/17

2          MS. PANICO:  Objection to form.

3     A    I still believe that and I have to check

4     the records as to when she started the

5     schedule.  But I still believe that once she

6     started her schedule, she didn't grieve this

7     after.  If I'm mistaken -- I run a whole

8     creation center, so if I'm mistaken, I don't

9     remember the timeline, that is very well

10    possible, but I didn't have copies of this.

11    This isn't part of the stuff that I looked at.

12    Q    So do you usually give testimony where you

13    state one thing and then after you look at a

14    document you state another?

15         MS. PANICO:  Objection to form.

16    A    I usually don't give testimony, but when I

17    do give testimony as today, I do the best I

18    can.

19    Q    So when you look at this document here and

20    you're drawing your attention to the lower

21    portion of the document where it says from

22    Earline Skates, sent Thursday, June 6, do you

23    see that?

24    A    Uhm-uhm.

25    Q    Do you see where it says "To"?  Do you see

V. Dinielli - 1/4/17

2      that?

3      A      Uhm-uhm.

4      Q      What's the subject line there?

5      A      "My work schedule starting June 17th."

6      Q      And who is that addressed to?

7      A      To me.

8      Q      Can you go ahead and read what it says

9      there?

10     A      "In reference to a memo dated

11     May 29th from you and presented to me on June 4

12     concerning my work schedule, I am grieving the

13     fact that I do not have two consecutive days

14     off from work."

15     Q      Isn't that a grieving or complaint that

16     she doesn't have two consecutive days off?

17     A      Yes.  It's a complaint, yes.

18     Q      So when you testified earlier that you

19     didn't receive a complaint from Ms. Skates,

20     that was incorrect, right?

21            MS. PANICO:  Objection to form.

22     A      I didn't -- well, it was incorrect.  I

23     didn't recall.

24     Q      Do you usually give incorrect testimony

25     while under oath?

1                    V. Dinielli - 1/4/17

2              MS. PANICO:  Objection to form.

3    A    I don't usually give testimony.

4    Q    But you usually tell the truth?

5    A    I usually do.

6    Q    So why didn't you tell the truth now?

7    A    Because I didn't remember.

8    Q    So do you lie when you don't remember?

9              MS. PANICO:  Objection to form.

10   A    No, I don't lie.

11   Q    Do you not tell the truth?

12   A    I tell the best to my ability.

13   Q    Is your ability to not tell the truth?

14   A    I'm not different from anybody else.

15   Q    So is it your testimony here today that

16   everybody else lies under oath?

17   A    Everybody else does the best they -- most

18   people try to do the best they can.

19   Q    And that everybody else takes an oath and

20   lies.

21        Is that your testimony here today?

22   A    I took an oath and I'm doing the best I

23   can.

24        MS. PANICO:  Mr. Henry, she testified that

25   she couldn't recall.  Please, let's just move

1                    V. Dinielli - 1/4/17

2          on.

3          Q    In fact, you weren't in possession of a

4          complaint that Ms. Skates made pertaining to

5          the two days --

6          A    It looks that way.

7          Q    So there was no agreement between you and

8          Ms. Skates pertaining to two consecutive days

9          off.  Is she right?

10         A    I still say there was an agreement.

11         Q    Well, why would she agree to something and

12         then complain about it?

13         A    I don't know why she did a lot of things.

14         Q    One of the things we know that she didn't

15         do was agree to the agreement you say took

16         place?

17              MS. PANICO:  Objection to form.

18         A    She stayed home on Sundays.  She came to

19         work on Monday.

20         Q    But you knew that Ms. Skates complained

21         about not having those two consecutive days

22         off, right?

23         A    Right.  She called the union and the union

24         showed her where -- that she could do it if she

25         agreed to it.  And we showed her cases where

1                  V. Dinielli - 1/4/17

2          other people at times because of personal

3          issues also had a broken up schedule.

4                  MS. PANICO:  Can we just go off the record

5          for a second?

6                  (Whereupon, an off-the-record discussion

7          was held.)

8                  MS. PANICO:  Back on the record.

9                  MR. HENRY:  May I have a readback of my

10         last question.

11                 (Whereupon, the requested record was read

12         back by the Court Reporter.)

13    BY MR. HENRY:

14         Q    May I have a response?

15         A    That was my response.

16                 MR. HENRY:  What was the last question?

17         The actual question, I'm sorry.

18                 (Whereupon, the requested record was read

19         back by the Court Reporter.)

20    BY MR. HENRY:

21         Q    Did there ever come a time -- rather,

22         drawing your attention to the earlier part of

23         this e-mail, do you see there where it says

24         attached is -- from, do you see that?

25         A    Yes.

1                    V. Dinielli - 1/4/17

2      Q     Do you see there where it says the date,

3      when was it sent?

4      A     On June 6th.  Thursday, June 6th.

5      Q     Can you go ahead and read what your

6      response to her was?

7      A     "Attached is a copy of my response to your

8      e-mail.  I will give you the hard copy of this

9      memo upon your return to work at the recreation

10     center.

11     Q     So, in fact, you were in possession of

12     Ms. Skates' complaint and you actually

13     responded to that complaint, right?

14     A     I don't recall.

15     Q     Well, is that not your name?

16     A     It is -- I'm telling you I don't remember.

17     I don't remember this particular issue.

18     Q     Is that not your e-mail address?

19     A     Yes, it is.

20     Q     Why didn't you put in the beginning of

21     this e-mail or why didn't you put in the body

22     of this e-mail the agreement that you claim

23     that you had?

24     A     I have no idea.  I have no idea.

25     Q     Is it possibly because there was no

1                  V. Dinielli - 1/4/17

2        agreement?

3        A    I have no idea.  This is four years ago.

4        I have no -- three years ago.  I have no idea.

5        Three and a half years ago.

6        Q    You just testified a few moments ago at

7        length that there was an agreement that you and

8        Ms. Skates had and you don't know why she did

9        half the things she did that you didn't know

10       why she would complain about an agreement,

11       right?

12       A    It was a verbal agreement that took place

13       with representatives for her from her union.

14       Q    Why is it that you wouldn't put here in

15       the e-mail that you wrote to her --

16       A    I don't know why I didn't do that.

17       Q    -- Ms. Skates, this is inconsistent with

18       our agreement?  Why didn't you do that?

19       A    I don't know why.

20       Q    Don't you think that would have been

21       important to put in an e-mail?

22       A    Hindsight is always 20/20.

23       Q    Do you usually leave important details out

24       of e-mails?

25       A    I don't think -- maybe I didn't think --

1                    V. Dinielli - 1/4/17

2          maybe at that time I didn't think it was

3          important.  I don't recall.  I don't recall

4          writing this e-mail.  I'm not denying writing

5          it.  I'm saying I don't recall writing it or

6          what I was thinking at the time.

7          Q    Do you usually write e-mails without

8          thinking?

9               MS. PANICO:  Objection to form.

10         Q    I'm waiting for an answer.

11         A    I don't believe so, no.  I didn't say I

12         wasn't thinking when I wrote this e-mail.  I

13         said I don't recall what I was thinking.

14         Q    Well, you were thinking that Ms. Skates

15         was complaining about the two consecutive days

16         that she didn't get, right?

17         A    Yes.

18         Q    And you knew at least in your mind that

19         you had some verbal agreement -- right?

20         A    Yes.

21         Q    -- where Ms. Skates was not complaining

22         about those two days, right?

23         A    Uhm-uhm.

24         Q    Well, why is it that you didn't put it in

25         your e-mail?

1                 V. Dinielli - 1/4/17

2          MS. PANICO:  Objection.  Asked and

3     answered.

4     Q     I'm still waiting for an answer.

5     A     I don't know why I didn't do it.

6     Q     Is it because there was no such agreement?

7          MS. PANICO:  Again, asked and answered

8     several times.

9     Q     Did there ever come a time that you

10    learned in or around June 2013 that Ms. Skates

11    was in the hospital?

12    A     According to my recollection, I remember

13    her calling me and telling me she was in the

14    hospital after she was in the hospital.  That's

15    when I said, you need -- you know, could you

16    give us -- send us some -- you know, a doctor's

17    note.

18    Q     Did she make that request directly to you

19    or did she, rather, provide that information

20    directly to you or was it provided to someone

21    else?

22    A     I believe it was provided to me.

23    Q     Did you ever receive an e-mail from

24    Ms. Skates explaining to you or responding to

25    you advising you that she was in the hospital

1                    V. Dinielli - 1/4/17

2          and that was why she had excessive absences?

3          A    I don't remember an e-mail.  I'm not

4          saying yes or no.  I do not remember.  I just

5          remember a doctor's note saying that she was

6          going to return to work on the 16th of June.

7          Q    Did there ever come a time that --

8          withdrawn.

9               MR. HENRY:  At this time I would like to

10         mark for identification Plaintiff's Exhibit 3.

11              (Whereupon, the aforementioned document,

12         was marked as Plaintiff's Exhibit 3 for

13         identification as of this date by the

14         reporter.)

15   BY MR. HENRY:

16         Q    Do you see that document there in front of

17         you?

18         A    Yes, I do.

19         Q    What do you recognize that document to be?

20         A    When I requested a note from her

21         physician.

22         Q    Drawing your attention to where it says

23         "To," do you see that?

24         A    Yes.

25         Q    I'm sorry.  One moment.

1           V. Dinielli - 1/4/17

2           MR. HENRY:  Do you have any objection with

3      striking that part of the transcript because I

4      have -- the tab was -- I had it misplaced?

5           MS. PANICO:  You want to just go on the

6      record and correct -- just change --

7           MR. HENRY:  She already testified to it,

8      what that particular one was.  So I didn't want

9      to -- I just want to make it a nullity as if it

10     didn't even exist just to make sure that we

11     stay on track.

12          MS. PANICO:  I don't understand what

13     you're asking me.

14          MR. HENRY:  Would you have any objection

15     to striking that portion of the record that I

16     asked her a question about that last exhibit

17     that I just gave her?

18          MS. PANICO:  Frankly, I don't remember.

19     It was just -- didn't you justify it?  That was

20     it.

21          Read back that section.

22          (Whereupon, the requested record was read

23     back by the Court Reporter.)

24          MR. HENRY:  So I'm going to give you

25     previously incorrectly marked as 3.  Do you

1                    V. Dinielli - 1/4/17

2         understand?  Because I had said 3 before and

3         there was questions about it.  So I was

4         wondering if you wanted to just --

5              MS. PANICO:  This is a totally different

6         exhibit?

7              MR. HENRY:  Exactly.  This is the correct

8         3.  But before it was marked incorrectly.

9              MS. PANICO:  Okay.  Can we say what that

10        old one is now?

11             MR. HENRY:  I'm going to give it as the

12        next one.

13             MS. PANICO:  Now it's marked as 4.

14             MR. HENRY:  Bates stamped as 375.

15             MS. PANICO:  Just go on the record and say

16        that Plaintiff's Exhibit 3 is marked Bates

17        stamp 374 and the other one, Exhibit 4, is

18        Bates stamped whatever it is.

19             MR. HENRY:  At this time previously

20        identified as Plaintiff's 3 but was incorrectly

21        labeled as 3, identified by Document 000375,

22        that document now is marked as Plaintiff's

23        Exhibit 4.  And the correct Exhibit 3, Bates

24        stamped as 000374, is the actual document in

25        front of the witness.

1                    V. Dinielli - 1/4/17

2    BY MR. HENRY:

3          Q     Do you see that document there in front of

4    you?

5          A     Yes.

6          Q     What do you recognize that document to be?

7          A     It was an e-mail sent to me from

8    Ms. Skates stating that she was in the hospital

9    and she was supplying copies of doctor's notes.

10         Q     You see some notation there.  What does

11   that notation there say?

12         A     The handwritten notation?

13         Q     Yes.

14         A     I sent a copy with the note by e-mail on

15   the 21st of June.

16         Q     Who did you send that to?

17         A     Conor Kiran.

18         Q     Then you also see there at the bottom that

19   there's a notation there that says -- what does

20   that notation say?

21         A     That's to an individual in the law firm.

22         Q     Do you know who that individual is?

23         A     Steve Marquis, I believe.

24         Q     Do you ordinarily send these type of

25   documents to HR?

1                    V. Dinielli - 1/4/17

2      A    I assume I was instructed to do so.

3      Q    Who would have instructed you to do so?

4      A    Conor Kiran.

5      Q    Do you recall when you made -- when you

6      sent this over?

7      A    It says Friday, June 21st.  So I guess

8      that's when it was.

9      Q    So is it typical practice to send an

10     e-mail or copies of an e-mail with doctor's

11     notes to Mr. Kiran and to the lawyer?

12     A    Yes.  Well, to Mr. Kiran, yes.

13     Q    How about to the lawyer?

14     A    No.  He probably instructed me to because

15     obviously I didn't even know his e-mail.

16     Q    When you testified earlier that you never

17     received any information or had no knowledge of

18     any leave requests or disability that

19     Ms. Skates had or any requests for sick, that

20     was inaccurate, right?

21          MS. PANICO:  Objection to form.

22     A    No.

23     Q    Well, drawing your attention here, what

24     does it say in the body of this e-mail here?

25     A    This was notification after she had taken

1                    V. Dinielli - 1/4/17

2        the sick time.

3            When I said I was never notified of leave

4        requests, I assume you're asking me if she

5        asked me if she could take off because she

6        needed time off in the future.  This is -- I

7        was obviously aware of time she took off in the

8        past and doctor's notes that were implying for

9        illnesses that were in the past.

10   Q    Did there ever come a time that you

11       requested from Ms. Skates a note from her

12       doctor to substantiate her request for sick

13       leave time?

14   A    For sick leave time had been taken

15       already?

16   Q    Or for future sick leave time.

17   A    I never asked for future sick leave time.

18       Past because she was taking so much time I

19       asked her for a doctor's note justifying or

20       verifying the time she had taken.

21   Q    So it's your testimony here today that the

22       only note that you requested from her doctor

23       was that pertaining to past sick leave time?

24   A    Yes.

25            MS. PANICO:  Objection to form.

```
 1                    V. Dinielli - 1/4/17

 2        Q    Is that right?

 3        A    Yes.

 4             MR. HENRY:  At this time I would like to

 5        mark for identification Plaintiff's 4.

 6             (Whereupon, the aforementioned document,

 7        was marked as Plaintiff's Exhibit 4 for

 8        identification as of this date by the

 9        reporter.)

10   BY MR. HENRY:

11        Q    Do you see that document there in front of

12        you?

13        A    Yes.

14        Q    What do you recognize that document to be?

15        A    This obviously was the document before

16        that asking for time for the time that she had

17        for her recent request for sick time that had

18        been taken already.

19        Q    Drawing your attention to where it says

20        "From," do you see that?

21        A    Yes.  That's me.

22        Q    Drawing your attention to the date, do you

23        see that?

24        A    Yes.  That's June 10th.

25        Q    Who was it addressed to?
```

1                    V. Dinielli - 1/4/17

2        A    Earline Skates.

3        Q    Who was it from?  I'm sorry.  Who was cc'd

4    in that?

5        A    Liz Jeffries.  She does the payroll cards

6    for my department.

7        Q    Would you agree that if someone makes a

8    request for something it means that they are

9    requesting it in the future?

10       A    No.

11       Q    Would you agree that if I make a recent

12   request for something that that pertains to a

13   recent set of circumstances?

14       A    The reason why Liz Jeffries is copied is

15   because she has to justify all of the time that

16   had been marked on the books that we were

17   paying her for.

18       Q    So my question is:  Can one make a recent

19   request for something that happened in the past

20   or is it a recent request pertaining to a

21   request that's made right here recently?

22            MS. PANICO:  Objection.  Calls for

23   speculation.

24       Q    You may answer.

25       A    It's the past.  It was the immediate past.

1                    V. Dinielli - 1/4/17

2        It wasn't three months ago.  It was the

3        immediate past.  She was running out of time.

4        Q     Drawing your attention to this document

5        here in front of you where it says, I am

6        requesting a note from your physician to

7        substantiate your recent request for sick time.

8        A     Right.

9        Q     Right?

10       A     Yes.  She was asking to be paid for days

11       that she didn't come to work.  She called out

12       sick and expected to be paid.

13       Q     Well, is there any reason why you didn't

14       put in here that you were reviewing a recent

15       past request for past sick time?

16             MS. PANICO:  Objection.  Calls for

17       speculation.

18       A     No.  This is the way I worded it.

19       Q     Did there ever come a time -- withdrawn.

20             You testified earlier that Ms. Skates was

21       terminated right after she notified you of a

22       sick -- of a work-related injury, right?

23       A     She had come in with her arm in a sling

24       and I notified Human Resources that she was in

25       the building.

1                  V. Dinielli - 1/4/17

2      Q    So you knew at the very least that she had

3      a work-related injury that triggered protection

4      under the FMLA, right?

5          MS. PANICO:  Objection to form.  Multiple

6      grounds.

7      Q    Is that right?

8          You can answer.

9      A    I didn't know or believe that it was a

10     work-related injury.

11     Q    That's because you had training in FMLA?

12     A    No.  It's because I saw her leave the day

13     before in perfect health, in what I assumed to

14     be perfect health.  I said good-bye to her

15     because I happened to be in the office.

16     Q    So your testimony here today is that you

17     have a trained eye for what is a qualified

18     disability or not?

19     A    I'm claiming that when I saw her, she

20     didn't look like she was injured.  Yes.

21     Q    So your testimony here today is that you

22     got the eye --

23     A    It surprised me.  It surprised me because

24     I didn't believe her to be injured when I

25     saw -- when she left at the end of the previous

1                    V. Dinielli - 1/4/17

2        workday.

3        Q    So is it your testimony here today that

4        injuries, work-related injuries can't happen in

5        the space of the day?

6        A    I said I was surprised.

7        Q    You have the crystal ball of when

8        work-related injuries could happen?

9        A    I said I was surprised.

10       Q    Well, aren't we all surprised when

11       accidents happen?

12            MS. PANICO:  Objection to form.

13       A    When she left the building, she seemed to

14       be fine.  She had her pocketbook in her hand.

15       She didn't seem to be complaining and she

16       didn't report an injury.

17       Q    That was the day before, right?

18       A    That was the day before.

19       Q    So your testimony here today is that you

20       are gifted to know when -- withdrawn.

21            Do you know when and how accidents happen?

22            MS. PANICO:  Objection to form.

23       Q    You may answer.

24       A    Not always.

25       Q    So you know instances when accidents are

1                    V. Dinielli - 1/4/17

2          going to happen?

3          A     No.  Not always.  I don't know.

4          Q     So how would you know that Ms. Skates did

5          not have a work-related injury based upon what

6          you claim that you saw her or the condition you

7          saw her in the day before?

8                MS. PANICO:  Objection to form.

9          A     The end of the work day, she came in, she

10         had her bag, she had her pocketbook.  She

11         punched out.  She said good-bye to everybody.

12         She did not fill out an incident report stating

13         that she was not feeling well or thought she

14         might have had an injury.  She did not say

15         anything.  So it surprised me a bit when the

16         next day she came in with her arm in a sling.

17         Q     When she came in with her arm in a sling,

18         did you write her up?

19         A     Why would I write her up?

20         Q     Did she engage in any type of erratic

21         disrespectful behavior?

22         A     No.  She was pleasant.

23         Q     What day was that?

24         A     That was October 22nd.

25         Q     How about the 23rd?  Was she pleasant on

1                    V. Dinielli - 1/4/17

2          that day too?

3          A    I don't recall.  If I had my dates mixed

4          up, then I have my dates mixed up, but I do not

5          see her after that day.

6          Q    So after you learned that Ms. Skates had

7          an injury and that she came in to work with a

8          sling, was there any point after that that

9          Ms. Skates was unpleasant or disrespectful or

10         rude to you?

11              MS. PANICO:  Objection to form.

12         A    She was terminated and left the building.

13         So I didn't see her after that.

14         Q    Why was she terminated, if you remember?

15         A    She was terminated for reasons of

16         excessive absence, for racial comments that she

17         made to other members of the staff and to

18         patrons in the facility.

19         Q    You testified earlier that Ms. Skates was

20         not written up.  Only time she was written up

21         was as a result of disrespecting you.

22              MS. PANICO:  Objection to form.

23         Q    Isn't that right?

24         A    You said that.  I said I didn't recall.

25         Q    Did you write her up?

1                    V. Dinielli - 1/4/17

2        A    I don't recall.

3        Q    Did you write her up for --

4        A    I don't recall.

5        Q    Okay.

6             Did you write -- withdrawn.

7        A    We have to go back and see and look at the

8        files.  I don't recall.

9        Q    Withdrawn.

10            During a break, did you confer with your

11       attorney with respect to my questions?

12       A    No.

13            MS. PANICO:  Objection.

14            This is attorney-client privileged

15       information.  I'm directing her not to answer.

16       Q    During the break, were you provided with

17       any information on how to respond to my

18       questions without revealing the subject of that

19       communication with your attorney?

20            MS. PANICO:  Objection.

21            Attorney-client privilege.  I'm directing

22       you not to answer.

23            MR. HENRY:  I've limited my question.

24       I've limited my question.

25

                        V. Dinielli - 1/4/17

2    BY MR. HENRY:

3        Q    Without telling me anything at all, any

4        communications that you had with your attorney,

5        were you provided with any guidance on how to

6        respond to my question?

7             MS. PANICO:  Objection.

8             Don't answer.

9        Q    You may answer.

10            MS. PANICO:  I'm directing you not to

11       answer.

12            MR. HENRY:  What grounds?

13            MS. PANICO:  Attorney-client privilege.

14            MR. HENRY:  On what grounds.  I've limited

15       it.  I don't need to know what she --

16            MS. PANICO:  It doesn't matter.

17            MR. HENRY:  It does matter.  What is the

18       basis?

19            MS. PANICO:  You're still asking her what

20       we discussed.

21            MR. HENRY:  No, I'm not.

22            MS. PANICO:  Yes, you are.

23            MR. HENRY:  I'm asking her if she received

24       from any source information on how to respond

25       to my questions.  It doesn't have to be you.

V. Dinielli - 1/4/17

2        It could be in her e-mail.  It could be a phone

3        call.

4  BY MR. HENRY:

5      Q   We had a break.  Did you receive from any

6        source, any source without telling me who it

7        was --

8        MS. PANICO:  Did you speak to anybody --

9        MR. HENRY:  No.  You can't answer the

10      question -- no.  You can't ask my questions.

11      MS. PANICO:  Well, I'm directing her not

12      to answer.

13      (Counsel speaking simultaneously.)

14      MR. HENRY:  How are you directing her not

15      to answer a question I haven't asked yet?

16      MS. PANICO:  You're asking her what we

17      discussed on the break.

18      MR. HENRY:  I'm not asking you do that.

19      And the record is clear.

20  BY MR. HENRY:

21      Q   During the break, from anyone, without

22        telling me who, I don't want to know who it

23        was, did you receive any instruction on how to

24        respond to my questions?

25      MS. PANICO:  Objection.

                    V. Dinielli - 1/4/17

2      Q    Without telling me who.  I don't want to

3      know who.

4           MS. PANICO:  Attorney-client privilege.

5      Q    I don't know if it's your lawyer.  Anyone.

6           MS. PANICO:  Don't answer.

7      Q    You may answer.

8           MS. PANICO:  I'm telling you not to

9      answer.

10          MR. HENRY:  I got to call the Court.

11          I've limited it.

12          MS. PANICO:  It's after 5 o'clock.  The

13     Court is not going to be there.  So you'll have

14     to preserve your question.

15          MR. HENRY:  The Court works late.

16          (Whereupon, a short recess was taken.)

17          MR. HENRY:  I limited it.  I don't need to

18     know who it was from.  I'm not asking from you.

19     I'm asking from anyone because --

20          MS. PANICO:  Well, why don't you start

21     off --

22          MR. HENRY:  I want to make sure --

23          MS. PANICO:  -- by asking whether or not

24     she spoke to anybody other than me?  If she

25     didn't speak to anybody other than me --

1              V. Dinielli - 1/4/17

2                   MR. HENRY:  No.  I'm not asking you to lay

3              a foundation.  I'm asking this witness a

4              pointed question.  I don't need to know --

5                   MS. PANICO:  I'm just saying we could

6              avoid having to get the Court involved.  If she

7              didn't speak to anybody other than me --

8                   (Counsel speaking simultaneously.)

9                   MR. HENRY:  We don't know that.  I wish I

10             could get --

11                  MS. PANICO:  I'm telling you to ask that.

12                  MR. HENRY:  No.  You can't tell me that.

13                  Let the record reflect that the witness is

14             now looking at her phone and --

15                  THE WITNESS:  I'm just texting my

16             children --

17                  MR. HENRY:  That's fine.  There's nothing

18             wrong with you looking at it.

19        BY MR. HENRY:

20             Q    My question again is without your --

21             without asking you any questions about whatever

22             you and your attorney spoke about, I really

23             don't care about that, I need to know if you

24             received from anyone, any human being with a

25             heart that blood pumps through their body any

1          V. Dinielli - 1/4/17

2     information or instructions on how to respond

3     to my questions.

4          MS. PANICO:  I'm maintaining my objection.

5     Q    You may answer.

6          MS. PANICO:  Don't answer.

7     Q    You may answer the question.

8          MS. PANICO:  I'm her attorney --

9          MR. HENRY:  I have every right --

10         MS. PANICO:  -- and I am directing her not

11    to answer the question.

12         MR. HENRY:  Ms. Panico, I have every

13    right --

14         MS. PANICO:  Don't tell her to answer the

15    question when I'm directing her not to.

16         MR. HENRY:  Let the record reflect that

17    Ms. Panico is reaching across the table --

18         MS. PANICO:  I'm not reaching across the

19    table, Mr. Henry.

20         MR. HENRY:  -- yelling at me.

21         I have every right to ask this question if

22    she -- ask the witness a question if she

23    received any information on how to respond to

24    my questions from anyone, number one, is

25    relevant because these questions are designed

1                    V. Dinielli - 1/4/17

2          to test this witness' credibility.  If this

3          witness went out and had a discussion with --

4          and I'm not talking about a lawyer -- with

5          anyone with a heartbeat.

6                    THE WITNESS:  I didn't leave the room.

7                    MS. PANICO:  Don't answer.  Let him pursue

8          whatever he wants to with the Court.

9                    MR. HENRY:  She can speak.

10                    MS. PANICO:  No, she can't speak.

11                    MR. HENRY:  Let the record reflect that

12          the Court Reporter in a sign of what I

13          interpreted is frustration with Ms. Panico's

14          continued ability to not allow me to make my

15          record --

16                    MS. PANICO:  You are amazing.

17                    MR. HENRY:  -- because I was speaking and

18          Ms. Panico -- my record was incomplete.

19     BY MR. HENRY:

20          Q    My question again is, Ms. Dinielli, I

21          don't want to know what you and your lawyer

22          talked about.  I really, quite frankly, don't

23          care what you and your lawyer talked about.  My

24          question is limited.

25                    Did you receive any guidance, instruction,

1                  V. Dinielli - 1/4/17

2        I'm not talking about what you and your lawyer

3        talked about, on how to respond to my

4        questions?

5             And the reason why I'm asking that is

6        because I believe that it's wholly improper if

7        you did.  And I need to be able to test your

8        credibility.  I don't need to know what you and

9        your lawyer may or may not have spoke about.  I

10       just need to know if you received any

11       information or guidance from anyone with a

12       heartbeat on how to respond to my questions.

13            MS. PANICO:  Mr. Henry, the way you're

14       phrasing the question that way, I'm not going

15       to allow my client to answer.  However, if you

16       would like to rephrase it, I have a suggestion.

17       Perhaps you can ask her whether or not she --

18       anybody other than her attorney asked her --

19            MR. HENRY:  I just said I don't care about

20       her attorney.

21            MS. PANICO:  I don't feel comfortable with

22       the way that the question is asked.

23            MR. HENRY:  It doesn't matter.  You have

24       now instructed this witness not to answer a

25       question with no grounds.  I've said it so many

V. Dinielli - 1/4/17

 2      different ways.

 3    BY MR. HENRY:

 4      Q    Ms. Dinielli, I do not care about what you

 5      and your lawyer spoke about.  That's not what I

 6      want to know.

 7          What I want to know is:  Did you receive

 8      instruction, guidance, not what you and your

 9      lawyer talked about, from anyone with a

10      heartbeat.

11          MS. PANICO:  So from anybody other than

12      your counsel.  Did anybody direct you on how to

13      respond?

14          THE WITNESS:  No.

15      Q    Did you receive any instruction on how to

16      respond to my question?

17      A    No.

18      Q    From anyone with a heartbeat?

19      A    No.

20          MS. PANICO:  With the exception of your

21      counsel.

22          MR. HENRY:  Let the record reflect that

23      Ms. Panico now has wasted 15 minutes of my time

24      with this nonsense and instructing her client

25      not to answer a question that I have limited

1                V. Dinielli - 1/4/17

2          and said that I didn't want to know anything

3          about the attorney-client communications.

4                My concern was, and I've had this in other

5          cases, where witnesses that are under oath go

6          out and receive e-mails, they receive

7          documents, they make a phone call and then they

8          are giving insight on how to respond to my

9          question.  My question was not designed to test

10         whether or not you coach her.

11               MS. PANICO:  You spent the last five

12         minutes wasting more time.  So why don't you

13         just move on, Mr. Henry.

14               MR. HENRY:  I'm making my record.

15               And for Ms. Panico to do what she just did

16         by wasting so much time, I think it's just in

17         line with her conduct the entire course of this

18         deposition.  And we will certainly deal with it

19         in kind.

20     BY MR. HENRY:

21         Q    Again, so is your answer now with respect

22         to receiving instructions or guidance from

23         anyone with a heartbeat, is it your testimony

24         here today that you didn't receive such

25         guidance, knowledge or --

1          V. Dinielli - 1/4/17

2          MS. PANICO:  Objection.

3     Q    -- during a break?

4          MS. PANICO:  Objection.

5          Can you please read back that question?

6          MR. HENRY:  I said without the lawyer.

7     With the exception of the lawyer.

8          MS. PANICO:  I didn't hear the question

9     that you asked.  I'm asking it to be read back,

10    please.

11  BY MR. HENRY:

12    Q    During the time --

13         MR. HENRY:  I'm not going to waste any

14    time.

15         Can you note this part of the transcript

16    for a ruling, please?

17         MS. PANICO:  Are you withdrawing the

18    question?

19         MR. HENRY:  No, I'm not.  I'm noting it

20    for a ruling.

21         MS. PANICO:  I'm asking -- so you're going

22    to ask it be marked for a ruling when I didn't

23    hear the question?

24         (Counsel speaking simultaneously.)

25         MR. HENRY:  This is my -- you should have

1                    V. Dinielli - 1/4/17

2        been paying attention.  Maybe if you had taken

3        your phone call with Dan Panico who was just

4        calling, as it's on our conference table, as

5        it's affecting my ability -- vibrating the

6        table, I think that we would have been --

7              MS. PANICO:  You know what, you're

8        harassing me.  I'm ending this deposition right

9        now.

10             MR. HENRY:  On what grounds?

11             MS. PANICO:  You're harassing me.  You've

12       been harassing the witness throughout the

13       entire day.  I'm ending the deposition right

14       now.

15             MR. HENRY:  Go ahead.  End it.  If that's

16       what you want to do.  You're terminating the

17       deposition.  Go ahead.  End it.

18             MS. PANICO:  Can you please stop attacking

19       me?

20             MR. HENRY:  How have I attacked you?

21             MS. PANICO:  Repeatedly throughout this

22       deposition.

23             This is my final warning.  If you

24       continue, I am leaving.

25             MR. HENRY:  Ms. Panico, you could do

1                    V. Dinielli - 1/4/17

2           whatever you want to.

3                MS. PANICO:  Nobody would put up with what

4           I put up with.

5                MR. HENRY:  Ms. Panico, you can do

6           whatever you choose.  The record is clear.  And

7           this is the reason why I videotape my

8           depositions.

9                MS. PANICO:  Yeah.  Exactly.  Because you

10          are the most difficult person to deal with in

11          the entire world.  This is exactly why you need

12          to record.

13               MR. HENRY:  Thank you.

14               The record is very clear.  My questions

15          are in line with those that are asked.

16               Ms. Panico did not hear the question that

17          I asked.

18               MS. PANICO:  And you refusing to allow the

19          Court Reporter to read it back to me?

20               THE COURT REPORTER:  I'm sorry.  There's

21          going to be a lot of "Counsel speaking

22          simultaneously in the transcript."

23               MR. HENRY:  I understand.

24               MS. PANICO:  Yup.

25               MR. HENRY:  So may I finish my -- what I

1          V. Dinielli - 1/4/17

2      was stating before Ms. Panico interjected.

3          MS. PANICO:  If you'll allow me to speak.

4          THE COURT REPORTER:  And you're still

5      doing it.

6          MS. PANICO:  Because he doesn't allow me

7      to speak.

8          MR. HENRY:  Could you put that in, please,

9      that I'm talking and what she said.

10          Let the record reflect that, again, the

11      Court Reporter has expressed tremendous

12      frustration with the direction of this

13      deposition and the simultaneous discussions.

14          The last I checked, I had an open

15      question.  And Ms. Panico asked to have a

16      readback of my question when it's my

17      deposition.  All I said was you probably didn't

18      hear the question because your cell phone,

19      which is on the conference room table, which

20      did light up and vibrate, which did have the

21      name Dan Panico, probably the reason why you

22      didn't hear it.  That's all I said.  It was not

23      intended to harass you.

24          I don't need a readback of my question.  I

25      just need to move forward with the next

1                    V. Dinielli - 1/4/17

2          question.

3                MS. PANICO:  And if I may.  Number one,

4          requested a readback of the question which

5          Mr. Henry refused to do, which is a common

6          courtesy that normal professionals grant to one

7          another.

8                And second of all, I was not looking at my

9          phone which is absolutely absurd.  I was

10         listening and thinking about the question.  And

11         I asked to have it read back because I wanted

12         to determine whether or not I needed to make an

13         objection.

14               MR. HENRY:  Okay.  Well, you can't -- if

15         every defendant -- if every defense witness or

16         defense counsel had the ability to ask a

17         readback for a question before they decide to

18         object to that question, I don't think we would

19         ever get through the rest of questions.

20               MS. PANICO:  I asked to do it one time,

21         Mr. Henry.  Is that taking out too much of your

22         time?

23               MR. HENRY:  Moving on, please.

24               MS. PANICO:  Please move on.

25

1                    V. Dinielli - 1/4/17

2   BY MR. HENRY:

3       Q    So with respect to the document there in

4       front of you, marked as Plaintiff's

5       Exhibit 4 --

6            MS. PANICO:  Do you have some sort

7       air-conditioning?  It's like 90 degrees in

8       here.

9            MR. HENRY:  I will look into it.

10           MS. PANICO:  Are you going to look into it

11      now?

12           MR. HENRY:  No.  We're in the middle of a

13      deposition.  I'll send a message.

14           MS. PANICO:  I'd ask that you do that now

15      because I am extremely warm.  And I'm normally

16      a person that's not.

17           MR. HENRY:  Well, we have water here, but

18      I have --

19           MS. PANICO:  You actually took my water

20      bottle away from me.

21           MR. HENRY:  Here's another one.  We have

22      plenty of water here to go around.  Quench your

23      thirst.

24  BY MR. HENRY:

25      Q    Ms. Dinielli, earlier you testified that

1                    V. Dinielli - 1/4/17

2       there had only been one time that Ms. Skates

3       was written up from the time that she

4       disrespected you to the time that she was

5       written up, right?  And that was for the

6       insubordination.

7              MS. PANICO:  Objection to form.  That's

8       not what she testified to.

9       Q    Was there any other writeups other than

10      the one for insubordination?

11      A    I said I don't recall.

12      Q    Did you ever write Ms. Skates up for using

13      offensive racial slurs?

14      A    No.  But there were complaints from

15      employees that they presented complaints.

16      Q    Did you ever write Ms. Skates up for --

17      A    I don't recall.  I don't recall.

18      Q    Did you ever meet with Ms. Skates in your

19      office where you have a door to say that you

20      are being accused of racial --

21      A    I don't believe so.

22      Q    So you never met with her, right?

23      A    No, I don't believe so.

24      Q    You never wrote her up for racial slurs,

25      right?

1                     V. Dinielli - 1/4/17

2       A    I don't recall.

3       Q    But you could recall writing her up and

4   you can recall writing her up because she waved

5   her finger and walked out and left your office.

6   You could recall writing her up for that,

7   right?

8       A    Yes.

9       Q    But you can't recall writing her up for

10  using racial slurs?

11      A    (There was no response.)

12      Q    What do you think is more egregious,

13  Ms. Dinielli, using racial slurs or walking

14  out --

15      A    I never experienced the racial slurs.  The

16  people that experienced and heard them are the

17  ones that made the complaint.

18      Q    Were those complaints in writing?

19      A    They were forwarded to Human Resources,

20  yes.

21      Q    Were those complaints in writing?

22      A    I don't recall.

23      Q    Did you ever see a written complaint?

24      A    I don't recall.

25      Q    Well, you recall that Ms. Skates turned

1                V. Dinielli - 1/4/17

2        around and waved her finger and stormed out of

3        your office that you called her back?

4        A    Yeah.  Because that was quite impressive.

5        Q    Well, don't you think racial slurs are

6        quite impressive too?

7        A    I didn't -- I wasn't there for the racial

8        slurs.  If I was there, then I would have.  I

9        was there when the employees were complaining

10       about it, that I was there for.  That, I do

11       remember.

12       Q    But you don't remember ever receiving

13       anything in writing about that now, do you?

14       A    No, I don't.

15       Q    You had never got any written complaints

16       about Ms. Skates, right?

17            MS. PANICO:  Objection to form.

18       A    I don't recall.

19       Q    You couldn't recall ever getting any

20       written complaints from employees pertaining to

21       racial slurs, right?

22            MS. PANICO:  Objection to form.

23       A    I didn't get them, but I believe they were

24       written up in Human Resources because it's not

25       really practice for them to come to me.  If

1                      V. Dinielli - 1/4/17

2           they come to me, I tell them to go to Human

3           Resources.  I believe Human Resources wrote

4           them up, however, I don't recall seeing it.

5      Q    But you've never seen any writeup, right?

6      A    I don't recall seeing the writeup.

7      Q    Now, your testimony pertaining to these

8           racial slurs and that you heard about it from

9           the employees, is it possible that you were

10          mistaken just as you were mistaken that

11          Ms. Skates made an agreement with you that she

12          didn't have a problem with not working two

13          consecutive days?

14          MS. PANICO:  Objection to form.  Again

15          you're mischaracterizing her testimony.  She

16          never testified that she didn't -- that there

17          was no agreement.  She never testified to that.

18          The record will speak for itself as to

19          what she testified to.  You don't need to

20          continue to mischaracterize what she's been

21          saying.

22     BY MR. HENRY:

23     Q    You were Ms. Skates' direct supervisor;

24          isn't that right?

25     A    Not direct.  I said I was the director of

1                   V. Dinielli - 1/4/17

2          the facility for which 20 full-time employees

3          are employed and probably close to 75

4          part-time.

5          Q    Did John Henry write Ms. Skates up for

6          racial slurs?

7          A    I don't believe so.

8          Q    Did James Beauford write Ms. Skates up for

9          racial slurs?

10         A    No.  I believe the individuals that had

11         the complaints went to Human Resources.

12         Q    Did Mr. Murphy write Ms. Skates up for

13         racial slurs?

14         A    No.

15         Q    Did the building maintenance maintain or

16         write Ms. Skates up for racial slurs?

17         A    No.

18         Q    Did any of the other rec attendants write

19         Ms. Skates up for racial slurs?

20         A    They went to Human Resources and they

21         filed the complaints.

22         Q    So your testimony here today is that the

23         other rec attendants went to Human Resources

24         and filed complaints?

25         A    I believe they did.  That is what I

1          V. Dinielli - 1/4/17

2     believe.

3     Q     But you don't know for sure because you've

4     never seen the complaints?

5     A     I never saw them write it up.  I witnessed

6     them complain to Human Resources and tell their

7     recollection.

8     Q     But you've never seen any writeups?

9     A     I don't recall seeing anything.

10    Q     How about the laborers?

11          MS. PANICO:  Can you allow her to finish

12    her response before you ask another question?

13          MR. HENRY:  The objection is noted.

14    A     I don't recall seeing anything written up.

15    Q     Did the laborers write her up?

16    A     No.

17    Q     So, in fact, as you're sitting here today,

18    you've never seen a writeup for racial slurs?

19    A     I don't recall.

20    Q     But you recall writing her up because she

21    waved her finger?

22    A     Yes.

23    Q     You recall who was in the room -- on the

24    far side of room when you spoke to her about a

25    private discussion pertaining to her vacation

1                V. Dinielli - 1/4/17

2        and comp time, right?  You recall that, right?

3        A    Yes, I do.  Because that was firsthand

4        knowledge.

5        Q    Earlier when I asked you how is your

6        memory, you testified that your memory was

7        average, but that you don't forget things

8        often.  Right?  Why would you forget who or why

9        or whether or not there was a writing

10       pertaining to racial slurs that Ms. Skates is

11       alleged to have made?

12            MS. PANICO:  Objection to form.

13       A    I run a 750 square foot facility.  I run

14       events all over the Village.  Ms. Skates was

15       not my only priority at the time.

16       Q    Well, she was your priority certainly from

17       June, when she disrespected you, to July when

18       you told her that you were going to fire her if

19       she didn't come back to work.  And she

20       certainly was your priority when you told her

21       that she was going to lose her accumulated time

22       because she couldn't find her card.

23            Right?  She was a priority then, right?

24            MS. PANICO:  Objection to form.

25       A    She was my priority.  Those issues were a

1                   V. Dinielli - 1/4/17

2         priority at the time such as probably hundred

3         others.

4         Q    So you could recall the square footage of

5         the facility, the employee count and the

6         program you run in Freeport, but you can't

7         recall who, where, when, what document, where

8         the writeup is pertaining to slurs that she's

9         alleged to have made?

10             MS. PANICO:  Objection to form.

11             She specifically testified that she

12        recalls the conversations that she had with the

13        individuals who told her about the racial

14        slurs.  She can't remember written complaints.

15             Please stop mischaracterizing her

16        testimony.

17             MR. HENRY:  At this time I would like to

18        mark for identification Plaintiff's Exhibit 5.

19             (Whereupon, the aforementioned document,

20        was marked as Plaintiff's Exhibit 5 for

21        identification as of this date by the

22        reporter.)

23  BY MR. HENRY:

24        Q    Do you see that document there in front of

25        you?

1                  V. Dinielli - 1/4/17

2       A     Yes, I do.

3       Q     What do you recognize that document to be?

4       A     I recognize it to be a letter that was

5       sent to Ms. Skates after her termination

6       telling her that she was not allowed on the

7       ground or in the facility.

8       Q     Can you go ahead and tell me what the date

9       of that letter is?

10      A     October 23rd, the day after she was

11      terminated.

12      Q     With respect to this letter, can you go

13      ahead and do me a favor and read the first

14      paragraph?  Actually, go ahead and read us the

15      letter.

16      A     "Dear, Ms. Skates:  As you know, your

17      employment with the Village of Freeport was

18      terminated effective 10/22/13.  Including in

19      the charges and specifications against you are

20      charges based upon offensive racial slurs made

21      by you and directed at both employees and

22      patrons of the recreation center.

23            "The Village of Freeport will not tolerate

24      such behavior at its facilities and will

25      protect its employees and patrons from any such

V. Dinielli - 1/4/17

2    harassment.  Therefore, we are barring you from

3    entry to the recreation center.  You are not

4    permitted entry to that facility or its ground

5    at any time for any reason.  Should you feel

6    that for some reason entry is critical, you may

7    contact the undersigned and I will arrange for

8    you to have supervised escorted access.  We

9    will consider unauthorized entry as an act of

10   trespass and pursue charges against you.  Your

11   compliance with this directive is therefore

12   critical.

13        "Very truly yours, Conor Kiran, Executive

14   Director of Human Resources."

15        Chief of Police, Howard, the Village

16   Attorney, and myself were copied on this

17   letter.

18   Q    You testified earlier that Ms. Skates was

19   pleasant in October 2013.  She was specifically

20   pleasant when you saw her in a sling on her

21   arm, right?

22   A    I said that she was pleasant on the

23   morning of -- that she came in.  She was in

24   pain and she was pleasant.

25   Q    You testified that she wasn't rude, right?

1                    V. Dinielli - 1/4/17

2        A    Yes, I did.  On that day she wasn't rude.

3        Q    You also testified that was the day that

4   you learned that she suffered a work-related

5   injury, right?

6        A    That she claimed she had a work-related

7   injury.

8        Q    In fact, you actually saw her in the lobby

9   as she left, right?

10       A    No.

11       Q    You testified that you learned --

12       A    That was the day before.  The day before I

13  saw her in the lobby when she left.  I saw her

14  punching out.  That was on the 21st.

15       Q    You also testified that she wasn't even in

16  thereafter, right?

17       A    In the building?

18       Q    Yes.

19       A    Yes, I did.

20       Q    So the last time that Ms. Skates was in

21  the building was the day that you saw her out

22  of the building?

23       A    I didn't see her out.  But whoever -- but

24  the day she left after she was terminated.

25       Q    So, in fact, this letter here that says

1                V. Dinielli - 1/4/17

2      that Ms. Skates was terminated effective a day

3      that she wasn't even at work was inaccurate,

4      right?

5      A     No.  That was the date.  The 22nd was the

6      date she came in and they terminated her.  She

7      was terminated.

8      Q     Did you ever provide Ms. Skates with

9      charges and specifications?

10     A     I didn't but the Village attorney and

11     Human Resources, they took control of the

12     meeting.

13     Q     Did you ever provide Ms. Skates or did you

14     ever review a -- charges and specifications

15     that is were filed against Ms. Skates?  Did you

16     ever see those?

17     A     As I said, the termination hearing, the

18     termination meeting was not -- I did not, you

19     know, spearhead that meeting.

20     Q     Have you ever seen charges and specifics

21     against Ms. Skates pertaining to what she's

22     alleged to have done on the day that she was

23     off?

24           MS. PANICO:  Objection to form.

25     Q     Have you ever seen any charges or

1                    V. Dinielli - 1/4/17

2        specifications against Ms. Skates for racial

3        slurs?

4        A    Have I seen documentation?

5        Q    Yes.

6        A    Since then I have.

7        Q    On this date here?

8        A    On this date, no.

9        Q    What are "charges and specifications"?

10       A    I'm sorry?

11       Q    What are "charges and specifications"?

12       A    Allegations of misconduct.

13       Q    Charges and specifications, why are those

14       important?  Why is a charge and specification

15       an important piece of document?

16            MS. PANICO:  Objection to form.

17       Q    You may answer.

18       A    Why are they important?

19       Q    Yes.

20       A    Because they are important for the reason

21       so that she would know the reasons why she was

22       terminated.

23       Q    So what's the typical process when someone

24       is given a charge and specification?  What

25       happens thereafter?

V. Dinielli - 1/4/17

2      A    I don't understand what you're saying.

3      Q    What is the policy?  What is the procedure

4      that takes place after someone is issued a

5      charges and specification outlining grounds for

6      termination?  What happens after they are given

7      those charges and specifications?

8           MS. PANICO:  Objection.  Calls for

9      speculation.

10     A    I don't work in Human Resources.  I don't

11     know.  Thank God I haven't -- had the --

12     Q    As you're standing here today, you have

13     never seen or at this point you hadn't seen

14     charges or specifications against Ms. Skates up

15     until this point, right?

16     A    I've heard the charges and allegations.

17     Q    But you hadn't seen it, right?

18     A    Personally, no.

19          As I said at the very beginning of this, I

20     had very little dealings with Ms. Skates.  I'm

21     the manager.  I run the facility.  I handle the

22     finances.  Handle all of that.  I don't really

23     get involved in much of the day-to-day

24     operations unless I'm called upon.

25     Q    Well, you were the and still are the

1                    V. Dinielli - 1/4/17

2        manager and supervisor of the recreation

3        center, right?

4        A    That's right.

5        Q    If there was a charge and specification

6        alleging or accusing Ms. Skates of offensive

7        racial slurs made to employees and patrons of

8        the recreation center, that would have been

9        something that you would have been directly

10       involved with, right?

11            MS. PANICO:  Objection to form.  Calls for

12       speculation.

13       Q    Isn't that right?

14       A    The employees came to me.  They told me

15       what their problem was and I forwarded them to

16       Human Resources.

17       Q    But you never thought once to take a

18       written statement from any of those employees?

19       A    Not my job to do that.  That's why we have

20       Human Resources.

21       Q    When did they come to you with these

22       concerns?  When did these employees come to

23       you?

24       A    Throughout her employment.

25       Q    So why did you wait until the day that she

1                    V. Dinielli - 1/4/17

2         had a work-related injury, the day before you

3         saw her in a sling to make it an issue then?

4         Why did you wait so long?

5         A    It was a culmination a lot of events.  It

6         had nothing to do with her work related because

7         at the time when the decision was made to

8         terminate her, we were not even aware of

9         work-related injury.  Because, as I said, when

10        she left work on the 21st, she did not tell

11        anybody nor did she tell the people she was

12        even working with that she had injured herself.

13        Nobody was aware.

14        Q    Why didn't you write Ms. Skates up for

15        harassing patrons of the recreation center?

16        Why didn't you do that?

17        A    I advised Human Resources.

18        Q    Why didn't you write Ms. Skates up for

19        offensive racial slurs?

20        A    I advised Human Resources.

21        Q    Who told you that Ms. Skates had offensive

22        racial slurs?  What employees told you that?

23        A    Vicky Grotton, Anique Adams.  Those are

24        the two that I can recall right now.

25        Q    What's Vicky Grotton's title?

V. Dinielli - 1/4/17

2    A    Rec attendant.

3    Q    And what's Anique Adams' title?

4    A    Cashier.

5    Q    Where are they stationed primarily?

6    A    Vicky Grotton worked alongside of Earline

7    for much of her employment with us.

8    Q    And when did that begin and when did that

9    end?

10   A    Pretty much on her first day.

11   Q    When did she stop working with Ms. Skates?

12   A    As far as I could recall, she always

13   worked a little bit with her.  Other than when

14   her days changed, then if Vicky was off a day,

15   then they weren't together.  But they did work

16   side by side.

17   Q    Did they work together in the exercise

18   room?

19   A    No.  That's where they split up.

20        Because the patrons were complaining that

21   the ladies were making too much noise.  So I

22   said, you know what, let's not let them

23   complain so much.  Why don't you girls just

24   split up so that we don't have to listen to the

25   seniors complain about you and we don't want

1                 V. Dinielli - 1/4/17

2         them to be making complaints, filing

3         complaints.

4         Q    So when Ms. Skates was split up and placed

5         in the exercise room, she no longer had

6         interaction with Vicky Grotton in June?

7         A    No.  That was only for like an hour of the

8         part of the day.

9         Q    How about Anique Adams, where was she

10        stationed?

11        A    Anique Adams was stationed as a cashier

12        which is at a desk pretty much to the side in

13        the middle of the lobby where they all

14        congregated and spoke during the course of the

15        day.

16        Q    Why would you wait until the day after

17        learning that Ms. Skates had a work-related

18        injury to complain to Human Resources or notify

19        Human Resources about complaints that were made

20        to you as early as June when Ms. Skates was

21        transferred?

22             MS. PANICO:  Objection to form.

23        Q    You may answer.

24        A    I said to you, and you keep switching it

25        around, I did not complain.  I did not do it

1                    V. Dinielli - 1/4/17

2        the day after hearing.  I did not know about

3        the work-related injury until the morning that

4        the termination was scheduled.  The termination

5        was scheduled, based on a culmination of all of

6        these issues, for the 22nd of October.

7             Ms. Skates called in in the morning.  I

8        alerted Human Resources and the Village

9        attorney that Ms. Skates was not coming to

10       work, so there was no reason for them to come

11       down and terminate her.

12       Q    When you say all of the issues, could you

13       be a little bit more specific?

14       A    Absence issues, the complaints issues from

15       employees and from the patrons.

16       Q    Were those the only issues?

17       A    Her attitude.  I mean, it was -- she

18       wasn't a pleasant person to work for as I was

19       told by -- she was a cancer in our facility.

20       Q    Who told you that?

21       A    I believe it was either Vicky Grotton or

22       Anique Adams or -- I don't recall exactly who.

23       But whenever they had a complaint, I said you

24       have to go to Human Resources with your

25       complaint and file them there.

1                    V. Dinielli - 1/4/17

2        Q    So why doesn't this letter here state that

3        Ms. Skates had absence issues, she had poor

4        attitude, she was not pleasant and that she was

5        a cancer in the facility?  Why doesn't this

6        letter state that?

7        A    I didn't write that letter, so I would not

8        know.

9        Q    But you got the letter, right?

10       A    I received the letter.  And this was based

11       on the employees filing another complaint with

12       Human Resources that they were scared that she

13       was going to come in and go postal.  That's why

14       this letter was written.

15            Again, it wasn't me.  That's just what I

16       heard.

17       Q    So is this letter, again, one of those

18       instances where you just received marching

19       orders and followed through, fall in line?

20       A    I guess so.  I just received the letter.

21       I didn't write the letter.  I didn't hand the

22       letter out.  I just received the letter.

23       Q    But you fell in line?

24       A    I didn't fall in line.  When the employees

25       came to me with their fears, I said call Human

1                    V. Dinielli - 1/4/17

2        Resources.

3        Q     Why didn't you write her up?

4        A     She was already terminated.

5        Q     Well, why didn't you write her up when

6        they first complained?

7        A     Because I couldn't write their complaints

8        up.   I sent them to Human Resources.

9        Q     Earlier I asked you a question whether or

10       not Ms. Skates had made any medical leave

11       requests directly to you.

12             Do you remember that?

13       A     Yes.

14       Q     You testified no, right?

15             MS. PANICO:  Objection to form.

16       A     I understand medical leave requests to be

17       for a period of time going forward.  So that is

18       what I answered no.  She never said to me I

19       need three weeks off, two weeks off.

20       Q     You testified when I asked you whether or

21       not Ms. Skates had -- you had ever denied any

22       leave or medical leave requests from Ms. Skates

23       and you said no.

24             MS. PANICO:  Objection to form.

25       A     I never did.

1                    V. Dinielli - 1/4/17

2        Q    I also asked you earlier whether or not

3    Ms. Skates ever made a direct request for leave

4    to you that you denied.  You said no.

5            MS. PANICO:  Objection to form.

6        Q    Isn't that right?

7        A    I answered those questions to the best my

8    ability.

9            MR. HENRY:  At this time I would like to

10    mark for identification Plaintiff's Exhibit 6.

11            (Whereupon, the aforementioned document,

12    was marked as Plaintiff's Exhibit 6 for

13    identification as of this date by the

14    reporter.)

15    BY MR. HENRY:

16        Q    Do you see that document there in front of

17    you?

18            MS. PANICO:  Could you please give us a

19    second to look at it.

20        A    Uhm-uhm.

21        Q    Do you see that document there in front of

22    you?

23            MS. PANICO:  Just wait one second.

24            MR. HENRY:  I think that the witness said,

25    "Uhm-uhm."  I don't think she needs your

1          V. Dinielli - 1/4/17

2     approval for --

3          MS. PANICO:  I think that the Court said

4     that I have the right to review it, actually

5     before my client does.  So I'm trying to cut

6     down --

7          MR. HENRY:  Very quickly to see the

8     exhibit and see what it is and move on.

9          MS. PANICO:  I have an opportunity to

10     review it before I even give it to my client.

11          MR. HENRY:  Let the record reflect now at

12     least two minutes passed that document has been

13     in front of this witness and it's a very basic

14     document.

15          MS. PANICO:  I am cutting down on the time

16     by reviewing it with my client.  But I do have

17     the right to review it and I will review it.

18     Thank you.

19          MR. HENRY:  Let record reflect that the

20     witness already acknowledged that she sees the

21     document.

22          MS. PANICO:  But I am not acknowledging

23     that.  And you're wasting more time by going on

24     this rant.

25          MR. HENRY:  Counsel's characterization

1                    V. Dinielli - 1/4/17

2          that it's a rant, again, is harassing.

3               But let the record reflect that this is

4          documents that the defendant produced to us,

5          Bates stamped at 00380, as part of this

6          document product.

7               So I'm not quite sure --

8               MS. PANICO:  It wouldn't be something the

9          plaintiff produced because the plaintiff didn't

10         produce any discovery.

11              MR. HENRY:  Again, I totally disagree with

12         your characterization.  But that's neither here

13         nor there.

14              Again, let the record reflect now at least

15         five minutes has passed that counsel has the

16         same exhibit in front of her and we are now at

17         a standstill because counsel wants to bring out

18         her magnifying glass to inspect document that

19         she produced months ago.

20              MS. PANICO:  Please let the record reflect

21         that since Mr. Henry has put down the document,

22         he has not stopped talking so that I have not

23         had an opportunity to actually review the

24         exhibit.

25              MR. HENRY:  Record speaks for itself.

1                  V. Dinielli - 1/4/17

2           MS. PANICO:  No, it doesn't.  Not with

3      respect to whether or not you've given me an

4      opportunity to review it, it doesn't.

5           MR. HENRY:  Time now is 6:09.  Counsel has

6      began looking at this document at

7      approximately --

8           MS. PANICO:  You're unbelievable.  You've

9      given three seconds to look at it.

10          (Counsel speaking simultaneously.)

11          MR. HENRY:  -- 6:03 and the time now is

12     6:09.  Counsel still has the document in her

13     hand that they produced.

14          MS. PANICO:  Mr. Henry has still not given

15     me an opportunity to review it without

16     speaking.  I have to listen to you while you're

17     speaking so that I can find out what you're

18     putting on the record.  So while you're

19     speaking, I'm not having an opportunity to

20     review it.

21          See how quick it goes when you actually

22     give a chance to look at the document.  Is 30

23     seconds too much to ask for?

24          MR. HENRY:  Let the record reflect that

25     the time now is 6:10.  Counsel has had that

1                    V. Dinielli - 1/4/17

2         document since, I believe, from my notation,

3         6:03.  The witness has now --

4              MS. PANICO:  And Mr. Henry continued to

5         speak the entire time I had the document with

6         the exception of the last 30 seconds.

7              (Counsel speaking simultaneously.)

8              MR. HENRY:  -- eight minutes after the

9         fact.

10             MS. PANICO:  That's not accurate.

11             MR. HENRY:  One moment, please.

12             Off the record.

13             (Whereupon, an off-the-record discussion

14        was held.)

15             MR. HENRY:  Let the record reflect that

16        I'm on a phone call right now, an important

17        phone call.  And as we took the conversation

18        off the record, counsel in the presence of four

19        or at least three other people other than

20        myself told -- stated that I'm the biggest

21        prick that she knows.

22             MS. PANICO:  Let the record reflect that

23        Mr. Henry has made misrepresentations

24        throughout this entire deposition.

25             MR. HENRY:  Counsel, did you not off the

1                     V. Dinielli - 1/4/17

2          record call me in the presence of the Court

3          Reporter, who is an officer of the Court, who

4          will, and based upon her role as an officer of

5          the Court, will attest to whatever it is that

6          you said that she heard?

7               Is it your testimony that you didn't call

8          me the biggest prick you know?

9               MS. PANICO:  Mr. Henry, I'm not the

10         witness to be deposed here.

11              MR. HENRY:  Is that your testimony here?

12              MS. PANICO:  Like I said, you made

13         numerous misrepresentations throughout the

14         course of this deposition.

15              (Counsel speaking simultaneously.)

16              MR. HENRY:  Well, if you believe that, was

17         that a misrepresentation?

18              Did you call me the biggest prick?

19              MS. PANICO:  I'm not required to answer

20         your questions.  I'm not the deponent here

21         today.

22              MR. HENRY:  Well, at this point, to the

23         extent that the Court Reporter, as an officer

24         of the Court heard it, I would request that the

25         record be noted and that that portion of the

1          V. Dinielli - 1/4/17

2          conversation was one that the Court Reporter --

3          in the presence of the Court Reporter was made

4          while off the record when I took an emergency

5          phone call from a family member while I'm in

6          this deposition.  If the Court Reporter could

7          note what she heard, that would be great.

8               MS. PANICO:  We were off the record for a

9          reason.  We were off the record because you

10         needed to take a personal phone call.  You made

11         a misrepresentation that I took a personal

12         phone call, which I did not.

13              MR. HENRY:  I said the phone rang and it

14         vibrated.

15              MS. PANICO:  You made an implication that

16         I took a personal phone call during the

17         deposition, which I did not.  Which is a

18         complete misrepresentation of the record as

19         you've been doing throughout this entire

20         deposition and as you continue to do.

21              MR. HENRY:  Ms. Panico, you just called

22         me --

23              MS. PANICO:  As I stated, I am not the

24         witness.  If you want to continue to question

25         the witness, then question the witness.  But

1                    V. Dinielli - 1/4/17

2        I'm not one on trial here.

3             Why don't you proceed with the deposition.

4             MR. HENRY:  You just called me the biggest

5        prick in front of everybody in this conference

6        room.  Why would you do that?

7             MS. PANICO:  Are we going forward with the

8        deposition or not?

9             MR. HENRY:  Why would you make personal

10        attacks?

11             MS. PANICO:  Because you've been doing it

12        throughout the entire day.

13             MR. HENRY:  I never called you a name.

14             MS. PANICO:  Mr. Henry, are you ready to

15        go forward?

16             MR. HENRY:  Have I ever called you a name?

17             No.  I want an apology for you calling me

18        the biggest prick.

19             MS. PANICO:  No.

20             MR. HENRY:  So you're not going to

21        apologize for calling me that?

22             MS. PANICO:  I'm not going to apologize.

23             I'm asking you to please go forward with

24        the deposition.

25             MR. HENRY:  I'll be the biggest prick and

1                    V. Dinielli - 1/4/17

2          I'm very offended behind it.  I'm actually

3          quite emotional.

4              MS. PANICO:  I bet you are.

5   BY MR. HENRY:

6      Q    Do you recognize that document --

7              MS. PANICO:  Let the record reflect that

8          Mr. Henry is laughing at this time.

9              MR. HENRY:  It's not going to be a

10         laughing matter when I sharpen my pencil.

11             MS. PANICO:  Is that a threat, Mr. Henry?

12             MR. HENRY:  It is.

13             MS. PANICO:  Is that a threat?

14             MR. HENRY:  Yes, it is.

15             MS. PANICO:  What are you going to do with

16         your sharpened pencil?

17             MR. HENRY:  I'm going to sharpen my pencel

18         and I'm going to outline the appropriate motion

19         that I'm going to be filing.

20             MS. PANICO:  What are you going to do,

21         Mr. Henry, with a sharpened pencil?

22             (Counsel speaking simultaneously.)

23             MR. HENRY:  And you're going to get a few

24         days to respond to it.  Don't worry.  You'll

25         have enough time to sharpen your pencil as

                        V. Dinielli - 1/4/17

2        well.

3   BY MR. HENRY:

4        Q    Do you see that document in front of you?

5        A    Yes, I do.

6        Q    Do you recognize what that document is?

7        A    Yes.

8        Q    Okay.

9             When I asked you earlier whether or not

10       Ms. Skates had made a request for leave

11       directly to you, you testified no, right?

12       A    Yes, I did.

13       Q    Do you see this document here where it

14       says:  "Village of Freeport"?

15       A    Uh-uhm.

16       Q    What's the word right under there?

17       A    Leave Request Form.

18       Q    And who is it from?

19       A    Earline Skates.

20       Q    Drawing your attention to the upper

21       right-hand section of that document, do you see

22       that too?

23       A    Yes, I do.

24       Q    Whose name is that?

25       A    That's mine.

                          V. Dinielli - 1/4/17

2        Q    So the testimony that you gave earlier

3    that Ms. Skates hadn't made any leave requests

4    to you was inaccurate, right?

5        A    Based on this, you're absolutely right.

6        Q    So do you usually give inaccurate

7    testimony, Ms. Dinielli, when you don't review?

8        A    First of all, my name it's Dinielli.

9        Q    I'm sorry.

10       A    Okay.  Ms. Dinielli.

11       Q    Ms. Dinielli, do you usually give

12   inaccurate testimony?

13       A    I'm going to answer the way I answered

14   before.  I don't usually, however, this was in

15   the very beginning of her employment and I did

16   not recall it.  I can only give -- I'm giving

17   as honest answers as I can based on what I

18   recall for something that happened three and a

19   half years ago.

20       Q    Ms. Dinielli --

21       A    She is one of 80 employees.

22       Q    Well, this is at least the sixth time that

23   you gave inaccurate testimony under oath.

24            MS. PANICO:  Objection to form.

25       Q    Isn't that right?

```
 1                V. Dinielli - 1/4/17

 2      A    So you say.

 3      Q    So you didn't think that you would have

 4      gotten it right the first time you gave

 5      inaccurate testimony under oath?

 6      A    If I would have remembered signing this,

 7      then I would have certainly answered

 8      differently.

 9      Q    So is it your testimony that you give

10      false answers before you know the truth?

11           MS. PANICO:  Objection to form.

12      A    At the beginning of this testimony, I told

13      you I'm doing the best that I can for something

14      that happened three and a half years ago.

15      Q    So now we know that your usual, your

16      default way of responding to questions is to

17      tell a lie first.

18           MS. PANICO:  Objection to form.

19           Mr. Henry, let's move on.

20      Q    Isn't that right?

21      A    I will not answer that question.

22      Q    Now, what does it say there under your

23      name, Ms. Dinielli?

24      A    Denied.

25      Q    So, in fact, you denied a leave request
```

1                    V. Dinielli - 1/4/17

2         that Ms. Skates made, right?  Isn't that right?

3         A    Yes, I did.

4         Q    What's the date on this here where it says

5         date received?  Do you see that?

6         A    May 3rd.  That was the day that --

7         May 2nd.

8         Q    Okay.

9              So what was the dates that Ms. Skates was

10        requesting?

11        A    The 3rd and the 10th, the 4th and the

12        11th.

13        Q    So when she made this request on

14        May 1st requesting to have May 3rd and May 10th

15        and May 4th and May 11th off, wouldn't those

16        dates have been in the future dates?

17        A    Yes.

18        Q    When you testified earlier you hadn't

19        denied any requests for future dates of leave

20        for Ms. Skates, that was inaccurate, right?

21        A    I was mistaken.

22        Q    Was it a mistake or was it inaccurate

23        testimony under oath?

24        A    It was a mistake.

25             MS. PANICO:  Objection to form.

1                      V. Dinielli - 1/4/17

2        Q     Was it the truth?

3              MS. PANICO:  Objection to form.

4        A     I believed it to be the truth when I said

5        it.

6        Q     So do you usually say things that you

7        believe to be the truth, but then when you see

8        something that has your name on it that

9        indicates that it's far from the truth, is the

10       case -- is that what you unusually do?

11             MS. PANICO:  Objection to form.

12       A     Always.  I always say things that I

13       believe to be true and I take responsibility

14       when I'm wrong.  Always.

15             MS. PANICO:  Mr. Henry, move on.

16       Q     Were you wrong when you said that you

17       never denied a future request for Ms. Skates?

18             MS. PANICO:  It's been asked and answered.

19       Move on.

20             MR. HENRY:  Your objection is noted.

21   BY MR. HENRY:

22       Q     Were you wrong when you said that?  Did

23       you make a mistake when you said that?

24             MS. PANICO:  She's already asked and

25       answered that twice.

1                V. Dinielli - 1/4/17

2           MR. HENRY:  Please allow me to make my

3      record.  There's an open question pending.  At

4      this point, you're limiting my ability to

5      question this witness.  Your objection is

6      noted.  I am testing this witness' credibility.

7      Q    You may answer.

8      A    I was wrong when -- I did not remember

9      denying this request.

10     Q    Were you wrong or did you make a mistake?

11          MS. PANICO:  Objection.  Asked and

12     answered.

13     A    Same thing.

14     Q    So you made a mistake and you were wrong?

15          MS. PANICO:  Objection.  Asked and

16     answered.

17     A    Yes.

18     Q    Did there ever come a time that you may

19     have made a mistake and were wrong and that

20     resulted in some consequence to Ms. Skates that

21     you weren't confronted with?

22          MS. PANICO:  Objection to form.

23     A    I don't believe so.

24     Q    So only for those instances or for those

25     mistakes or for those wrongs that you're

1          V. Dinielli - 1/4/17

2          confronted with, that's when you admit it,

3          right?

4               MS. PANICO:  Objection to form.

5          A    When it's pointed out to me, I take

6          responsibility.

7          Q    But when no one is looking, no one is

8          looking, right?

9               MS. PANICO:  Objection to form.

10         A    I'm sure she's looking and so are you.

11         Q    I'm sure there's someone else looking too.

12         A    Okay.

13         Q    Now that you see that you gave wrong and

14         mistaken testimony inaccurately under oath, can

15         you recall any other times that Ms. Skates made

16         a request for leave directly to you that you

17         denied?

18              MS. PANICO:  Objection to form.

19         A     If Ms. Skates asked for leave and she did

20         not have time available, I would have signed

21         fast just like I do other people, and I would

22         have denied it.  I do not recall every slip

23         that I sign.

24         Q    Why didn't you say that to begin with?

25         Why didn't you be honest to begin with?

1                    V. Dinielli - 1/4/17

2       A    I just didn't think of it.

3            MS. PANICO:  Objection to form.

4            Mr. Henry, you're harassing the witness.

5            MR. HENRY:  I'm testing her credibility.

6       I have every right to ask that question.

7            MS. PANICO:  That's not testing somebody's

8       credibility.  Obviously you don't know what

9       you're doing then.

10           MR. HENRY:  Let the record reflect again

11      counsel's attack on me.  I'm not sure why.

12           MS. PANICO:  Because you're harassing the

13      witness.  You've harassed me throughout the

14      course of the entire time.  And it's only

15      because of short discovery deadline that I've

16      remained here.  Otherwise, believe me, we would

17      have been gone a long time ago.

18           MR. HENRY:  This is why I had asked that I

19      record my own deposition.

20           MS. PANICO:  Because you harass witnesses

21      throughout the course.  That's exactly right.

22           MR. HENRY:  I'm sure --

23           MS. PANICO:  If I knew the harassment that

24      my client and I were going to be subjected to

25      throughout the course of this deposition, then

1                V. Dinielli - 1/4/17

2        I would have recorded it.

3            MR. HENRY:  Well, if we knew -- if we had

4        the benefit of recording it, then we wouldn't

5        have a need for you to feel the way you feel,

6        right?

7            MS. PANICO:  Well, only we would be

8        recorded.

9    BY MR. HENRY:

10       Q    Again, my question to you was:  Now that

11       you know that you gave wrong and inaccurate

12       information pertaining to Ms. Skates' leave

13       requests from you as early as May, is there any

14       other instances where you can think of that you

15       may have made or given mistaken testimony?

16       A    No.

17           MS. PANICO:  Objection to form.  Multiple

18       grounds.  Objection to form.  Objection.  Asked

19       and answered.

20       Q    Are there any other mistaken -- any other

21       instances where you were mistaken or gave

22       inaccurate testimony?

23       A    I don't believe I did, however, if she

24       didn't have time available, I would have signed

25       it fast and I would have -- and it would have

1              V. Dinielli - 1/4/17

2         been the same for everybody else.  So it has

3         nothing to do with -- if she has no time, she

4         can't get paid.  And that would not be my

5         decision.  It would just be you don't have the

6         time.

7              MR. HENRY:  At this time I would like to

8         mark for identification Plaintiff's Exhibit 8.

9              (Whereupon, the aforementioned document,

10        was marked as Plaintiff's Exhibit 8 for

11        identification as of this date by the

12        reporter.)

13             MR. HENRY:  Let the record reflect that

14        the exhibit was provided to the witness minutes

15        ago.  Counsel, again, in light --

16             MS. PANICO:  Why are you misrepresenting?

17        I didn't have it for minutes.

18             (Counsel speaking simultaneously.)

19             MR. HENRY:  The way she has been holding

20        on to the exhibit outside of the purview of the

21        this witness.  She knows that we are limited

22        time.

23             The time now is 6:20 and counsel has not

24        provided the exhibit to the witness and I'm

25        unable to test this witness' knowledge on it.

1           V. Dinielli - 1/4/17

2       And, again, these are documents that were

3       provided to us by counsel.

4           MS. PANICO:  Please allow the record to

5       reflect that I had the document for all of five

6       seconds before Mr. Henry began speaking.

7           Please also allow the record to reflect

8       that Mr. Henry has not provided me as counsel

9       with a copy of any of the exhibits.  So,

10      unfortunately, because of Mr. Henry's error, I

11      have to review the -- my client's exhibit

12      before I can pass it off to her.  It's

13      unfortunate that Mr. Henry didn't provide or

14      prepare for the deposition.  But,

15      unfortunately, that's what we're left with.

16          MR. HENRY:  Let the record reflect that

17      counsel confirmed for the first time this

18      deposition that we noticed back in September

19      yesterday, January 3rd at 6:03 p.m.  When I

20      sent her an e-mail and the e-mail states that

21      Ms. Panico, I attempted to reach you to confirm

22      Ms. Dinielli's deposition for tomorrow at

23      12:30, however was advised that you were out of

24      the office and was unable to leave -- and I was

25      unable to leave you a voice mail to confirm

1              V. Dinielli - 1/4/17

2        Ms. Dinielli's deposition will begin on or

3        about 12:30 at our North Baldwin office and

4        should last throughout the afternoon.  We will

5        see you then.

6             That e-mail was sent to counsel yesterday

7        at 4:39 p.m.  Counsel only responded two hours

8        later with confirmation that Ms. Dinielli and

9        herself would be here.  And then today she

10       called in our office and said that she was

11       running late and wasn't sure what time she

12       would get here, it may be or may not be, as

13       reported to me by my assistant, approximately

14       12:45.  Counsel didn't actually get here until

15       nearly a little past 1:00 and then we had the

16       issues that unfolded.

17            So please forgive me if in our hasted

18       moving forward with this deposition, which you

19       only confirmed less than 24 hours ago, that I

20       don't have copies, courtesy copies, that are

21       our Court Reporter so graciously exhibited for

22       us during the time it took for to you get here

23       as she was waiting since 12:20.

24            MS. PANICO:  Let the record reflect that I

25       myself have evidence that the deposition was

V. Dinielli - 1/4/17

2        actually confirmed on January 30th through

3        e-mail correspondence and from telephone

4        conversations with Mr. Henry.

5             MR. HENRY:  January 30 hasn't happened

6        yet.

7             MS. PANICO:  I apologize.

8             MR. HENRY:  I just read an e-mail that I

9        just sent that I'm actually going to now print

10       out and have it attached to this as --

11            You can actually begin with letter

12       exhibits as Plaintiff's letter Exhibit A.

13            MS. PANICO:  I apologize.  Mr. Henry is

14       correct.  The deposition was confirmed by me

15       through e-mail and telephone conversations on

16       December 30th --

17            MR. HENRY:  That's not accurate.

18            MS. PANICO:  -- prior to today.  I have

19       e-mails to confirm it.

20            MR. HENRY:  The e-mail here, as I just

21       read into the record, that yesterday at --

22            MS. PANICO:  Just because you sent a

23       second e-mail doesn't mean it wasn't confirmed

24       on December 30th.

25            MR. HENRY:  Well, again, the record will

1                    V. Dinielli - 1/4/17

2          speak for itself.  My apologies if -- within

3          the 15 minutes that it took you to get here or

4          20, 30 minutes late that you got here --

5               MS. PANICO:  I was 15 minutes late and

6          made a courtesy call to your office to let you

7          know that I was running late.

8               (Counsel speaking simultaneously.)

9               MR. HENRY:  We'll pull the surveillance

10         camera.

11              MS. PANICO:  Good.  I hope you do.  Spend

12         more time on this case.

13    BY MR. HENRY:

14         Q    Do you recognize that document there in

15         front of you?

16         A    Yes, I do.

17         Q    Whose signature is that there where it

18         says "Department"?

19         A    Me.

20         Q    So when you testified earlier that you

21         didn't have any or receive any leave requests

22         for Ms. Skates, now this is the second time

23         that you're presented with documents that

24         indicate otherwise, right?

25         A    When you said leave requests from her, I

1               V. Dinielli - 1/4/17

2        mean this is filled out and just handed to me

3        about somebody else in my office.

4        Q     Does it say Leave Request Form?

5        A     Yes.

6        Q     Okay.

7        A     All right.

8              MS. PANICO:  I think the problem is with

9        the way you're defining leave.

10             THE WITNESS:  Yes.

11             MR. HENRY:  Again, let the record reflect

12       counsel's insistence -- I don't even know if

13       that was an objection.  I don't know what that

14       was.  I have an open question pending and

15       counsel just decided to put her opinion on the

16       record.

17             MS. PANICO:  You're creating -- I will --

18       maybe I should have prefaced it with the word

19       objection.  But the bottom line --

20             MR. HENRY:  Well, you should have.  The

21       Court warned you.

22             MS. PANICO:  -- is that you're asking

23       questions that are unclear and that are

24       confusing and intentionally trying to make --

25             MR. HENRY:  Your objection is noted.

1                    V. Dinielli - 1/4/17

2              MS. PANICO:  -- intentionally confusing

3        the witness.

4              MR. HENRY:  No kidding.

5   BY MR. HENRY:

6        Q    That's your signature, right?

7        A    That is.

8        Q    So you were inaccurate at least two times.

9        A    I misunderstood your questions, to be

10       totally honest.

11       Q    So that is the excuse for giving

12       inaccurate or wrong testimony, right?

13             MS. PANICO:  Objection.

14       A    It's not an excuse.  It's the reason why I

15       was answering the questions the way I was

16       answering.

17             MS. PANICO:  You're harassing the witness.

18       A    And this is approved.

19       Q    What's the date on that approval?

20       A    6/4.

21       Q    You made that approval, right?

22       A    Yes, I did.

23       Q    Drawing your attention to previously

24       marked Exhibit 1, do you see that?  Withdrawn.

25             You testified earlier that you received

V. Dinielli - 1/4/17

2    complaints from members of your staff

3    pertaining to Ms. Skates; isn't that right?

4    A    Uhm-uhm.

5    Q    You also testified that those complaints

6    were from, I believe the names you provided was

7    Vicky Grotton and Anique Adams.

8    A    Yes.

9    Q    And that those complaints were that

10   Ms. Skates had used racial slurs, right?

11   A    Uhm-uhm.

12   Q    You also testified that those complaints

13   began as early as Ms. Skates being transferred

14   to the exercise room, right?

15   A    No.

16   Q    When did those complaints begin?

17   A    I don't recall when the complaints began.

18   Q    Well, you testified that the complaints

19   were -- the complaints were made prompting you

20   to transfer Ms. Skates for her own protection?

21        MS. PANICO:  Objection to form.

22   A    No.  That is not what I said.

23   Q    You testified that you separated

24   Ms. Skates from --

25   A    For one hour of the day.  That's not --

1            V. Dinielli - 1/4/17

2        she wasn't transferred to the fitness center

3        for the whole period.

4        Q    But that was in June, right?  Right around

5        the time that she was transferred.

6        A    Whatever the date was.  I'm getting

7        confused now.  Whatever that date was.

8        Q    So you separated Ms. Skates from Vicky

9        Grotton and Anique Adams, right?

10       A    No.

11            MS. PANICO:  Objection to form.

12       A    At that time, when the senior room was

13       being cleaned, which took about one hour, they

14       separated.  Then they came back together and

15       they went to the next duty.

16       Q    With respect to the complaints that you

17       received from Vicky Grotton and Anique Adams,

18       did you ever meet with Ms. Skates in June of

19       2013 to talk to her about those complaints?

20       A    No, I didn't.

21       Q    Why didn't you meet with her then to talk

22       to her?

23       A    Because I didn't hear any racial slurs.

24       Q    Did you hear any complaints at all in

25       June?

1                    V. Dinielli - 1/4/17

2    A    No.  I don't believe I did in June.  I

3    believe that they started coming towards the

4    end when they didn't know what to do about it

5    anymore.

6    Q    Now, with respect to the issues that you

7    claimed that Ms. Skates had with patrons and

8    seniors, that happened in early June, right?

9    A    Uhm-uhm.

10   Q    Did you ever meet with Ms. Skates and say

11   that the patrons and the -- patrons are

12   complaining about you?

13   A    Yes, I did.  That's when I separated the

14   two of them because she was heard calling one

15   of the patrons, the seniors, a Jew bastard.  So

16   didn't want that patron to put a formal

17   complaint in.  So that's why I said to her, why

18   don't you just go up for the hour, you go up to

19   the fitness center and leave Vicky down here by

20   herself.

21   Q    Why didn't you write Ms. Skates up in

22   June?

23   A    Because I didn't hear that.  I was looking

24   out for her.

25   Q    Were you looking out for her when you

1                    V. Dinielli - 1/4/17

2       wrote her up when she walked away from you?

3       A    No, I didn't.

4       Q    Well, why would you look -- why would you

5       look out for her patron if she called a patron

6       in the facility that you're --

7       A    Because I know the patrons can be a little

8       difficult.  I don't believe what they were

9       doing was -- I mean, they were just talking

10      amongst themselves and the women were trying to

11      play mahjong.

12      Q    Well, don't you think the word Jew bastard

13      is a racial slur?

14      A    I didn't hear her say it.  So I don't even

15      know if it really happened.  That is what they

16      told me.  I just -- I was not there for it.

17      Q    So in the same way that you didn't hear

18      the racial slurs that she allegedly made to

19      Vicky Groten or Anique Adams, the same way you

20      didn't hear that --

21      A    And that's why I didn't write any of them

22      up.  I said the person who heard it should make

23      the complaint.  I did not hear any -- her say

24      that.

25           MR. HENRY:  At this time I would like to

1                    V. Dinielli - 1/4/17

2          mark for identification Plaintiff's 25.

3                (Whereupon, the aforementioned document,

4          was marked as Plaintiff's Exhibit 25 for

5          identification as of this date by the

6          reporter.)

7              MR. HENRY:  Let the record reflect that

8          I've placed the document in front of the

9          witness --

10             MS. PANICO:  I'm timing it.

11             MR. HENRY:  -- on the table.  Counsel

12         picked it up from the table and is holding it

13         outside of the purview the witness.  And,

14         again, this has been in kind with what she has

15         been doing the entire deposition in terms of

16         taking exhibits, holding them outside of the

17         view of the witness, reviewing them for

18         extended periods, and I guess limiting my

19         ability to test this witness' knowledge,

20         limiting my ability to ask questions in the

21         spur of the moment and what I believe to be an

22         attempt to delay and run the clock because she

23         knows that discovery is closing in two days.

24             Again, I've noted my objection numerous

25         times.  These are documents that have been

1        V. Dinielli - 1/4/17

2        produced by the defendant to us.  She has --

3        counsel has been in possession of these

4        documents as early as the initial disclosure

5        period, which, I believe, was earlier this

6        year.  And for her to take the time that she's

7        taking to review documents as I'm in the middle

8        of a deposition, to me, is just unheard of.

9            At this point only 15 seconds has passed

10       in my objection and counsel certainly can

11       continue from that.

12           MS. PANICO:  I started this after you were

13       about two minutes in.  So if you're looking at

14       this, this is not accurate.

15           MR. HENRY:  Again, let the record reflect

16       counsel is holding up what appears to be an

17       iPhone, looks as though she may have

18       triggered -- I don't know -- I can't tell from

19       where I'm at, but she may be recording this

20       deposition.  And I know earlier we had -- she

21       raised the very issue about recording.  But

22       again, I don't know.  I can't see.  But I have

23       iPhone and it looks like she's activated the

24       recording button, although she raised the huge

25       issue and terminated the deposition earlier

1              V. Dinielli - 1/4/17

2       because she had concerns with me recording.

3              So I just wanted the record to be clear.

4              Counsel, again, there's is an open

5       question.  You have the exhibit.  The witness

6       hasn't looked at it yet and you're affecting my

7       ability to move forward.

8              MS. PANICO:  So Mr. Henry has now gone on

9       a rant for about three minutes where during

10      that time period he has provided me absolutely

11      no opportunity to review the document that he

12      gave to my client.

13             Again, the Court did indicate during a

14      prior telephone conference with the Court that

15      I do have the right to review the document, not

16      only while my client is reviewing it but that I

17      actually have the right to review the document

18      before it goes to my client.

19             I'm just asking --

20             MR. HENRY:  That's not what the Court

21      said.

22             MS. PANICO:  -- for the opportunity to

23      review the document as the Court indicated that

24      I am allowed to do.

25             Mr. Henry who so concerned about the time,

1                     V. Dinielli - 1/4/17

2          has wasted several minutes going on a rant

3          about this issue and indicating that I'm

4          recording this, which is entirely false.  I am

5          not technologically savvy.  I have no idea how

6          to even record on my telephone.  So his

7          misrepresentation in that regard is, again,

8          harassment and is entirely baseless and

9          unsupported.  He has nothing to substantiate it

10         and no reason to believe whatsoever that I'm

11         recording this.

12              I do, in fact, have the stopwatch going

13         and that is only because Mr. Henry has made

14         numerous misrepresentations over and over again

15         indicating that I've had the document for five

16         minutes when I haven't even had it for ten

17         seconds.  I have the stopwatch going so that

18         way I know exactly how long has gone by.

19              I'll now take the opportunity to review

20         the exhibit which has not been given to me yet.

21              MR. HENRY:  The exhibit was given to you.

22         It was placed on the table before you picked it

23         up.

24              MS. PANICO:  But you wouldn't stop talking

25         to give me the opportunity to look at it.

1                    V. Dinielli - 1/4/17

2          MR. HENRY:  You have no reason at all to

3     review it.

4          MS. PANICO:  Oh, really.  You know what,

5     then I'll give you the same exact courtesy on

6     Friday when I see your client.  See how you

7     feel about it then.

8          MR. HENRY:  We have nothing to hide.

9          MS. PANICO:  You think I'm trying to hide

10    something by reviewing a document?

11         MR. HENRY:  You called me a prick for no

12    reason.

13         MS. PANICO:  Okay, Mr. Henry.

14         MR. HENRY:  And then lied about it.

15         MS. SKATES:  May I ask a question?

16         MR. HENRY:  Again, now it's three minutes

17    that's passed and the witness still does not

18    have the exhibit.

19         MS. PANICO:  Again, that's a

20    misrepresentation on the time.

21         MR. HENRY:  The Court was very clear that

22    you -- note.

23         MS. PANICO:  Mr. Henry, if you would just

24    stop talking, then I can review the document.

25         MR. HENRY:  Let record reflect that

                        V. Dinielli - 1/4/17

 1

 2          Ms. Panico has raised her voice --

 3               MS. PANICO:  Oh, my God.

 4               MR. HENRY:  -- and flailed her arms.

 5               MS. PANICO:  That's, again -- I never

 6          flailed my arms.  Thank you.

 7               MR. HENRY:  Have you finished your review?

 8               MS. PANICO:  Mr. Henry, you know I don't

 9          have the document in front of me.  So I feel

10          like you're chastising me by asking me that

11          question.

12               MR. HENRY:  Let the record reflect that

13          counsel had not notified me when she finished

14          her review.  I've been sitting here waiting.

15               MS. PANICO:  Let the record reflect that

16          Ms. Dinielli had the document a minute or so

17          ago --

18               MR. HENRY:  Did you tell me that?

19               MS. PANICO:  -- and Mr. Henry was looking

20          down at his notes.

21               MR. HENRY:  Did you tell me that?

22               MS. PANICO:  I don't have no obligation to

23          tell you I'm done reviewing the document.  I

24          passed the document to Ms. Dinielli.

25               MR. HENRY:  And when you take five minutes

1                    V. Dinielli - 1/4/17

2          to review a single-page document, I think that

3          you should at least tell me when you're done

4          reviewing it.

5               MS. PANICO:  I didn't take five minutes to

6          review it.  So maybe that's the

7          misunderstanding.  I took 30 seconds to review

8          it after you finally stopped talking.

9     BY MR. HENRY:

10         Q    Ms. Dinielli, do you see that document

11         there in front you?

12         A    Yes.

13         Q    What do you recognize that document to be?

14         A    It was a letter that -- to Conor Kiran,

15         Director of Human Resources, from me on June 27

16         outlining Ms. Skates' work schedule or days

17         that she had not come to work or had time off,

18         I should say.

19         Q    What's the date of that letter?

20         A    June 27, 2013.

21         Q    Do you see here where it says Earline

22         Skates first day of work was 4/2/2013?

23         A    Yes.

24         Q    Do you also see she was disciplined in a

25         memo dated April 17, 2013 for an incident that

1                    V. Dinielli - 1/4/17

2        took place in your office on 4/16?

3        A    Yes.

4        Q    Was that the incident where you claim

5        Ms. Skates disrespected you?

6        A    Yes.

7        Q    Do you also see here these are the dates

8        she did not report to work and the category

9        from which she is paid?

10       A    Yes.

11       Q    Do you see that it runs through a list of

12       dates beginning in April 2013 and ending in or

13       about June 20th of 2013 beginning with the

14       first date April 3, 2013 to the last date?

15       A    I believe it goes to June 27th, but...

16       Q    Well, it says here these are the dates she

17       did not report to work and the category from

18       which she was paid.

19           Do you see that?

20       A    But then there's the days that she didn't

21       come to work that she wasn't paid.

22       Q    The very least -- at the earliest this

23       reflects dates from as early of April 3, 2013

24       and as late as June 27, 2013?

25       A    Yes.

1                   V. Dinielli - 1/4/17

2        Q    You also see at the become where it says

3   June 19th you received an e-mail with a

4   doctor's note stating when she would be able to

5   return to work?

6        A    Yes.

7        Q    Do you see that?

8        A    Uhm-uhm.

9        Q    Did you author this correspondence, this

10  interoffice correspondence?

11       A    Did I what?

12       Q    Did you author it?

13       A    Did I author it?

14       Q    Author.  Did you write this?

15       A    Yes.

16       Q    Why is it that in this -- well, withdrawn.

17            Would you say that this was a fair

18  characterization of the events involving

19  Ms. Skates up and until and including June 27,

20  2013?

21       A    I believe so, yes.  I believe so.

22       Q    Was there any reason you failed to put in

23  here that Ms. Skates had called the patron a

24  Jew bastard?

25       A    That wasn't what I was asked to provide at

1         V. Dinielli - 1/4/17

2         that time.  This is probably because Human

3         Resources does payroll and they probably were

4         asking what her time off was.

5         Q    Well, when you wrote that she was

6         disciplined in a memo dated for an incident

7         that took place on April 16th, that has nothing

8         to do with payroll, does it?

9         A    No.

10        Q    So, in fact, this memo contains instances

11        where Ms. Skates was alleged to have been

12        disciplined.

13        A    And the reason why I probably didn't

14        mention that was because that was just hearsay

15        and, again, I was not there.

16        Q    Well, is there any reason why you didn't

17        even notate that you've received numerous

18        complaints from patrons and employees alike

19        regarding Ms. Skates?

20             MS. PANICO:  Objection to form.

21        A    No.

22             MS. PANICO:  In that particular document?

23        A    Because anybody who had a complaint, I

24        told them they have to bring their complaint

25        either to the union or to Human Resources.

1                        V. Dinielli - 1/4/17

2       Q     But you failed to in the summarized --

3       what you testified is a fair summary, an

4       accurate summary of Ms. Skates' employee status

5       up until June 27th, you failed to put facts in

6       here that you now are stating on the record,

7       right?

8       A     I put facts here at the time on

9       June 27th of facts that I believed to be

10      important at the time.

11      Q     Well, you didn't think it's important that

12      if Ms. Skates was disciplined for waving her

13      finger and walking out of your office that it

14      wasn't important to put in here that she called

15      someone a Jew bastard?

16           MS. PANICO:  Objection to form.

17      A     No.  Because I was not there.

18      Q     You didn't think it was important to put

19      that you received complaints from employees and

20      from different and various patrons about

21      Ms. Skates' behavior and conduct?

22           MS. PANICO:  Objection to form.

23      Q     That wasn't important?

24      A     I handled things the way I thought they

25      were appropriate to handle.

1              V. Dinielli - 1/4/17

2        Q    So, once again --

3        A    I was not going to write Ms. Skates up for

4    an instance that I did not witness.  If

5    somebody else wanted to follow through with

6    those complaints, it was their duty to report

7    them to the proper department or individual.

8            I believe the Jew bastard remark, she

9    denied and I gave her the benefit of the doubt

10   at the time.  This is why I moved her from that

11   area so that she would have no problems going

12   forward.

13       Q    In light of time, I'm trying to skip

14   through certain portions of my outline so that

15   I can try to get you out as soon as possible.

16           Do you have any objections to that?

17       A    No.

18       Q    You testified earlier when I asked you

19   whether or not it was typical for employees to

20   be given access to parking in the back of

21   building.

22           Do you remember that?

23       A    Uhm-uhm.

24       Q    You testified that, no, employees were not

25   allowed to park in the back of the building

V. Dinielli - 1/4/17

2    unless they were closing the building, right?

3        What was the other reason why you said.

4    A    I said -- first, I didn't say they weren't

5    allowed.  I said the people that had passes to

6    the back and that parked in the back were the

7    individuals that opened the building, closed

8    the building, the mechanical -- the man that

9    runs the mechanics of the building, the girl

10    that does the bank run daily, myself.  Those

11    are the ones that I recall.

12    Q    You testified earlier that they don't even

13    make those parking key cards anymore, that

14    there were only about five.

15    A    I didn't say five.  I said there's about

16    five spots back there.  I don't know how many

17    were -- the company that issues them is no

18    longer or we don't have -- the Village doesn't

19    have contract with them any longer.  So we

20    cannot make additional passes.  We recycle the

21    ones that we have.  In my tenure, I have never

22    issued a pass.

23    Q    So your testimony here today is that

24    you've never issued a pass during your tenure?

25    A    Yep.

1          V. Dinielli - 1/4/17

2     Q    But in or around May of 2013, Ms. Skates

3     had disrespected you, right?

4          MS. PANICO:  Objection to form.

5     Q    Isn't that right?

6     A    That's what you said.

7     Q    And that you also did not issue pass or

8     limit anyone's ability to park in the back,

9     right, besides Ms. Skates.

10          Isn't that right?

11          MS. PANICO:  Objection to form.

12    A    I don't understand.

13    Q    Was there anyone else other than

14    Ms. Skates that was prevented from parking in

15    the back?

16    A    Yes.  There are 22 full-time employees at

17    the time.

18    Q    How many of those employees were not

19    allowed to park in the back?

20    A    I would say -- I would say more than half

21    of them didn't have access.  Some of them

22    worked nights.  Some of them worked days.  So

23    they would probably be more than five people.

24    However, there wouldn't be five people there at

25    the time.

1          V. Dinielli - 1/4/17

2     Q    So prior to a decision being made that

3     Ms. Skates could no longer park in the back --

4     A    She never parked in the back.

5     Q    It's your testimony here today that

6     Ms. Skates, as a recreation center staff

7     member, never parked in the back?

8          MS. PANICO:  Objection.  Asked and

9     answered.

10    A    I'm not aware of any time that she had the

11    ability to park in the back.  If she did, it

12    was not to my knowledge.

13    Q    Was Ms. Skates ever tasked with opening or

14    closing the building?

15    A    I don't believe so, no.  She never had

16    keys to have -- for the facility.

17    Q    Were you familiar -- during the time of

18    2013, were you familiar with the agreement by

19    and between the Village of Freeport and CSEA

20    Local 1000 AFSCME?  Were you familiar with that

21    agreement?

22    A    The union for -- agreement, yes.

23    Q    And what was the most current -- during

24    that time, what would have been the most

25    current agreement in play?

1                     V. Dinielli - 1/4/17

2          A     I don't remember.

3          Q     How frequent is the agreement changed?

4          A     I think there's a contract -- I don't

5     know.  I'm not sure.  It's not annually though.

6     I'm not sure.  I don't want to say --

7          Q     Well, do you remember --

8          A     -- because I'm in the union.  So I don't

9     really --

10         Q     Was Ms. Skates in the union?

11         A     I don't know.

12         Q     Well, you said --

13         A     I assume so.

14         Q     You said you met with Ms. Skates and the

15    union rep.

16         A     I assume she was in the union although --

17    I don't know.  That's a Human Resources issue.

18    I don't know.

19         Q     Well, why would you meet with

20    Ms. Skates --

21         A     She had union representation.  So I assume

22    she was in the union.

23         Q     Well, does the union usually represent

24    people that are not a part of it?

25         A     I believed everybody was in the union.

1          V. Dinielli - 1/4/17

2     But, again, I'm not quite sure about that.

3     Q    Do you have any reason now to believe that

4     Ms. Skates was not a part of the union?

5     A    No.  That's -- I'm -- I don't have any

6     reason to ask or need to know that information.

7     Q    But at the very least, you knew the union

8     agreement, right?

9     A    I referred to the union agreement, yes.

10    Q    The union agreement was provided to you to

11    address a variety of different issues affecting

12    a union member.

13         Isn't that right?

14    A    No.

15    Q    So it's your testimony here today that the

16    union agreement doesn't provide guidance with

17    dealing with union-related issues?

18    A    It is.  But that's not why I had it.  I

19    had it because I asked for a copy for my own --

20    anytime there was an issue, I sent people to

21    Human Resources.

22    Q    You testified earlier that you were

23    familiar with the compensatory time, right?

24         MS. PANICO:  Objection to form.

25    Q    Did you not testify earlier that you were

1                          V. Dinielli - 1/4/17

2          aware of comp time?

3          A     What do you mean?

4          Q     What comp time was and accumulated time.

5          A     What comp time was, yes.

6          Q     Where would you have found the definition

7          for comp time?

8          A     That would be in the union book.

9          Q     You would rely on the union book for

10         guidance on?

11         A     If I was looking for information, yes.

12         Q     You also testified that you were familiar

13         with the sick leave policy.

14         A     I don't remember saying.

15         Q     Were you familiar -- are you familiar with

16         the sick leave policy?

17         A     As far as what?

18         Q     As far as a leave request, leave sick

19         time?

20         A     Yes.  Yes.

21         Q     Where would you have found that?  Where

22         would you have obtained that knowledge?

23         A     From Human Resources.

24         Q     How about the union agreement?

25         A     Union agreement.  How many days people are

V. Dinielli - 1/4/17

 1

 2    entitled to, when those days go into effect,

 3    yes.

 4    Q    So would you defer to the union agreement

 5    when you had a question pertaining to time that

 6    an employee would be entitled to?

 7    A    No.

 8    Q    Well, what else would you look at?  What

 9    other source?

10    A    I had a girl that handled that for me and

11    she would have the cards and she kept the cards

12    and she would give me the information.  And

13    she's been working there for many years and

14    she's very familiar.

15    Q    Is there any source or were there any

16    source of policy that pertained to the sick

17    leave, Freeport sick leave practice and policy

18    or was it only contained in the union

19    agreement?

20    A    Well, the Village adhered to the union

21    agreement.  Everybody was -- worked under the

22    whatever the union agreement was for benefits,

23    sick time, personal time, everybody was -- fell

24    under that umbrella.

25    Q    Did there ever come an instance where

V. Dinielli - 1/4/17

2      or -- withdrawn.

3           So as far as your understanding of the

4      union agreement is concerned and the sick leave

5      portion, was there any limitations on your

6      ability to take action against an employee out

7      on sick leave during the time that they are out

8      on sick leave?

9           MS. PANICO:  Objection to form.

10     A     I would have -- I don't know.

11          MS. PANICO:  Do you understand the

12     question?

13          THE WITNESS:  I don't understand the

14     question really.

15     BY MR. HENRY:

16     Q     How many consecutive days of sick leave is

17     an employee entitled to before any action can

18     be taken against that employee?

19     A     I don't know.  If there was an issue, I

20     would have called Human Resources.

21     Q     Did you ever look at the union manual?

22     A     I've looked at it, yes.

23     Q     You testified earlier when I asked you

24     pertaining to Ms. Skates when you threatened

25     that she would be terminated for failure --

1          V. Dinielli - 1/4/17

2     A    I never threatened.

3     Q    You testified earlier that Ms. Skates was

4     given a certain day to return to work because

5     she failed to notify or however you

6     characterized it.

7          Do you recall that?

8     A    Uhm-uhm.

9     Q    The testimony also indicated that

10    Ms. Skates had been out for at least two

11    consecutive days?

12    A    Uhm-uhm.

13    Q    But you had issued her a letter advising

14    her that she would be terminated during those

15    consecutive day periods --

16         MS. PANICO:  Objection to form.

17    Q    -- right?

18    A    No.

19         MS. PANICO:  Mischaracterization of

20    testimony.

21         MR. HENRY:  At this time I would like to

22    mark for identification Plaintiff's 36.

23         (Whereupon, the aforementioned document,

24    was marked as Plaintiffs' Exhibit 36 for

25    identification as of this date by the

                    V. Dinielli - 1/4/17

 1

 2       reporter.)

 3            MR. HENRY:  Marked for identification

 4       Plaintiff's Exhibit 36.

 5   BY MR. HENRY:

 6       Q    Just take a moment to take a look at the

 7       document.  I just want to make sure your lawyer

 8       has an opportunity to look at it.

 9            MS. PANICO:  He just wants to make a phone

10       call.

11   BY MR. HENRY:

12       Q    Have you had an opportunity to take a look

13       at that document?

14       A    I've seen it before, yes.

15       Q    Do you recognize that document?

16       A    Yes, I do.

17       Q    What do you recognize that document to be?

18       A    This is the books of the Village of

19       Freeport CSEA union agreement.

20       Q    Now, drawing your attention to Page 15 of

21       that document, do you see that?

22       A    Yes.

23       Q    Now, would you say that this section here,

24       Section 19, where it says "sick leave," that

25       that section accurately reflects the section

1                    V. Dinielli - 1/4/17

2          that was in play --

3          A    Yes.

4          Q    -- during the time that --

5          A    Yes.

6          Q    -- Ms. Skates --

7          A    Yes.

8          Q    -- worked for Freeport?

9          A    Yes.

10         Q    One moment.

11              Drawing your attention to the first page

12         of that document there, where it says March 1,

13         2004 to February 20, 2010, would this have been

14         the same agreement?

15         A    Yes.  The context would be the same.

16         Q    But this is not the actual --

17         A    I think it is.  I don't know that they

18         came out with another one.

19              Like I said, I don't -- I had a copy of my

20         own in my office.  I don't have it anymore.

21         Somebody took it and I'm not sure even where it

22         went, so...

23              MR. HENRY:  Ms. Panico, you produced this

24         document to us.  Is this the latest -- would

25         this have been the version that would be in

1                    V. Dinielli - 1/4/17

2        place during the year 2013 when Ms. Skates was

3        working there?

4             MS. PANICO:  I would have to look back.  I

5        believe that that is the one that was in play.

6        There may have been separate memorandum of

7        agreements that were also attached and annexed

8        thereto which generally deal with increases in

9        pay, et cetera.

10            But, generally, what happens is after a

11       CBA expires, the CBA remains in place with

12       memorandums of agreement annexed thereto until

13       a new CBA replaces it.  I'm not aware of a new

14       CBA replacing this one.

15  BY MR. HENRY:

16       Q    So drawing your attention to where it says

17       sick leave on Page 15, do you see that?

18       A    Yes.

19       Q    Would you say, now that we've had an

20       opportunity to review this document, that this

21       sick leave section would have accurately or

22       closely reflected what was in play during the

23       year of 2013?

24       A    Yes.

25       Q    Were you familiar with this policy?

1                     V. Dinielli - 1/4/17

2        A    I was familiar with the policy but not

3        really on the details.  Because, like I said,

4        it really didn't come up that often.  I had an

5        employee who handled this for me.  And if had I

6        had questions, I called Human Resources.

7        Q    So during the instances where you denied

8        Ms. Skates sick leave requests, did you look at

9        this manual at all?

10       A    No, I didn't.

11       Q    So you failed to look at a policy that

12       provided you with direction as to whether or

13       how to approve or deny sick leave?

14       A    I called Human Resources and they directed

15       me.

16       Q    So is it your testimony here today that

17       every time you denied Ms. Skates sick leave

18       request you done so after you called Human

19       Resources?

20       A    Yes, I did.

21       Q    And who did you call in Human Resources?

22       A    Conor Kiran.

23       Q    So not once did you review this policy

24       whatsoever to ensure whether or not the

25       direction that was given to you by Conor Kiran

V. Dinielli - 1/4/17

 1

 2       sometimes, which you disagreed, with whether or

 3       not that direction was accurate?

 4       A     Well, I didn't have to.  When I denied

 5       her, she had no time available.  So, therefore,

 6       I denied the time.  If I had a question as to

 7       my -- if my interpretation was correct, then I

 8       called Human Resources to find out what the

 9       correct interpretation was because I most

10       certainly did not want to go against any union

11       benefit.

12       Q     Drawing your attention to Page 17 of that

13       document where it says personal leave, do you

14       see that section there?

15       A     Yes, I do.

16       Q     Would you say that this section also

17       accurately reflects the section that was in

18       place in the year of 2013?

19       A     Yes.

20       Q     Did you ever review the section here

21       before you approved or denied any of

22       Ms. Skates' personal leave requests?

23       A     The only time I denied her personal -- her

24       leave request was when she didn't have time

25       available.

1                    V. Dinielli - 1/4/17

2        Q    Did you review this document before you

3        did so to verify whether or not you had the

4        ability?

5        A    Possibly.  But, like I said, I always

6        checked with Human Resources to make sure that

7        my interpretation was correct.

8        Q    Drawing your attention to Subpart B of

9        Section 21, do you see that?

10       A    Yes.

11       Q    Drawing your attention to where it begins

12       with "In the event," do you see that?  It's the

13       second sentence.  Do you see that?

14       A    On B?

15       Q    Yes.

16       A    That's the third sentence, the third line.

17       All right, "in the event," right?

18       Q    Do you see that?

19       A    Yep.

20       Q    Can you go ahead and read until you get to

21       a period?

22       A    "In the event of an emergency, an employee

23       may be permitted to take a personal day without

24       the requisite two business day notice provided

25       the employee calls in to the supervisor or

V. Dinielli - 1/4/17

1

2      manager and requests the day prior to the start

3      of the employee scheduled work day and provided

4      the employee provides written proof upon return

5      to work and within 24 hours of the personal day

6      satisfactory to the department head and the

7      said emergency."

8      Q     In the year 2013, you were Ms. Skates

9      supervisor or manager, right?

10     A     Yes, I was.

11     Q     You testified that there was a time that

12     she didn't come to work because of an

13     emergency, in fact, the hospitalization that

14     she called you, right?

15     A     No.  I never said that.

16     Q     You learned that she was in the hospital,

17     right?

18     A     After she didn't come to work for two

19     weeks.

20     Q     Well, there was at least two days that had

21     passed that you had learned that Ms. Skates was

22     in the hospital; isn't that right?

23     A     I don't recall knowing that.  Maybe I did.

24     Maybe I didn't.

25     Q     But doesn't it state here in the policy

1          V. Dinielli - 1/4/17

2          that in the event of an emergency an employee

3          may be --

4          A    She always got paid for days -- when those

5          days -- when she had time available.  I never

6          denied time available when she had time

7          accrued.

8          Q    But it says here that in the event of an

9          emergency, she's permitted to take that day.

10         A    If she has it available.  If it's accrued.

11         If there's no time accrued, then she cannot

12         take the time.

13         Q    Where does it say here, Ms. Dinielli, that

14         there's a requirement for time accrued?

15         A    That's probably why I called Human

16         Resources.  It's a matter of interpretation.

17         Q    But it doesn't say here the accrued time,

18         right?

19         A    That's probably why I called Human

20         Resources.

21         Q    But the fact --

22         A    Because she had no time and what am I to

23         do.  How will the Village pay her.  That is

24         what I did.

25         Q    Well, how about read the agreement and see

1              V. Dinielli - 1/4/17

2       what it says?

3       A     It's a very it -- doesn't say like you

4       said what you're supposed to do if somebody

5       doesn't have time available.

6       Q     Well, do you disagree with the people that

7       drafted this agreement?  Do you disagree with

8       it?  Is this one of those things that you

9       disagree with?

10           MS. PANICO:  Objection to form.

11      A     I don't agree or disagree.  If I don't

12      understand it, I call for verification.

13      Q     But the agreement, as it stands in front

14      of you, doesn't say anything about accrued

15      time, does it?

16           MS. PANICO:  Objection to form.

17      A     She called most mornings in the morning

18      and she was never denied because she called

19      late.

20      Q     Can you answer my question, please?

21           Is there anything in Subpart B of

22      Section 21 under personal leave that mentions

23      anything about accrued time?

24           MS. PANICO:  Objection to form.  You're

25      asking her for legal conclusions.

1                     V. Dinielli - 1/4/17

2      Q    Does it say anything about accrued time in

3      here, Ms. Dinielli?

4      A    No.  It doesn't say that you could take

5      time off if you don't have it available either.

6      There's a page in here that says what you're

7      entitled to.

8           Don't roll your eyes at me.

9           There's a page in here that says what

10     time -- how do you accrue time also.  And if

11     you don't have the time accrued, therefore you

12     can't take it.

13     Q    Ms. Dinielli, it says here in the event of

14     an emergency, an employee may be permitted to

15     take a personal day without the requisite two

16     days business notice.

17          Do you see that?

18     A    Yes.

19     Q    Provided that the employee calls the

20     supervisor and request the day prior to the

21     start.

22     A    But if you don't have a personal day, you

23     can't take that.

24     Q    Well, where does it say here anything

25     about a requirement for a personal day or a

1          V. Dinielli - 1/4/17

2     requirement for accrual?

3     A     It says you can take a personal day.  You

4     have to have it in order to take it.  Such as a

5     vacation day.  You can't take a vacation day if

6     you don't have a vacation day.

7     Q     It doesn't say that here, does it?

8     A     Well, that's interpretation.  I interpret

9     it as to mean you need to have it.  You can't

10    use something you don't have.

11    Q     But it doesn't say that here in the

12    policy, right?

13    A     To me that's common sense, but...

14    Q     Well --

15    A     That's interpretation.  That's why I would

16    call to make sure that the way I interpret

17    something is right.  And the way I interpreted

18    it was right according to Human Resources.

19    Q     What's the purpose of an agreement if

20    you're left to your interpretation,

21    Ms. Dinielli?

22         MS. PANICO:  Objection to form.

23    Q     Isn't the purpose of an agreement so that

24    people are not left to their interpretation?

25    A     There's always reading into something.

1                    V. Dinielli - 1/4/17

2        Q    Well, here it's pretty clear-cut to me.

3        A    It's pretty clear-cut to me.  You can't

4        take a personal day if you don't have a

5        personal day.

6             MS. PANICO:  Please.

7        Q    But it doesn't say that there, does it?

8             MS. PANICO:  Asked and answered.

9        Objection.

10       Q    Drawing your attention to Page 26, do you

11       see that where it begins Section 34,

12       disciplinary procedures?

13       A    Yes.

14       Q    Would you say that this section here

15       accurately reflects the section that was in

16       play during the year of 2013?

17       A    I would think this does.  To be totally

18       honest, I haven't read it.

19       Q    Drawing your attention to Subpart H, do

20       you see that, where it begins "no penalty"?

21       A    Uhm-uhm.

22       Q    Can you go ahead and read what it says

23       here?

24       A    "No penalty or punishment beyond a

25       reprimand or warning may be imposed unless the

1           V. Dinielli - 1/4/17

2     employee has been given a reasonable

3     opportunity to a union representative present

4     at the time any such penalty or punishment is

5     imposed.  It is the employee's responsibility

6     to have his or her union representative be

7     available within a two-hour minimum period."

8     Q    Would you say that that after reading it

9     is an accurate summarization of the

10    disciplinary procedure?

11    A    Yes.

12    Q    Drawing your attention to Plaintiff's

13    Exhibit 5 which was provided to you previously,

14    let me know once you have that document there

15    in front of you.

16         Do you see that document there in front of

17    you?

18    A    Yes, I do.

19    Q    Do you see where it says that as you know,

20    your employment was terminated effective 10/22.

21    Included in the charges and specifications

22    against you where charges were based upon

23    offensive racial slurs.

24         Do you see that?

25    A    Uhm-uhm.

1                    V. Dinielli - 1/4/17

2    Q    Drawing your attention to Subpart H of the

3    disciplinary procedures, does it not say here

4    that no penalty or punishment beyond a

5    reprimand or warning should be imposed unless

6    the employee has been give a reasonable

7    opportunity to have a union rep present at the

8    time that the penalty is imposed it.

9         Do you see that?

10   A    Yes.

11   Q    So at what point in time was Ms. Skates

12   given a reasonable opportunity to have a union

13   representative present before she was

14   terminated when she was terminated on a day

15   that she wasn't even at work?

16        MS. PANICO:  Objection to form.

17   A    We always -- she always had a union

18   representative with her.

19   Q    You testified previously that the last day

20   you saw Ms. Skates was the last day that she

21   worked was October 21st, right?

22   A    Uhm-uhm.

23   Q    She was terminated, based upon this

24   letter, the day after, right?

25   A    No.  She was terminated on 10/22 and I

1                    V. Dinielli - 1/4/17

2      believe a union representative was present.

3      Q     You just testified that the last day you

4      saw Ms. Skates at the facility was on

5      October 21st.

6      A     No, I did not.  I did not.  That was the

7      22nd.  The 21st was the day I saw her leave the

8      facility when she claimed she was injured.

9            So don't roll your eyes at me when you're

10     not right yourself.

11     Q     You testified -- did you see Ms. Skates on

12     the 22nd?

13     A     Yes, I did.

14     Q     When did you see Ms. Skates on the 22nd?

15     A     She called me and said she was coming in

16     to fill out an incident report.  She called out

17     sick in the morning.  I did not speak to her.

18     Then she came in.

19           She didn't call me.  I take that back.

20           She called in the morning.  She called out

21     sick.  She was having -- she was having -- she

22     was in the hospital.  Then on her way home, she

23     came to the rec center to fill out an incident

24     report.  That is when I saw her.

25     Q     So Ms. Skates was not in on the 22nd.

1                    V. Dinielli - 1/4/17

2              Only came in to fill out a sick form, right?

3         A     Correct.

4         Q     Okay.

5              So I was correct when I said the last day

6         you saw Ms. Skates work was the day that you

7         saw her leave which was on October 21st?

8         A     Last day I saw that she worked.  The next

9         day she came in, but I did see her.

10        Q     Now, it states here that effective

11        October 22nd, right?  That would have been the

12        last day you saw Ms. Skates work, right?

13              MS. PANICO:  Objection.

14        A     Uhm-uhm.

15        Q     Is that a yes?

16        A     That's the last day I saw her in the

17        workplace.

18        Q     That's a yes?

19        A     In the workplace, right.

20        Q     At what point in time -- from the last day

21        you saw Ms. Skates in the workplace on

22        October 21st --

23        A     22nd.

24        Q     Well, you said the last day -- withdrawn.

25              The last day you saw Ms. Skates work was

1        V. Dinielli - 1/4/17

2        October 21st.

3        A    I saw her punch out, yes.

4        Q    So the last time you saw Ms. Skates punch

5        out was on October 21st.

6        A    Correct.

7        Q    So when between October 21st, the last day

8        you saw her punch out to the next day that she

9        was terminated October 22nd, did Ms. Skates

10       have an opportunity to have -- a reasonable

11       opportunity to have her union representative

12       present before she was terminated?

13       A    Human Resources called them and notified

14       them.

15       Q    Does it say in here in Subpart H that

16       Human Resources can take the place of a union

17       rep?  Can you show me where it says that in

18       Subpart H?

19            MS. PANICO:  Objection.

20       Mischaracterization of testimony.

21       A    I didn't say --

22       Q    Can you show me anywhere in Subpart H

23       where Human Resources is even mentioned.  Can

24       you take a look at it?

25       A    I don't need to take a look at it.  I

                     V. Dinielli - 1/4/17

 1

 2    don't know that it says or it doesn't say.

 3         Human Resources is who -- I am management.

 4    I work with Human Resources.  I don't work with

 5    the union.  The union won't even speak to me.

 6    Q    But with respect to Subpart H where it

 7    says no penalty or punishment beyond reprimand

 8    or warning may be imposed, there's nothing in

 9    here that indicates a requirement for clearance

10    or approval through Human Resources, right?

11    A    Human Resources is the one that deals with

12    the employees.

13    Q    Show me here where it says that Human

14    Resources is even a part of this discussion in

15    Subpart H.

16    A    Human Resources is the one that terminated

17    here.

18    Q    My question, Ms. Dinielli --

19    A    Human Resources terminated her.  I did not

20    terminate her.

21    Q    My question, Ms. Dinielli, is where in in

22    Subpart H do you see the word Human Resources?

23    A    Where does it say anybody?  Where does it

24    say who to -- who terminated her.  Human

25    Resources, the members of Human Resources and

1                    V. Dinielli - 1/4/17

2        legal counsel terminated her.

3        Q    You testified earlier that you learned

4        that there were charges and specifications made

5        against Ms. Skates for offensive racial slurs

6        that she had made to Ms. Vicky Grotton and

7        Anique Adams.

8             You testified to that, right?

9             MS. PANICO:  Objection to form.

10       A    Yes.

11       Q    Drawing your attention to Subpart M of

12       Page 27, do you see that?

13            Go ahead and read that to me, please,

14       Subpart M.

15       A    "Notice of Discipline and Charges.  An

16       employee who is entitled to the protection of

17       this section shall within 20 days of the

18       imposition of a penalty be served with a

19       written notice of the discipline and charges of

20       incompetence and/or misconduct either in person

21       or by certified mail, return receipt requested

22       to his or her current address as it appears on

23       the Village personnel records.  If the employee

24       wishes to contest said" --

25       Q    Okay.

1          V. Dinielli - 1/4/17

2          MS. PANICO:  Can she finish?

3     A    -- "employee must proceed in accordance

4     with disciplinary review procedure set forth in

5     this section.  A copy of notice and charges

6     shall simultaneously be served upon the union."

7     Q    How is it possible that Ms. Skates would

8     have been served with such notice called for

9     under Section 21 Subpart M in less than a day

10    after the decision to terminate her?  How is

11    that possible?

12    A    I don't know.  You would have to check

13    with Human Resources.  I don't know.

14    Q    Now that you read the policy, would you

15    say that that -- the termination process

16    followed this agreement?

17    A    I don't know what went on in that office,

18    so I'm not going to say anything.

19    Q    But you can read, right?

20    A    I could read, but I don't know what steps,

21    what actions they took.

22    Q    Based upon --

23    A    I'm not going to speak for a department

24    that I don't work in.

25    Q    Well, you were her supervisor, right?

1          V. Dinielli - 1/4/17

2     A     Uhm-uhm.

3     Q     And you were cc'd in the letter dated

4     October 23rd, right?

5     A     Yes.

6     Q     You were the one that received the

7     complaints from Vicky Grotton and Anique Adams

8     about the racial slurs, right?

9     A     Uhm-uhm.

10    Q     So why is it that you have no idea about

11    whether or not the policy was followed with

12    respect to the notice of discipline and

13    charges?

14          MS. PANICO:  Objection.

15          You're asking for a legal interpretation

16    in an area she already indicated she's not

17    familiar with.

18          I'm asking you to please move on.

19    Q     You may answer.

20    A     When the complaints were made, I told them

21    that they had to follow Village protocol and go

22    to Human Resources or call their union

23    representative.

24    Q     Well, why would you tell them to follow

25    Village protocol when you don't follow it

1          V. Dinielli - 1/4/17

2     yourself?

3          MS. PANICO:  Objection to form.

4     A    I believe I follow it.

5     Q    Was Ms. Skates afforded the protection of

6     this section as set forth here?

7          MS. PANICO:  Objection.

8     A    She always had union representation.

9     Q    Was she given 21 days at the imposition of

10    a penalty to be served with that?

11    A    I do not know.

12         MR. HENRY:  I think we have about an hour

13    and probably -- about an hour maybe 30 minutes

14    left.  So would you be willing to stipulate to

15    the production of this witness and also to

16    provide us with the dates for the other

17    witnesses by January 6th, Ms. Panico?

18         MS. PANICO:  In regards to the present

19    witness that's being deposed, I will agree if

20    Mr. Henry doesn't want to complete her

21    deposition today, which Ms. Dinielli has

22    indicated that she is, in fact, available to

23    continue the deposition today.  And I have also

24    indicated that I am available to complete the

25    deposition today.  But, nevertheless, if

1                    V. Dinielli - 1/4/17

2        Mr. Henry does not want to complete the

3        deposition today, I will make Ms. Dinielli

4        available for another hour and a half on a

5        separate date.

6             In regards to the witnesses that Mr. Henry

7        is referring to, we will have to deal with that

8        off the record in a separate stipulation.  I'm

9        not going to deal with that during

10       Ms. Dinielli's deposition.  I don't believe

11       that that's the appropriate way to handle those

12       depositions.

13            MR. HENRY:  I disagree with your

14       characterization.  For one, it's not that I'm

15       not able to continue.  The time now is 7:36.

16       We've spent a considerable amount of time.  I

17       made an accommodation for you to start at

18       12:30.  You showed up 30 minutes later or

19       actually a little bit more than 30 minutes

20       later.  And I've made that accommodation

21       because of representations you made to me in

22       terms of your scheduling.

23            With that said, I'm -- there certain

24       documents that we requested that are subject to

25       our ongoing issues.  For instance, there was

V. Dinielli - 1/4/17

2      some policy paperwork that I requested

3      pertaining to FMLA policies.  This witness here

4      testified that there was some notes in her file

5      that she reviewed separate and apart from

6      Ms. Skates' file.  We requested those documents

7      pursuant to the rule which I cited on the

8      record earlier.  There are a number of

9      documents that will be forthcoming based upon

10     the testimony that this witness has provided

11     today.  Some of those requests, as I indicated,

12     earlier were made months ago and I never got

13     them.

14          So what I'm saying is is that if you're

15     agreeing to stipulate, it's not because I'm not

16     prepared to go forward, it's just that it will

17     save the time of me making an application to

18     the Court because of your failure to turn over

19     documents that you could have turned over

20     months ago.

21          Based upon this witness' testimony

22     earlier, she didn't indicate at all that you

23     even requested any documents or notes from her.

24     I couldn't even test her knowledge on what

25     documents were requested of her or did she

1                    V. Dinielli - 1/4/17

2        review because you raised the issue of

3        attorney-client privilege.

4              So to that end --

5              MS. PANICO:  I would like to correct the

6        record.

7              First of all, Ms. Dinielli did indicate

8        that she turned over her files to counsel.

9              MR. HENRY:  Not you.

10             MS. PANICO:  I indicated on the record

11       that I have, in fact, produced Ms. Dinielli's

12       file.

13             MR. HENRY:  That you may have.

14             MS. PANICO:  I indicated on the record

15       that we produced -- not that I may have.  I

16       know for absolute certainty that I did.  I also

17       indicated for absolute certainty that we

18       produced a copy of the Village's FMLA policy.

19       So if Mr. Henry --

20             MR. HENRY:  Again, I don't have that

21       policy.  Again, I asked for the Bates number.

22       You were able to look in your phone and find

23       e-mails dated --

24             MS. PANICO:  I have access to my e-mail on

25       my phone.  I don't have access to my case files

1                      V. Dinielli - 1/4/17

2          on my phone.

3              MR. HENRY:  You're stipulating that you're

4          going to produce this witness again.

5              Now, I don't want to have an

6          off-the-record discussion about the other

7          witnesses.  As you know, we've noticed these

8          witnesses months ago.  Whether you want to

9          believe -- whether we agree to disagree on when

10         you could actually confirm Ms. Dinielli's

11         deposition, the earliest of that confirmation

12         based upon your numbers would have been

13         December 30th, which was four days ago and

14         factoring the weekend and New Year's Day that

15         actually is only one business day ago.

16             That was what you stated on the record

17         when you read your phone and showed when you

18         believed you confirmed it.  And at the latest

19         in that spectrum, I requested a confirmation

20         yesterday after 4:00 which you confirmed at

21         6:03.

22             MS. PANICO:  I confirmed it on

23         December 30th, the same exact day that you

24         asked me whether or not we could proceed on

25         January 4th.

1                  V. Dinielli - 1/4/17

2              MR. HENRY:  I asked because you were

3       giving me dates outside of discovery and I

4       demanded that we get a date while within the

5       period of discovery and the e-mails will

6       reflect that you were going to get me at least

7       one witness as you testified and the rest

8       afterwards.

9              So, again, I'm not going to go back and

10      forth with you, especially with someone who

11      called me a prick in front of a whole

12      conference room.  What I'm saying is is that we

13      need some finality on these other witnesses.

14             Right now I have an associate in my office

15      that's in the process of preparing a motion to

16      compel.  I believe we've exhausted our good

17      faith efforts numerous times.  And my intention

18      was not to file this motion to compel because I

19      wanted to work with you.

20             My question to you is:  Can you provide to

21      me by January 6th dates for the witnesses that

22      were noticed months ago?

23             To that end, I know that you have some

24      issues with documents and productions.  And,

25      again, I have every document here that was

1                    V. Dinielli - 1/4/17

2          produced to you.  I could print them out, give

3          them to you again.

4              You gave me a whole list of issues that

5          you had with our production and I gave you

6          issues that I had with our production.  I

7          remember in a conference call with the Court it

8          was clear that the source -- best source of

9          information would have been a deposition for

10         the majority of the questions you had.  And I

11         had agreed to supplement our response, which I

12         believe was sent to you.  But one thing has

13         nothing to do with the other.

14             We noticed witnesses to be deposed.

15         Discovery closes in two days.  You promised

16         that you would produce those witnesses.  And

17         now it seems that you've made an about-face in

18         doing so and that promise to do so and I wanted

19         to get some finality.

20             MS. PANICO:  What I would like to indicate

21         on record is that Mr. Henry was supposed to

22         produce HIPAA authorizations back in June of

23         this past year.  To date, we are still looking

24         like for a HIPAA authorization for the physical

25         therapist that plaintiff saw related to wrist

```
 1                    V. Dinielli - 1/4/17

 2         injury.  Complaint indicates that the plaintiff

 3         saw physical therapist in Paragraph 81 of the

 4         complaint.  We've requested this numerous

 5         times.  We still have not received it.

 6              In addition, the plaintiff was served with

 7         discovery demands after months and multiple

 8         telephone calls with the Court in which we

 9         requested a motion to compel.  We requested

10         permission to file a motion to compel regarding

11         the plaintiffs failure to produce responses to

12         our document demands.

13              After multiple telephone calls with the

14         Court, Mr. Henry agreed that he would, in fact,

15         produce responses to our document demands.

16         However, rather than providing a good faith

17         response to our document demands, he simply

18         objected to every single demand and indicated

19         that he was objecting and that investigation

20         was ongoing with regards to our demands.

21              It is our position that this is wholly

22         improper and that Mr. Henry should be required

23         to indicate whether or not he is objecting to

24         the demand, whether or not the documents cannot

25         be located.  Essentially a definitive answer as
```

1                    V. Dinielli - 1/4/17

2        to whether or not these documents even exist.

3        We have no basis to believe that these

4        documents are not in existence at this point.

5            At this point, it seems that Mr. Henry is

6        simply refusing to produce them.  Although off

7        the record he has indicated that they don't

8        exist, I need something in writing from

9        Mr. Henry indicating with respect to each of

10       our demands whether or not the documents that

11       we've requested exist or not.

12           MR. HENRY:  They don't exist, on the

13       record.  And I told you this before, I told you

14       this in the presence of the Court's clerk,

15       whatever we haven't turned over to you does not

16       exist.

17           Also, let the record reflect that

18       Ms. Panico is merely reading from an e-mail

19       that she sent dated in or around December -- I

20       believe we have several e-mails here on the

21       same point, but it seems as though the earliest

22       of those was December 21st where in sum and

23       substance she wrote --

24           MS. PANICO:  Mr. Henry, can you please

25       allow me --

1                    V. Dinielli - 1/4/17


2              MR. HENRY:  I just want it clear on record

3         that the e-mail you're reading from is one

4         dated December 21st.

5              MS. PANICO:  Okay.

6              MR. HENRY:  And that's what I have here.

7         And that e-mail, again, predates the time that

8         we made our production to Ms. Panico of the

9         items that she is contending that she did not

10        receive.

11             In fact, Ms. Panico sent us an e-mail

12        thereafter, I'll give you the exact date, where

13        she actually --

14             MS. PANICO:  Mr. Henry, please allow me to

15        go --

16             MR. HENRY:  I'm not going to have you

17        lying.

18             MS. PANICO:  I'm not lying.

19             MR. HENRY:  Yeah, you are.  Because I'm

20        reading exactly from the e-mail that you

21        sent --

22             MS. PANICO:  Mr. Henry, please.

23             MR. HENRY:  -- and where you acknowledge

24        receipt.  I'm reading it right here.

25             MS. PANICO:  Time and time again I've

1                V. Dinielli - 1/4/17

2          demonstrated to you that what you consider to

3          be my lies are not actually lies but are

4          actually truth.  I've shown you e-mail after

5          e-mail indicating that you contend are me lying

6          and making misrepresentations are not

7          misrepresentations.

8               MR. HENRY:  You called me a prick off the

9          record, right?

10              MS. PANICO:  Mr. Henry, please.

11              MR. HENRY:  Is that a yes or no?

12              MS. PANICO:  Like I said, I'm not your

13         witness.  I'm not the one on trial here.  Can

14         you please refrain from harassing me?

15              MR. HENRY:  I'm not harassing you.

16              MS. PANICO:  In addition to what I set

17         forth already regarding the HIPAA

18         authorizations and plaintiff's failure to

19         response to discovery document demands --

20              MR. HENRY:  Disagree.

21              MS. PANICO:  -- we also requested that the

22         plaintiff -- within those documents demands to

23         produce phone records.  There's simply no

24         reason why Ms. Skates can't produce phone

25         records or at least authorizations for the

1                    E. Skates - 1/4/17

2           defendant to obtain her phone records from the

3           phone in which she alleges that she called in

4           sick to work.

5                  MR. HENRY:  One moment, please.

6                  May I please have the plaintiff,

7           Ms. Skates, sworn in.

8    E A R L I N E   S K A T E S, called as a witness,

9           having been first duly sworn by a Notary Public

10          of the State of New York, was examined and

11          testified as follows:

12   EXAMINATION BY

13   MR. HENRY:

14          Q    Ms. Skates, how many times have I asked

15          for you to produce to me all the documents that

16          you have?

17          A    Maybe twice.

18          Q    Did you produce to me all the documents

19          that you had?

20          A    I provided everything except out-of-pocket

21          monies.  That I -- my medications.

22          Q    Did I not provide you with a copy of the

23          requests that Freeport sent me for you to?

24          A    Yes.

25          Q    Did you not type the responses --

1                   E. Skates - 1/4/17

2        A    Yes.

3        Q    -- to each and every question?

4        A    Yes.

5        Q    Did you not respond truthfully and verify

6        those?

7        A    Yes.

8        Q    How many times did I have you come in and

9        notarize and sign a verification form to the

10       responses that you gave, that they were true?

11       A    Twice.

12       Q    As you're standing here today, are there

13       any documents that you have that I don't have?

14       A    No.

15       Q    As you're standing here today, are there

16       any phone records that you have that I don't

17       have?

18       A    I don't think so.

19       Q    Have you searched and looked as far and

20       high and low as you could to give me everything

21       that I've asked you for?

22       A    Yes.

23       Q    How many times have I called you here in

24       the middle of the night or in the middle of the

25       afternoon to make sure and reverify and double

1                    Proceedings

2          verify that what you wrote and gave me was

3          everything that was the case?

4          A     At least five times.

5          MR. HENRY:  Let the record reflect that I

6          just asked Ms. Skates questions on the record

7          pertaining to documents that she may or may not

8          have had that counsel believes that I'm somehow

9          holding on to.  Ms. Skates has testified under

10         oath, under oath right on the spot, that there

11         is no such documents.

12         MS. PANICO:  What I'm asking for are

13         proper responses to my discovery demands.

14         MR. HENRY:  Now you have the testimony of

15         Ms. Skates on the record that you can certainly

16         ask her on Friday or what date it is for her

17         deposition, on the 6th, you can follow up.  You

18         now have sworn testimony from her that there's

19         nothing else.

20         MS. PANICO:  If you want me to go through

21         each one of my discovery demands with

22         Ms. Skates right now, then I'm happy to do

23         that.

24         MR. HENRY:  Ms. Skates just testified that

25         there's nothing else further that she has.

```
  1                       Proceedings

  2          MS. PANICO:  But you're not asking her

  3     pointed questions.

  4          MR. HENRY:  You can do so on Friday.

  5          MS. PANICO:  I'm not going to waste my

  6     time compelling responses to discovery demands

  7     that should have been responded to several

  8     months ago.

  9          MR. HENRY:  The record will speak for

 10     itself.

 11          I'm done here.

 12          MS. PANICO:  Again, the last thing that

 13     we're still looking for are copies of the

 14     plaintiff's phone records or at least an

 15     authorization to obtain phone records from the

 16     telephones of Ms. Skates allegedly called to

 17     the Village to let them know that she's going

 18     to be out for the day.

 19          We are willing to produce the individuals

 20     who the plaintiff noticed for deposition

 21     contingent upon our receipt of these three

 22     outstanding items.  To date, Mr. Henry and the

 23     plaintiff have not produced any responses to

 24     our discovery demands.

 25          With respect to the interrogatories,
```

1                            Proceedings

2          nearly every single interrogatory was objected

3          to.

4                  With respect to our document demands, as

5          I've indicated already, every single demand was

6          objected to with an indication that there was

7          simply an ongoing investigation.

8                  There's still HIPAA authorizations that's

9          outstanding since the booking of June.  And

10         because of fact that Mr. Henry did not produce

11         the HIPAA authorizations until about a week or

12         two weeks ago, there's no way that we'll have

13         Ms. Skates' medical records by the time of her

14         deposition which obviously prejudices the

15         defendant.

16                 So because of the fact that Mr. Henry and

17         the plaintiff have been so delinquent in there

18         responses to our discovery demands, we simply

19         cannot, without prejudicing ourselves, produce

20         five more witnesses for Mr. Henry and the

21         plaintiff where we're still requesting and

22         looking for simple responses to our document

23         demands.

24                 MR. HENRY:  Ms. Panico, have you ever sent

25         me a deficiency letter?

1                         Proceedings

2          MS. PANICO:  Yes.  I sent you an e-mail

3    indicating --

4          MR. HENRY:  Have you ever sent me a

5    deficiency letter prior to December 21st of

6    2016?

7          MS. PANICO:  I have sent you probably --

8    I'm not the one you're deposing.  In case you

9    forgot I'm your adversary.  I'm opposing

10   counsel.  So don't speak to me like I'm the

11   witness here.

12         (Counsel speaking simultaneously.)

13         MR. HENRY:  Let the record reflect that

14   Ms. Panico is yelling at me.

15         MS. PANICO:  That's number one.

16         Number two, yes I have sent you multiple

17   correspondences since June.

18         MR. HENRY:  We're finished here.  We're

19   going to adjourn and the second part, as

20   counsel stated, and we are going to be

21   proceeding with our motion.  And there you have

22   it.

23         So do you have a date in mind now that we

24   can select?

25         THE WITNESS:  I don't know when --

1                        Proceedings

2              MS. PANICO:  I'll speak to Ms. Dinielli

3        after we leave.

4              MR. HENRY:  All right.  Thank you.

5              Let the record reflect now that the time

6        is 7:49 and that we believe we have at least an

7        hour and a half remaining.

8              And counsel is being served with a notice

9        to depose for -- dated for tomorrow for

10       Ms. Dinielli.  And subject to her providing me

11       with a new date, I would expect to see her

12       tomorrow.

13             MS. PANICO:  Mr. Henry is currently being

14       so served with a Notice of Deposition for

15       Ms. Skates for this upcoming Friday, January 6

16       at 10 o'clock a.m.  This was a second Notice of

17       Deposition.  Mr. Henry is unnecessarily

18       requiring me to jump through hoops.  Generally,

19       I have relationships with my adversary whereby

20       we can consent to production of witnesses.  But

21       Mr. Henry is now requiring me to produce a

22       second Notice of Deposition.

23  BY MR. HENRY:

24       Q    Ms. Skates, as you've already been sworn

25       in, did you not indicate to me, on

1                          Proceedings

2          January 6th that you were previously scheduled

3          for jury duty?

4          A     Yes.

5          Q     Did you not request from me something in

6          writing indicating when -- the date of that

7          deposition so you can produce if asked for?

8          A     Yes.

9                MR. HENRY:  Let the record reflect that I

10         requested from Ms. Panico on at least two

11         occasions prior to today this very same Notice

12         of Deposition as she gave to me now because

13         Ms. Skates needed it because of the impending

14         jury duty that she has so that she wouldn't be

15         running into any issues with it.  And that's

16         the reason why I asked.  Not because I wanted

17         her to jump through loops but because

18         Ms. Skates needed to ensure that her civic duty

19         of jury duty -- she wasn't in violation.

20         That's why I asked for this.

21               MS. PANICO:  Let record reflect that

22         Mr. Henry never informed me that Ms. Skates had

23         jury duty on January 6th.

24               MR. HENRY:  Why would I have to?  I just

25         asked for a notice, an updated notice with the

```
 1                    Proceedings

 2       dates because Ms. Skates needed it for personal

 3       reasons.

 4             MS. PANICO:  And, like I said, that's

 5       generally -- that is not the way that is

 6       generally professionally done.

 7             MR. HENRY:  E-mail says she needed it for

 8       personal reasons, I believe.  What more do you

 9       want me to say?

10             (Whereupon, at 7:52 p.m., the Examination

11       of this Witness was concluded.)

12

13                    _____

14                    VICTORIA DINIELLI

15

16       Subscribed and sworn to before me

17       this _____ day of _____, 2017.

18

19       _____

20       NOTARY PUBLIC

21

22

23

24

25
```

```
 2

 3                        I N D E X

 4    WITNESS                                    PAGE

 5    VICTORIA DINIELLI

 6    EXAMINATION BY

 7    MR. HENRY                                  15

 8    EARLINE SKATES

 9    EXAMINATION BY

10    MR. HENRY                                  285

11

12    PRODUCTION REQUESTS                  PAGE/LINE

13    Copy of documents reviewed by the witness   30/ 7
      on the date of the deposition
14
      Witness' job application with Freeport      38/21
15

16

17

18

19

20

21

22

23

24

25
```

2                              E X H I B I T S

3      PLAINTIFF'S              DESCRIPTION                    PAGE

4        EXHIBIT 1             Document                        134

5        EXHIBIT 2             Document                        143

6        EXHIBIT 3             Document                        153

7        EXHIBIT 4             document                        159

8        EXHIBIT 5             document                        189

9        EXHIBIT 6             Document                        203

10       EXHIBIT 8             Document                        221

11       EXHIBIT 25            Document                        232

12       EXHIBIT 36            Document                        253

13

14                  QUESTIONS MARKED FOR A RULING

15                              PAGE/LINE

16                              176/ 2

17

18

19

20

21

22

23

24

25

2   CERTIFICATION

3   STATE OF NEW YORK   )

4                      : SS.:

5   COUNTY OF NEW YORK  )

6          I, CHANDRA D. BROWN, a Notary Public for

7   and within the State of New York, do hereby certify:

8          That the witness whose examination is

9   hereinbefore set forth was duly sworn and that such

10  examination is a true record of the testimony given

11  by that witness.

12         I further certify that I am not related to

13  any of the parties to this action by blood or by

14  marriage and that I am in no way interested in the

15  outcome of this matter.

16         IN WITNESS WHEREOF, I have hereunto set my

17  hand the 25th day of January, 2017.

18

19         _____

20         CHANDRA D. BROWN, RPR, CLR

21

22

23

24

25